1
2
3
4
5

6

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

7

8
9
10

**Larry Joe Prince,**
Petitioner
-vs-
**Charles L. Ryan, et al.,**
Respondents

CV-08-1299-PHX-SRB (JRI)

**REPORT & RECOMMENDATION**
**On Petition for Writ of Habeas Corpus**
**Pursuant to 28 U.S.C. § 2254**

11

## I. MATTER UNDER CONSIDERATION

12
13
14
15
16
17
18

Petitioner, incarcerated at the time as a prisoner of the Arizona Department of Corrections in the Guadalupe County Correctional Facility in Santa Rosa, New Mexico,[1] filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on July 14, 2008 (Doc. 1).  Petitioner raises claims of failure to disclose evidence, juror misconduct and ineffective assistance of counsel.  On October 27, 2008, Respondents filed their Answer (Doc. 16).  Pursuant to Court Order, Respondents filed a Supplemental Answer (Doc. 27) on February 13, 2009.  Petitioner filed a Reply on March 2, 2010 (Doc. 55).

19
20
21

Pursuant to Court Order, Respondents supplemented the record on May 13, 2010 (Doc. 57), and on June 10, 2010 (Doc. 59, 60, 61, 62, 63, 64, 65, and 66).[2]  Petitioner supplemented the record on August 9, 2010 with his Reply to Objections (Doc. 70).

22
23
24
25

The Petitioner's Petition is now ripe for consideration.  Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28

26
27

[1] Petitioner has apparently since been released on parole, having been incarcerated for 25 years.  (*See* Notice of Change of Address, 8/31/10, Doc. 71.)

28

[2] Docs. 60 and 63 are duplicates of Docs. 59 and  61, respectively.

1  U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

2

3  ## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND

4  ## A. FACTUAL BACKGROUND

5      In disposing of Petitioner's Petition for Review from the denial of his first post-

6  conviction relief petition, the Arizona Court of Appeals summarized the facts as follows:

7          The trial evidence showed that, on October 12, 1984, petitioner
   and Kevin Cobey went to a friend's apartment. Petitioner brought along
8  his gun, a KG-99. Petitioner telephoned Richards and made plans to
   meet him outside the apartment. According to Cobey, after telephoning
9  Richards, petitioner said "he was pissed off," that "Rob didn't have his
   stuff or something," and that "he was going to shoot him."
10         Richards was with James Tabola at the time of the telephone
   conversation. After the conversation, Richards asked Tabola for a
11 baggy and flour. Richards said he was going to sell the flour as cocaine
   in order to recover $1,100 owed him by the person he had just spoken
12 to. He said the person he was going to meet had recently been released
   from jail on an assault charge. Petitioner had been released on an
13 assault charge the previous day.
           After his telephone conversation, petitioner left the apartment
14 carrying the KG-99 wrapped in a towel. Cobey testified that he heard
   a car pull up in front of the apartments and then heard a shot. He then
15 saw Richards' car pull away from the parking lot. Shortly afterward,
   petitioner telephoned Cobey. At petitioner's request, Cobey and a
16 companion picked him up at a nearby fast food restaurant. Petitioner
   was shirtless and did not have his gun. However, he was carrying some
17 of Richards' jewelry.
           Later, petitioner and Cobey used Richards' keys to enter
18 Richards' apartment. They searched for cocaine, money and jewelry,
   but found only jewelry, which they took. Cobey and petitioner returned
19 to the apartment that they shared. There, petitioner admitted the murder
   to Cobey, "describing how he had shot Richards in the face, rolled him
20 over to the passenger side of the car, and driven away."
           Cobey subsequently told Ken Hatch about the murder. Hatch
21 confronted petitioner. Petitioner initially denied any involvement, but
   later admitted the murder to Hatch. Petitioner "eventually told Hatch
22 details involved in the murder, including shooting Richards in the
   mouth, removing Richards from the driver's seat, and then driving to
23 the location where the body was found and walking away." Richards'
   body was found by a witness who, on the night of the murder, saw an
24 unidentified white male get out of the car and walk away. Petitioner is
   a white male.

25 (Exhibit F, Mem. Dec. 3/5/96 at 2-3.)[3]

26

27 _____

28     [3] Exhibits to the Answer, Doc. 16, and Supplements (Doc. 57, 59, 61, 62, 64, 65 and
   66 , are referenced herein as "Exhibit ___."  Exhibits to the Petition, Doc. 1, are referenced

**B. PROCEEDINGS AT TRIAL AND ON DIRECT APPEAL**

Petitioner was charged with first degree murder, proceeded to trial in March and April, 1986. (Exhibit F, Mem. Dec. 3/5/96 at 2.)  At trial, the following testimony was presented:[4]

**James Tabola** - James Tabola testified (Exhibit HHH, R.T. 3/19/86 at 98-125.) that he was an entertainment business associate of the victim, and he allowed the victim to use a closet in his home to store and process cocaine, in exchange for some of the cocaine. Tabola last saw the victim on Friday, October 12th (the weekend of the murder) at about 7:30 p.m. at Tabola's residence. He was wearing a gold necklace, watch, bracelet, and perhaps ring, and silver eyeglasses. He did not have a gun, and Tabola did not consider him a rough and tumble guy, but instead thought he was gay.

The victim was at Tabola's residence for about a half hour. While there, the victim appeared to receive a phone call, and then asked to borrow some flour and a baggie, so he could get back $1,100 that the guy on the phone owed him, by selling him the flour as cocaine. The victim described the person on the phone as having recently gotten out of jail for assault, and having no money.  Tabola did not know Petitioner.

The following Sunday, Tabola saw the victim's body on TV, wearing the same clothes he had worn on that Friday.  A week later, police interviewed Tabola and he related the same story.

Subsequently, Tabola had a felony conviction for possession of a narcotic for sale. Neither the victim nor Petitioner were involved in that case.

**Officer Martinez** - Louis Martinez testified (Exhibit HHH, R.T. 3/19/86 at 126-134) that he had been a police officer with the City of Phoenix since December 1974, and was on patrol on Sunday, October 14, 1984, when he receive a call at 9:13 am to go to the area of

---

herein as "Pet. Exhibit ___."  Exhibits to the Reply, Doc. 55, are referenced herein as "Reply Exhibit ___."

[4] Because this Court must ultimately evaluate the effect of various *Brady* material, and the validity of Petitioner's claim of actual innocence, the undersigned summarizes the testimony at trial and, hereinafter, the testimony at the various state court evidentiary hearings.

22nd and Danbury in Northwest Phoenix.  He found a Honda car  parked, with the windows rolled up and the drivers side door unlocked.  There was a man in the front seat, his feet sticking up on the passenger side and his head almost under the dash.  He opened the car, smelled the faint odor of gun powder, and then determined the man was dead. No one was around the car.  He then secured the area by blocking off the entire street.

After other officers arrived, he and Deceive Jennings went to the victim's residence and entered the apartment with a passkey obtained from the manager. The apartment was neat and furnished. They searched the home for people, but not for contraband.  No one was home.  He noted an answering machine with lights on, a bird in a cage, and keys scattered on the kitchen counter.  He left the apartment after about five minutes, leaving Detective Jennings behind.

**Detective Jennings** - Harry Jennings testified (Exhibit HHH, R.T. 3/19/86 at 134-153) that he was a retired detective with the Phoenix Police Department, and responded to the location where the victim's body was found.  He obtained ID from a wallet laying next to the body, and directed photographers to take some pictures.  There was no money, weapons or jewelry in the vehicle.  He spoke to the witness who lived in the area and reported the car.  He determined the death was a homicide based upon the position of the body and absence of weapons in the vehicle. He did not move the body and did not determine a cause of death other than noting the large amount of blood.

He then went to the victim's apartment and looked through the apartment for signs of the homicide having been committed there, but found the only thing unusual to be loose keys on the counter, one of which was to the front door of the apartment.  He had the keys and apartment photographed and dusted for fingerprints.  He removed two cassette tapes from the phone answering machine, and delivered them to Detective Butler.

He spoke to members of the victim's family to try to determine the last time the victim had been seen or spoken to.  He had no involvement with the case after that first day.

**Tammy Shaw** - Tammy Shaw testified (Exhibit III, R.T. 3/20/86 at 18-91; Exhibit JJJ, R.T. 3/20/86 at 1-12) that in 1984 she and her roommate Julie Swan met Petitioner and

1    Kevin Cobey.  She became Petitioner's girlfriend and Julie Swan became Kevin Cobey's

2    girlfriend.  Petitioner moved into her apartment in September, 1984, and continued to live

3    there at least three weeks after a search warrant was served on November 6, 1984.  Petitioner

4    possessed a KG-99 gun with a long handle and a clip of bullets which he kept in a brief case,

5    but she did not see it after the end of September, when Swan had asked him to get rid of it.

6    He also had .380 Colt.

7        Petitioner was dealing cocaine until sometime in October.  Rob Richards was at her

8    apartment the weekend before the murder and met with Petitioner in the bedroom.  Richards

9    was Petitioner's supplier of cocaine.

10       She knows nothing of Richards' death.  When interviewed by police she denied

11   knowing Petitioner.

12       Petitioner had been arrested on October 8th and she and Julie Swan picked him up

13   from jail on October 11th, and returned to their apartment.  Ron Rango, Kevin Cobey, and

14   Cheryl and Julie Swan were in the apartment at various times that day.  At 2:00 in the

15   morning on October 12th, Petitioner, Cobey and Rango left the apartment.  An hour later,

16   Cobey and Rango returned. She believed Petitioner had gone to this ex-girlfriend's house.

17   After an hour, Petitioner called and asked Cobey to pick him up. Neither Petitioner nor

18   Cobey had a car.  Cobey borrowed Swan's car.  Cobey left and returned with Petitioner an

19   hour later.  There was no partying going on that evening.

20       The next evening, on October 12th, 1984, when Shaw returned home from work,

21   Petitioner and Cobey were there and just getting up and showering.  A number of people

22   came to the home, and spent the evening partying, drinking and doing cocaine. People there

23   included Petitioner, Cobey, Swan, David (Swan's brother), Beth LeBrun, Tom Ellinghausen,

24   Rango, Petitioner's brother James, Martin Salazar, two girl cousins of Salazar, and a guy

25   named Steve.  Rango, Ellinghausen, and Cobey left  at about 8:00pm  and returned about

26   11:00pm.   Petitioner left the residence only once, at about 7:00pm for 10 to 15 minutes, and

27   she was told it was to talk to the victim.

28       Despite her testimony, she did tell Detective Butler that the partying had occurred on

1   Thursday October 11, 1984, and that on Friday, October 12th, she was home alone with
2   Petitioner, and Swan.  She told him that on that Friday night the victim came to the
3   apartment, and Shaw was able to describe his dress, which she described as things he always
4   wore, even though she had only seen him once.

5       Shaw obtained immunity for her testimony, with regard to her possession of marijuana
6   and cocaine.  The immunity was conditioned upon her truthful testimony.

7       Petitioner had a wad of money the weekend of the murder.

8       **Ronald Rango** - Ronald Rango testified (Exhibit JJJ, R.T. 3/20/86 at 13-29) that  he
9   was in the apartment of Petitioner and Kevin Cobey on Thursday, October 11, 1984, which
10   was the day Petitioner got out of jail.  People were drinking, but he did not

11       The following night was his wife's birthday, and they went out to dinner, where they
12   met Cobey and Swan at about 11:30 in the evening.  They returned home for the night, and
13   had a party attended by Swan and Cobey and others.

14       He had seen Petitioner with his gun, which may have been a KG-99, on several
15   occasions. Early Sunday morning the weekend of the murder, Kevin Cobey told him that the
16   victim had been shot.

17       **Randee Rector** - Randee Rector testified (Exhibit JJJ, R.T. 3/20/86 at 29-48; Exhibit
18   UUU, R.T. 4/2/86 at 26-45) that she had been Petitioner's girlfriend for about two years, but
19   is not currently.  Petitioner lived with her for about two weeks in the beginning of September,
20   1984.  At that time he had a KG-99 which she saw a few times.  A bullet from the gun was
21   left in her apartment, which she eventually gave to Detective Butler.

22       Petitioner was dealing cocaine in the summer of 1984, and he was supplied by the
23   victim, Rob Richards, who she had met a few times.  The last time she saw him was in
24   September shortly before he was killed.  Around the end of September, the victim came to
25   her house with Petitioner, and while they sat there Petitioner took the victim's key chain, and
26   was playing with it,  taking the two halves apart.  Rector denied telling Detective Butler that
27   Petitioner was not there when the victim was.

28       Petitioner moved out of Rector's house and moved in with Tammy Shaw around the

1    middle of September, 1984.

2         At about 1:00 in the morning, early Friday, October 12, 1984, she called Petitioner

3    and he came to her home and spent several hours.  Petitioner apparently called Kevin Cobey

4    to pick Petitioner up.  Cobey showed up at her door and said he was there to pick up

5    Petitioner.  Petitioner left.

6         Rector denied telling Detective Butler that Petitioner was violent and had beaten her

7    a number of times in the past.  But, they did argue that night that he came over, he pushed

8    her on his way out, and punched a hole through her door when she wouldn't let him back in.

9         Rector's stepmother was present during that interview with Detective Butler.  Butler

10   said he was going to get Petitioner if it was the last thing he did.

11        She was dating Kenny Hatch sometime in the summer of 1985.  While she was dating

12   Hatch, just before Petitioner was arrested, she was talking with Petitioner about reconciling

13   with him.  Hatch did not want her around Petitioner, and offered to get a peace bond to keep

14   Petitioner away.  One time while she was at Kenny Hatch's residence, Petitioner called,

15   Kenny answered, and handed her the phone.

16        A couple of month's before Petitioner's arrest, she spoke with Kenny Hatch at his

17   residence about Petitioner's involvement with the victim's death, including a conversation

18   between Petitioner and Kenny about the death.[5]  She had a second conversation with Hatch

19   at a bar about Petitioner's involvement.  She tried to discuss the matter with Petitioner.  She

20   does not believe Hatch to be honest.

21        She visited Petitioner in jail on a number of occasions.

22        **Heinz Karnitschnig** - Heinz Karnitschnig testified (Exhibit JJJ, R.T. 3/20/86 at 49-

23   78) that he was the Maricopa County Chief Medical Examiner, and autopsied the victim, Rob

24   Richards.  The victim had a close range gunshot wound to the left side of his face, where the

25   lips meet.  The bullet was lodged on right side of the back of the victim's neck.  There were

26   ───────────────

27        [5] The defense made an offer of proof in response to a successful hearsay objection

28   that Rector would testify that Hatch told her that he had asked Petitioner about the
     allegations, and that Petitioner had denied being involved. (Exhibit UUU, R.T. 4/2/86 at 25.)

1  linear scars over the back of his left index finger.  The victim died from the gunshot wound.

2  The bullet was recovered and given to a police officer.

3      The body was beginning to decompose, and the condition was consistent with being

4  shot and then left in a vehicle,  and not discovered for as much as 36-37 hours, or as little as

5  24 hours.  The blood in the vehicle was consistent with the victim being shot in the vehicle.

6  The powder tattooing was consistent with a shot from several inches to about a foot away.

7  A toxicology report reflected alcohol and cocaine in the victim. The lividity, the fixed, purple

8  coloring of the skin, was consistent with the victim being placed, within four hours of his

9  death, in the position in which he was found.

10      **Thomas Ellinghausen** - Thomas Ellinghausen testified (Exhibit KKK, R.T. 3/21/86

11  at 2-63; Exhibit LLL, R.T. 3/21/86 at 3-36) that he is a fifth grade school teacher, and in

12  October 1984 lived at the same apartment complex as Kevin Cobey.  Cobey lived with him

13  for several weeks.  He met Petitioner through Cobey.  On Thursday, October 11, 1984, he

14  went to the apartment of Cobey and Petitioners' girlfriends.  Petitioner had just gotten out

15  of jail, and they were celebrating.  Tammy Shaw and Julie Swan were there.  Julie left to visit

16  a friend in the hospital. Ron Rango and his girlfriend were also there.  Ellinghausen was there

17  for one-half to three hours, had a few beers and left  by himself.

18      He had seen Petitioner in possession of a KG-99 firearm, both earlier that summer and

19  on October 11, 1984.  The weapon was sitting in his briefcase, which was open.

20      He did not go to Shaw and Swan's apartment on Friday, October 12, 1984, but was

21  at home. At about 7:30pm, Petitioner and Kevin Cobey came to his home.  Because of

22  Cobey's cocaine possession and Petitioner's gun, he had asked Cobey to move out about a

23  month before.  Cobey still had some things in his home.

24      After some time watching a game together, Petitioner went to use the phone, and then

25  left the apartment.  Ellinghausen used the restroom and shaved in preparation for a date, and

26  when he finished, Cobey told him that Petitioner had called and they needed to go pick him

27  up.  They drove to a Jack in the Box, and picked up Petitioner, who was sweating, not

28  wearing a shirt, not carrying anything, and was unusually quiet.  They returned to his

1   apartment, and Petitioner and Cobey left in Tammy Shaw's car. Ellinghausen then went on

2   his date.  He thought it was strange that they had asked him to pick up Petitioner even though

3   they had a vehicle.

4        He had met the victim, Rob Richards on two occasions. The victim was Petitioner's

5   cocaine supplier. He learned of the victim's death and the search of Shaw's apartment from

6   Cobey. Cobey was uncertain whether Petitioner had killed the victim, but was concerned that

7   he would himself be implicated.

8        **Kevin Cobey** - Kevin Cobey testified (Exhibit LLL, R.T. 3/21/86 at 37-96;

9   Exhibit MMM, R.T. 3/24/86 at 2-73; Exhibit NNN, R.T. 3/24/86 at 4-14) that he had been

10  a co-defendant with Petitioner, charged with murder.  He pled guilty to burglary in exchange

11  for no jail time, which he insisted on because of fear for his life in prison.  Subsequent to his

12  plea, he was arrested for cocaine possession, and in exchange for an agreement not to

13  prosecute those charges, his plea agreement was modified to permit jail time, but no prison

14  time.

15       He had known Petitioner since the summer of 1982 or 1983.  He lived in the same

16  apartment complex as Tom Ellinghausen, and lived in his apartment for about a month,

17  before moving in with Julie Swan and Tammy Shaw.  In October, 1984, he still had some of

18  his things in Ellinghausen's apartment.

19       In October, 1984, Petitioner carried a KG-99 firearm which he often kept in a brief

20  case with cocaine.  Swan and Shaw objected to the gun being in their apartment.  Petitioner

21  was using and selling cocaine.  He sold mostly to their group of friends in small quantities.

22  Cobey got cocaine from Petitioner, and Petitioner did not charge him for it.  Cobey helped

23  petitioner cut, weigh and deliver the cocaine and picked up money for him.  They had cut

24  cocaine at Ellinghausen's apartment.

25       Cobey met Rob Richards through Petitioner, and knew Richards to be selling cocaine

26  to Petitioner.

27       Approximately several weeks to a month prior to the shooting, Cobey, Kenny Hatch,

28  Petitioner's brother, and Jimmy Pechac went to Smitty's and bought ammunition for

1   Petitioner's gun.  Petitioner was not with them.  Kenny Hatch may have been the one that
2   bought the ammunition.

3       On October 11, 1984, Petitioner was released from jail, and they had a party at
4   Tammy and Julie's apartment, which was attended by Petitioner, Cobey, Swan, Shaw, Martin
5   Salazar, Petitioner's brother, Rango and his girlfriend Cheryl, Ellinghausen, and another
6   small group of people.  Various ones were drinking and/or using cocaine.  He did not leave
7   the apartment with Petitioner.

8       On Friday, October 12, 1984, Cobey and Petitioner hung around the apartment.  Ron
9   Rango and Cheryl came to their apartment, but Ellinghausen did not.  He denied leaving the
10  apartment with Rango and Ellinghausen.  He did eventually leave with Petitioner at about
11  6:30 p.m. to go to Ellinghausen's apartment to get some clothes.  They went in Shaw's car,
12  because Cobey's El Camino was broken down.  The KG-99 was with them.

13      Petitioner told Cobey he was upset with the victim because of a cocaine deal, and that
14  the victim owed him about two or three thousand dollars.  While at Ellinghausen's apartment,
15  Petitioner made a phone call which Cobey believed was to the victim.  The victim then called
16  back and said he was coming over.  Petitioner was upset and said he was going to shoot the
17  victim.  Petitioner had made similar comments in the past.

18      Ellinghausen went into the bathroom.  Petitioner picked up his gun, put a towel over
19  it and went outside.  Then a few minutes later Cobey heard the victim's car pull up, and then
20  Cobey heard a shot.  When he pulled back the curtain, the car was pulling away.  He initially
21  told Detective Butler that he heard two shots.  Ellinghausen was in the bathroom at the time
22  of the shot.  When he came out, Cobey asked him if he had heard something.

23      About twenty minutes after Petitioner had walked out of the apartment, the phone
24  rang, and it was Petitioner calling to be picked up at the Jack-in-the-Box.  They left to pick
25  up Petitioner in Ellinghausen's car because Cobey did not drive Swann's car.

26      When they picked up Petitioner, he got in the backseat.  He was not wearing a shirt,
27  was not carrying his gun, and had some jewelry in his pocket.  He was pale, shakey, and
28  breathing quickly.  They returned to the apartment, Cobey got some shirts, they drank a beer,

1   and then Cobey and Petitioner left in Swann's car and went to the victim's apartment to look
2   for money and cocaine.

3   Petitioner had a key and they went in the apartment.  Petitioner searched the
4   apartment, found a gold nugget bracelet which he took, and they left and went to Swan and
5   Shaw's apartment.

6   Only Swan and Shaw were at the apartment.  Cobey asked Petitioner what they were
7   going to do, and Petitioner said not to worry that he would take care of it.  Petitioner
8   described to him how he shot the victim in the face, rolled him into the passenger seat and
9   drove away.  Petitioner said he had taken care of the bullet cartridge.

10  Sometime later, other people began to arrive, including Petitioner's brother James,
11  Martin Salazar and a couple of girls.  It got noisy, so Swan got angry and left.

12  The next night, Saturday, Cobey and Julie Swan went to Gatsby's with Ron Rango
13  and Cheryl, and eventually went to Ron and Cheryl's home.

14  A week later, Cobey told Ellinghausen that Petitioner had shot the victim, but didn't
15  tell him how it happened.  He also told Petitioner's friend Ken Hatch that Petitioner had shot
16  his coke dealer, that they had gone to the victim's apartment to find his stash and found
17  nothing.

18  Several weeks later, the police served a search warrant on Cobey at Swan's apartment.
19  Cobey denied knowing anything about the murder.

20  Cobey denied having testified at Petitioner's drug trial that he had never been
21  involved with Petitioner in cutting or dealing cocaine.

22  Cobey did not see Petitioner's KG-99 after the night of the murder.  Petitioner may
23  have told him that he melted it down.

24  **Julie Swan** - Julie Swan testified (Exhibit NNN, R.T. 3/2/86 at 14-64) that in October,
25  1984 she was renting an apartment with Tammy Shaw.  Petitioner and Kevin Cobey were
26  staying in the apartment.  Petitioner was Shaw's boyfriend and Cobey was her boyfriend.
27  She had met Petitioner and Cobey that August or September, along with Ron Rango and
28  "Tom" at Graham Central Station.  Petitioner had cocaine, scales, sifters and snorting tubes

1  in the apartment.   Petitioner used that equipment to weigh out and package cocaine.
2  Petitioner was dealing cocaine, and Cobey worked with him.

3  She would get cocaine from Petitioner, but Petitioner would not charge her for it.
4  Cobey, Rango and Ellinghausen also got cocaine from Petitioner without paying for it.

5  Petitioner would drive Shaw's cars: a Camaro and a Torino.

6  Petitioner possessed a KG-99 firearm in September and October.  The gun was usually
7  wrapped in a towel or in Petitioner's brief case.  She had complained to Shaw and Petitioner
8  about the gun, but Petitioner continued to have guns in the house.  She did not see the KG-99
9  again after October 12th, but Petitioner had a new gun a week or two later.

10  She met Rob Richards, the victim, in October, about a week before his death, at her
11  apartment.  He met with Petitioner in Tammy Shaw's bedroom.

12  Her friend's fiancee was in an accident on October 10, and in the hospital.  Petitioner
13  got out of jail on Thursday, the 11th.  She and Shaw gave him a ride home from jail.  Then
14  she went to the hospital.  When she got home, there was a party going on.  The people there
15  included Tammy Shaw, Petitioner, Cobey, Ron Rango and Cheryl, and Tom Ellinghausen.
16  They were drinking and using cocaine.  She drank and used cocaine.  Petitioner, Cobey and
17  Ron Rango left at some point, leaving just the girls there.  Petitioner and Cobey returned.
18  She is not certain whether Rango returned.

19  She overslept the next morning, Friday October 12th, went to work at noon, worked
20  until 1:30 or 2:00 and then went to the hospital and stayed until about 9:00.  At about 6:00
21  she called Shaw and asked her not to have a party.  When she got home, Tammy was the only
22  one there, and she repeated not wanting anyone in the apartment because her friend's fiancee
23  had died.  Around 11:00 there was a commotion from a party going on.  Petitioner and Cobey
24  were there, along with a number of other people.  She left the apartment and went driving for
25  an hour and a half or two.  When she returned, the party was still going on.  She stayed out
26  by the pool until 3:00 or 4:00 in the morning.

27  The next day, Saturday, she and Cobey went out with Ron and Cheryl.

28  When she learned of the murder she spoke with Petitioner who denied knowing

1  anything about it, suggested it was over a dope deal,  and told her where he was and who he
2  was with when it happened.

3  She and Cobey had been engaged, eventually moved in together in a different
4  apartment, but no longer see each other, and she asked the prosecutor to keep her from
5  having to see him at trial.

6  **Ken Hatch** - Ken Hatch testified (Exhibit NNN, R.T. 3/24/86 at 64-106; Exhibit
7  OOO, R.T. 3/25/86 at 13-75) that he had known Petitioner for 15 or 16 years, and Kevin
8  Cobey for two years. He had only seen Cobey a few times as of October, 1984.  Hatch and
9  Petitioner saw each other at least every month or so. Petitioner would provide him with
10  cocaine that they would do together. Petitioner would not charge him. Petitioner took over
11  Hatch's apartment.  Hatch never met the victim.

12  About two weeks after  Sunday, October 14, 1984, he talked with Cobey about the
13  victim's death. At that time Hatch had not seen Petitioner for a month or so.  Cobey said that
14  Petitioner had shot his dealer a couple of weeks prior.  Cobey claimed he had seen Petitioner
15  shoot the victim, and was standing just a couple of feet away.  Cobey said the Petitioner's
16  gun was melted down.

17  Later that night, Hatch spoke with Petitioner who at first denied involvement but then
18  Petitioner told him that Petitioner had shot his dealer once in the mouth while the victim was
19  sitting in his car, pushed him over and drove away.  Petitioner claimed the victim was coming
20  to shoot him.  Petitioner said the dealer had a .357 weapon in the car, which Petitioner later
21  put in his pants.  He said he shot the victim with his KG-99, and that it happened in the
22  parking lot of the apartment complex.  Petitioner said he picked up the shell and put it in his
23  pocket, drove the car six or seven blocks away, parked it and walked away.

24  A couple of months later, he again spoke with Petitioner about the shooting.
25  Petitioner said he and his brother had been arrested and Petitioner had a gun on him.  He said
26  the murder weapon was melted down.

27  Either Petitioner or Cobey told him that after the shooting Cobey had taken the gun,
28  and gone to the victim's apartment after the shooting, where there were a couple of guns and

1  some jewelry taken, but no cocaine found.

2      Hatch had seen Petitioner in possession of a KG-99 in August.  He kept it in his

3  briefcase with his cocaine, which he described as his life.  Petitioner said he needed the gun

4  to protect himself.  Hatch did not see the gun after the murder.  Petitioner told him that it had

5  been melted down.

6      About a month before the murder, Hatch had taken Cobey to Smitty's to buy 9mm

7  ammunition.  Petitioner's brother went with them.

8      About a month before Petitioner was arrested, Hatch was living with Petitioner's ex-

9  girlfriend Randee Rector, and Petitioner called and threatened Hatch because of the

10  relationship.  Petitioner told Hatch he was going to blow Hatch's head off, and told Rector

11  he would cut Hatch's throat.  So Hatch contacted Roskey, whose brother was an undercover

12  narcotics officer to tell him about the murder.  He also talked with "Tom" about it, but denied

13  talking with Tom Ellinghausen about the victim's death.

14      Rector eventually returned to dating Petitioner.  Hatch told Rector what he knew about

15  the murder.  Hatch told his work partner, Kenny Goodman, and his brother-in-law, Larry

16  Roskey, about what Petitioner told him.

17      Hatch was told by Jimmie Pacheco where the melted gun was put.

18      **Douglas Haese** - Douglas Haese testified (Exhibit OOO, R.T. 3/25/86 at 76-81) that

19  he was a Phoenix Police officer, and on October 8, 1984 he stopped a vehicle driven by

20  Petitioner, who he arrested on a misdemeanor assault warrant.

21      **Elaine Richards** - Elaine Richards testified (Exhibit OOO, R.T. 3/25/86 at 81-97) that

22  she was the mother of the victim, who was very fastidious about his clothes, laundry, and

23  vehicles.  He carried two sets of keys, with the car keys on a separate ring to avoid scratching

24  the steering column.  He had a pager and an answering machine.  He also would on occasion

25  carry large sums of money.  He had worked for the family engraving business, and left for

26  a time to  work for a different company.  She had no knowledge of his involvement with

27  cocaine.

28      **Pamela Richards** - Pamela Richards testified (Exhibit OOO, R.T. 3/25/86 at 97-118;

Exhibit SSS, R.T. 3/31/86 at 2-5) that  she was the victim's sister, that he was extremely conscientious about cleaning his vehicles and his clothing, had much of his clothing laundered, and it would be surprising for him to have someone help him with his laundry. He was possessive about his vehicles and did not let his siblings drive his car.  He had two key rings connected by a silver connector.  He had a phone answering system that he could access messages away from his home.  He was conscientious about checking his messages. He would regularly carry several hundred dollar bills.  She was not aware her brother was involved in cocaine dealing.  He was in a bowling league that bowled 7:00 to 11:00 on Tuesdays or Thursdays.  He regularly wore a nugget on a gold chain, a ring, a gold bracelet and a watch.

She saw television coverage on the murder on Sunday, October 13th.  They looked for coverage on Monday evening, on the different stations so they could videotape it.  They saw no coverage on that day.

Sammie Yates was the victim's best friend, and the person he was buying his cocaine from.

**Steven Richards** - Steven Richards testified (Exhibit OOO, R.T. 3/25/86 at 119-168) that he was the victim's brother. He lived with the victim for several months after they moved out of their parents' home.    The victim kept his car very clean.  He only allowed Steven to borrow his car once, and Petitioner's claims of having borrowed the car or parking for the victim at their bowling league were not characteristic.  He had two key rings, one with car keys and the other with house keys, joined by a connector.  He put plastic colored tags on the keys.  He was meticulous about his apartment and his clothes, having them dry cleaned or washing them himself.  He was in a bowling league with the victim that bowled every Tuesday or Thursday night.  The victim routinely carried cash.  He had an answering machine with a device so he could retrieve messages remotely.  He usually wore a necklace, watch, and a thick bracelet, all gold.  He wore prescription glasses.  He had purchased some chains.  When they went to clean out his apartment after his death, all the jewelry was gone, but the cases were left.  He had suspicions that his brother was involved in cocaine

1   transactions. He had two briefcases, one for cassette tapes, kept a calendar and telephone

2   numbers. The victim told him he had a handgun that he kept in his apartment. The victim

3   worked for the family business, and then another firm, and wanted to get into the restaurant

4   business. He did not know Petitioner and had never heard him discussed.

5     **Larry Roskey** - Larry Roskey testified (Exhibit OOO, R.T. 3/25/86 at 168-189) that

6   he is the brother-in-law of Ken Hatch, who in December of 1984 told him that Petitioner

7   admitted killing Rob Richards.   Roskey knew Petitioner through Hatch, and they had

8   socialized together.  Hatch did not want to go to the police and didn't want Roskey to tell

9   anyone.   Roskey's brother Richard is a detective for the Maricopa County Sheriff's

10   Department. Roskey did not tell his brother about Petitioner, until the summer of 1985, when

11   Hatch asked him to.  He did not know the victim and does not know anything about his

12   death.   He never saw Petitioner  with cocaine or weapons.   Hatch had several pistols,

13   including at least one 9mm pistol. He believed Hatch to be truthful on things of importance.

14     **Richard Roskey** - Richard Roskey testified (Exhibit PPP, R.T. 3/26/86 at 4-14) that

15   he was a detective with the Maricopa County Sheriff's Office.  Ken Hatch was the brother-

16   in-law of Richard's brother Larry Rosky.  On August 4, 1985, his brother contacted him

17   saying Hatch had information about a homicide.  Hatch came to Richard Roskey's home and

18   told him that Petitioner had killed someone, and that Detective Butler was handling the case.

19   He and Hatch then met with Detective Butler.  In the narcotics world, the term "burn" refers

20   to someone who arranges to buy drugs, gets them without paying for them, sells them, and

21   then doesn't pay his seller for them.

22     **Charlene Chigges** - Charlene Chigges testified (Exhibit PPP, R.T. 3/2/86 at 14-29)

23   that she was a cocktail waitress at Bobby McGee's, where she met the victim.  They went

24   out on one date on Wednesday, October 10, 1984.  The victim was to call her on Friday so

25   they could go out on Saturday, but he did not call.  The victim was a neat dresser. When they

26   went on their date, they took the victim's car, which was immaculate.  They stopped for gas,

27   the victim spilled gas on the car and complained that he had just washed the car.  The car's

28   windshield was spotless.  The victim had given her roses at her home, and gave her a gold

1   bracelet after dinner.  After the victim's death, she returned the bracelet to the family because

2   it was a family tradition.

3       **Billy Butler** - Billy Butler testified (Exhibit PPP, R.T. 3/26/86 at 29-165; Exhibit

4   QQQ, R.T. 3/27/86 at 3-157; Exhibit VVV, R.T. 4/3/86 at 167-193; ) that he was a detective

5   with the Phoenix Police Department.  On October 14, 1984, at 11:00 a.m. he responded to

6   the  scene of a homicide, which had been secured by another officer.  Another officer was

7   taking photographs and two print identification technicians were examining the vehicle and

8   surrounding areas for prints.    The car's upholstery and floor were very clean.  There was

9   blood on the drivers side door, but none where the door and sill overlapped. There were

10  blood splatters on the passenger door and around the glove box.  There were windshield

11  wiper marks on the windshield.  The key was still in the ignition on a bent and paritally open

12  key ring.  They could not remove the key from the ignition.   The victim's face was caked

13  with mud.  There was coagulated blood and dried blood on the passenger floor of the car, and

14  blood on the victim's shirt.  The only money in the car was some change on the seat.  There

15  was no money in the wallet found in the car.  There was no weapon in the car.  The victim's

16  shirt pocket was ripped, and his pants zipper was half way down.  The only jewelry he had

17  on was a watch and a ring.  No jewelry was found in the vehicle.  The car was impounded

18  and was later processed by DPS with a laser for latent prints.  He could not see the entrance

19  wound for the blood, and did not see an exit wound.  He observed the autopsy, including the

20  removal of a bullet and bullet fragments from the mouth and back of the head.  The bullet

21  was impounded.

22      He obtained a 9mm shell casing and bullet from Randee Rector.  She told him that

23  Petitioner was a very violent person and had beat her up quite a few times in the past.

24      He interviewed Tammy Shaw at her work, in a normal tone of voice.  She at first

25  repeatedly denied knowing anyone named Larry.

26      He also interviewed Julie Swan in a normal tone of voice.  She reported that she first

27  learned of the victim's death while seeing it on TV with Petitioner, and Petitioner said he

28  probably was killed because he owed somebody money for dope.  When he interviewed her

a second time, she said she learned of the death when Petitioner telephoned her.

On November 6, 1984 he executed a search warrant at Shaw and Swan's residence and at Petitioner's grandfather's residence.

He interviewed Tom Ellinghausen after Petitioner and Cobey were arrested.  He interviewed him in a normal tone, and then put pressure on him by raising his voice and accusing him of lying by raising known facts.  Ellinghausen was nervous during the interview.

He interviewed Cobey at the time he was arrested, and used a pressure technique, and got him crying.

His first interview with Petitioner was on November 1, 1984, and Butler had him fingerprinted and photographed five days later.  During the interview, Petitioner admitted having been released from jail on October 11, 1984.  He admitted knowing the victim, and being with him at about 6:30 p.m. on October 12, 1984.  He described the victim as his cocaine dealer, and said that on that night he gave the victim $1,250 that he owed him plus $2,500 from another person to buy cocaine.  Petitioner admitted he was buying cocaine, cutting it and selling it.  Petitioner said he met the victim in the parking lot on 7th Avenue , the victim was in his car, and Petitioner gave him the money.  He said the victim was wearing parachute pants and white boots. Petitioner said that when he handed the victim the money as the victim sat in his car, Petitioner may have touched the roof by the driver's side.  He did not say he touched the windshield wipers.  He claimed he had driven the vehicle once, a long time ago to park it when they were bowling, and volunteered that he had touched the door handle, steering wheel, and cassette. Petitioner appeared very nervous.

On November 6 or 8, 1984, Petitioner was stopped on a court order, and finger printed.  He had .380 Colt in the car when he was stopped.  Butler interviewed him at the police station.  Petitioner told him that after he was released from jail, he was picked up by Shaw and Swan, went to their apartment, had a party and got drunk. He said the people at the part were Swan, Shaw, Cobey, Rango and Cheryl.  Petitioner said he had known the victim for one and one-half months.  He met him at the Service Station Bar, which is directly south

from where the body was found.  Petitioner said that he had been at the victim's apartment two weeks prior to his death and did the victim's laundry, and then they went bowling. Petitioner denied ever being upset with the victim.  Petitioner said on October 12, 1984 he was wearing parachute pants, tennis shoes and a black shirt. Petitioner said the victim carried two sets of keys joined by a connector.  He said he had driven the victim's car once, and that was on Monday, October 8, 1984 to a Circle K to get something.

Petitioner said he had just purchased a .380 Colt gun, but denied owning any other gun.  He denied ever having seen or owned  a KG-99 gun, but volunteered that his brother had a 9 millimeter Luger.  Butler had not mentioned that a KG-99 is a 9 millimeter gun.  The search at Petitioner's grandfather's home had produced the box of a KG-99 in Petitioner's brother's bedroom.  Petitioner admitted having seen the box two nights before.  Petitioner was nervous.

He interviewed Petitioner a third time on August 23, 1985.

Petitioner told him that he had been arrested on a traffic citation on the day he had driven the victim's car.  However, he had been arrested driving a brown Ford, not a red Honda as owned by the victim.

The police received two calls about the murder from an anonymous male caller, who provided Petitioner's phone number.

When Butler interviewed Steve Richards on October 14, 1984, they discussed the victim's involvement with cocaine and Richards provided the name Steve Compton as one of the victim's buyers.

He did not have the splatters in the victim's car tested to confirm they were blood, nor did he have splatter analysis done, nor have the car vacuumed. He did not have the gun residue from the tattooing analyzed, although it could be used to identify the manufacturer of the bullet.

The body was reported by Doug [Daniel] McClung.

He had the fingerprints checked against Petitioner, Petitioner's brother, Kevin Cobey, and Ken Hatch.  He did not have them checked against Larry Roskey or Tom Ellinghausen.

- 19 -

1    On November 21, 1984, he interviewed Jeff Pappe.  Pappe told him that James Prince

2    demanded money back on the KG-99, and that he didn't argue with him because he was a

3    a bad dude.  He said he had fired the KG-99 on the Indian reservation, but was quite drunk

4    at the time, and couldn't identify the location.   He described it as being between 99th and

5    150th and that an Indian on horseback rode up and told them there was cattle in the area and

6    they could not be shooting there.

7         In August of 1985, Tom Ellinghausen told him that Petitioner and Cobey had been at

8    his house after sundown, but could not remember a more specific time.

9         The investigation was stalled from December, 1984 until Ken Hatch came forward in

10   August of 1985.  He interviewed Swan and Shaw because an anonymous caller had given

11   him the phone number at their apartment and had referenced a "Larry" who had just gotten

12   out of jail.

13        There was rain in Phoenix at Sky Harbor Airport on October 11th and 12th, 1984.

14        When the prosecutor interviewed Martin Salazar just before trial, Butler was present.

15   Salazar said the only occupants of his van were himself, Art, Petitioner and Ken Hatch. He

16   said he could not hear anything of the conversation between Hatch and Petitioner.

17        When the prosecutor interviewed Randee Rector just before trial, Butler was present.

18   She said there was only one conversation between she and Hatch about Petitioner's

19   discussion with Hatch.  That discussion took place at Chapter Eleven, and Rector's friend

20   Chris Patella was present.  She did not say there was a second conversation between just her

21   and Hatch.

22        Contrary to Petitioner's claims, Petitioner never proposed being put in a lineup.

23   **Raymond Gieszl** - Raymond Gieszl testified (Exhibit QQQ, R.T. 3/27/86 at 157-174;

24   Exhibit RRR, R.T. 3/28/86 at 3-89) that he was a criminalist for the City of Phoenix, trained

25   in examining firearms.  He examined  and dismantled the bullet from Randee Rector and he

26   examined the bullet from the victim.

27        The bullet from the victim was a .38 or 9 millimeter caliber.  A KG-99 uses a nine

28   millimeter Luger cartridge.  The bullet appeared to have been manufactured by Remington

Peters, was a hollow point Luger bullet, from an early 1970's jacket design, indicating it was a 115 grain bullet, The cartridge from Randee Rector was also a 9 millimeter cartridge with a 115 grain jacketed hollow point bullet.  It appeared to be the same design, caliber and dimension as the bullet from the victim.  It was of the type that would be fired by a KG-99.

A KG-99's rifling is six lands and grooves, a right-hand twist and the land and groove widths were approximately equal.  That was the same rifling as found on the bullet from the victim.  At least six other firearms have a similar caliber and rifling characteristics.

A KG-99 is a semi-automatic hand gun with a high-capacity magazine, and is uncommon in the west.

The powder tattooing on the victim indicated the shot was fired from two to six inches away.

**Mitchell Rae** - Mitchell Rae testified (Exhibit SSS, R.T. 3/31/86 at 7-37; Exhibit VVV, R.T. 4/3/86 at 138-148)  that he was a police officer for the City of Phoenix in the homicide detail, with experience in narcotics.  He searched Shaw and Swann's apartment and Petitioner's grandfather's house on November 6, 1984.

He served an order for fingerprints on Petitioner on that day.  Petitioner had been stopped by other officers. Rae arrived ten to fifteen minutes later.  A Colt 380 semiautomatic pistol had been found wedged between the center console and the front passenger seat.  A clip for the gun was also seized.  A box of PMC 9 millimeter Lugar cartridges was in the glove box.

Another clip for the Colt gun was subsequently found between the mattress and box springs of the bed in Tammy Shaw's room.  Shaw said it belonged to Petitioner, and that Petitioner had just recently acquired the gun, and had had it for several weeks. Shaw said that Petitioner had been keeping a KG-99 in the apartment, but she didn't know who it belonged to.  She had last seen it a week and a half to two weeks before the search.  The conversation with Shaw about the Colt and the KG-99 were separated by different conversation about some papers, a blue bag, etc.

In Shaw's room, they also found drug paraphernalia, including a grinder used for

cutting cocaine, sifters, a razor blade, snort tubes, scales and vial of inositol, used for cutting cocaine by increasing the quantity.  That type of paraphernalia is not normally possessed by someone who is merely a user, but by a seller wanting to increase his profit.

At Petitioner's grandfather's house they found a box for a KG-99.  It was in plain sight in a bedroom.  Petitioner's brother, James Prince, told him he bought the gun for $150 from a guy in a bar, and that he sold it to a guy at the Statler Lounge.

He and Detective Butler went to a rifle range to search for bullets in connection with the case.  The did so based on information that an owner of the KG-99 had done target practice at that range.  He dug the bullets out of the earth backstop for a whole day. Detective Butler went out again on a different day.

In his experience, narcotics dealers keep records of people who owe them money. The exhibits of the victim's black book and papers appeared to be such records.  The entries recorded under the initials "LY" were consistent with a running balance totaling $1250.  The circling on the last page is indicative of a past due debt.

Kevin Cobey told him that he had overheard a conversation by Petitioner in which he stated he was expecting to receive some cocaine Friday night, October 12, 1984.  Cobey told Rae that Petitioner said the victim owed him $3,000, and he had been trying to locate the victim all weekend.  Cobey said he thought he had been at a big party at Shaw and Swann's apartment on Thursday, October 11, 1984, and at Gatsby's with Swan, Ron, and Cheryl on that Friday.  Cobey said he was drunk most of the time and did not really remember.

He took a photograph of Petitioner and six other people to the Service Station Bar, but none identified Petitioner.

He called Interdynamics and learned that the KG-99 purchased by James Prince had six lines and six grooves and a right hand twist, but not all KG-99s did.

**Steven Anderson** - Steven Anderson testified (Exhibit SSS, R.T. 3/31/86 at 37-74) that he was a latent print examiner with the Arizona Department of Public Safety.  He examined the inside of the victim's vehicle for latent prints, using black powder, super glue, and lasers.  No prints were obtained with the laser.  He obtained prints from Petitioner.

1    A latent print taken from the windshield wiper control of the victim's car matched

2 Petitioner's right ring finger.  No prints were obtainable from the gearshift or steering wheel,

3 or light switch.

4    **Daniel McClung** - Daniel McClung testified (Exhibit SSS, R.T. 3/31/86 at 76-104)

5 that, while at his home,  he noticed the headlights and then the brake lights of  a car parking

6 in front of a neighboring house that was vacant.  It was unusual for a car to park in that area.

7    He went to look out the window, but was not wearing his glasses for his

8 nearsightedness.  He had to bend down and look up to see past his orange tree.  The driver

9 walked away from the car at a fast pace, without first locking the drivers door.  The driver

10 was a white male, guessed to be  in his twenties, from five and a half to six and a half feet

11 tall, with light colored or not black  hair which was longer than conservative, a long, bony

12 face, medium weight, and possibly with or without a mustache, facial hair or sideburns.  His

13 clothes were not white, and he believed them to possibly be either brown or tan and solid

14 colors, although it could have been checked or red and white stripped.  He thought the car

15 might have been stolen, or that the driver was going to a party.

16    On Sunday morning, he looked at the vehicle again, a red Honda Accord.  He wrote

17 down the license plate and looked inside and saw a body.  He ran home and called the police.

18 He later spoke to two different detectives.  Although he was uncertain of the time, he

19 originally told one of them that the car was parked there on Thursday night, between 9:45

20 and 10:00 p.m..  But it may have been Friday night and as late as 1:00 a.m. Saturday

21 morning, but likely not much before 10:00 p.m.

22    **Michael Dywan** - Michael Dywan testified (Exhibit SSS, R.T. 3/31/86 at 105-109)

23 that he employed the victim intermittently for several months as a commissioned outside

24 sales representative for his sign contracting, name plates, plaques and awards business.  The

25 victim never brought any significant amount of business in, and didn't make any money.

26 They discussed becoming partners, either in Dywan's business, the victim's parents'

27 business, or both.  No agreement was ever reached.  The victim purportedly had a business

28 partner who would provide the finances.

**Elizabeth LeBrun** - Elizabeth (Beth) LeBrun testified (Exhibit SSS, R.T. 3/31/86 at 109-198; Exhibit TTT, R.T. 4/1/86 at 2-31) that she met Petitioner in about June of 1984 through Tammy Shaw. She dates Shaw's brother, and is Shaw's friend. Petitioner lived with Shaw from the summer of 1984. Petitioner was arrested in October, 1984. She did not seem him on the day he was released, a Thursday, but saw him the next day, Friday, at about 6:00 p.m. Her boyfriend (Tammy Shaw's brother, David) would get off work at 5:00pm, shower, and then they would go to Tammy's apartment. Petitioner, Tammy Shaw, and possibly Julie Swan were there when she and David Shaw arrived. They drank and had a party, and a lot of people showed up around 8:00 to 8:30 or later, including Kevin Cobey, Tom, and Ron. Later, Marty came with Petitioner's brother Jim Prince, Marty's cousin, and two girls.

Kevin and Tom left shortly after they got there. The later group left for a short time to take the two girls home, but came back quickly. Petitioner left for about 10 minutes. She heard he went to the parking lot. She saw him leave and come back. She is certain he was not gone for several hours. At about 11:30 or 12:00 she and Tammy Shaw left to go to the liquor store. They were gone no longer than 20 minutes. She left at about 4:00 a.m. They were supposed to take David Shaw's mom to work at 4:30.

At some point in the evening, Julie Swan came out and yelled at Tammy Shaw because she didn't want anyone at the apartment because her friend was in the hospital. Swan dressed and left the apartment for several hours. LeBrun had about a half of a glass of Seagram's and 7Up to drink. Everybody was using drugs, and she used a little bit. She had done it once before and was afraid of it.

The next night, she and David Shaw got to the apartment at about 7:30 or 8:00, and stayed until about 2:00 a.m. Petitioner and Tammy were there. Jim and Marty showed up later at about 10:00, after the races ended.

She had seen Petitioner with a KG-99 on two occasions, once in June or July, and again in September. Petitioner also had a Colt gun, like a Colt 380, during the same period of time. She did not know why Petitioner would tell the police he acquired the Colt in November, 1984.

1    She originally had told the prosecutor in a recorded interview that these events
2    occurred the weekend of October 21st, based upon her recollection tying it to her sister's or
3    father's birthday.  But, her sister's birthday was in November. She recalled being told the
4    victim was killed on Saturday night. She told the prosecutor that the party at Tammy's when
5    they were there until 4:00 a.m. was on Saturday, and that the next night, Sunday, she stayed
6    home.  She told the prosecutor that they were at Tammy Shaw's apartment on the prior
7    Friday night until 2:00 a.m., but were not there the prior Thursday night.  She told him that
8    Tom, and Tom's friend Ron, Ron's girlfriend Cheryl, Martin, Martin's cousin and another
9    guy  and two girls were there on Saturday night, but not on Friday night.  She told him that
10   if the victim were killed on Friday, October 12th, that she would not have an alibi for
11   Petitioner, because she did not know where she was that night.

12   On that Friday night, Julie Swan had left to go out with Ron and Cheryl.  She told the
13   prosecutor that she, David Shaw, Tammy Shaw and Petitioner lived together in a house
14   beginning in December, 1984.  Prior to that time, the four of them partied together about
15   every other weekend.

16   She told the prosecutor that Kevin Cobey told her that Petitioner killed the victim, that
17   she had talked with Petitioner about it and told him she didn't think he had done it.

18   **Jeff Pappe** - Jeff Pappe testified (Exhibit TTT, R.T. 4/1/86 at 31-38) that he had
19   known Petitioner for six or seven years, and that shortly before June of 1984 Pappe bought
20   a 9 millimeter KG-99.  In June of 1984, he sold the gun to Petitioner's brother Jim Prince for
21   $400.  When Prince complained the gun was worth only $300 he refunded $150 to him.  He
22   disputed telling the detective that he couldn't find the location where he had fired the gun
23   because he and his friend were four wheeling and drunk at the time.

24   **David Shaw** - David Shaw testified (Exhibit TTT, R.T. 4/1/86 at 38-67) that he had
25   met the Petitioner in the summer of 1984 and his sister, Tammy Shaw, was Petitioner's
26   girlfriend.  He recalled Julie Swan, his sister's roommate, having a friend die from a car
27   crash.  He was with Petitioner on Friday and Saturday on that weekend.  On that Friday, he
28   was with his girlfriend Beth LeBrun, and they went to Tammy's apartment at about 6:30 p.m.

1    Tammy, Petitioner, Julie, and Kevin were there.  Between 10:30 and 11:00, Martin, Jim

2    Prince and a couple of girls arrived, having come from the races.  At about 8:30 or 9:00, Julie

3    left because she was upset they were there partying. David Shaw left at about 4:30 a.m. to

4    go move LeBrun's car so his mom could go to work.   Petitioner was there the entire time

5    David Shaw was there, but could have gone outside without him knowing it, but not for more

6    than 5 or 10 minutes. About 8:30 or 9:00, he Petitioner and Beth went out to the swimming

7    pool because Julie was upset that they were in the house.    Sometime between 10:00 and

8    11:00 Beth and Tammy left together for about 15 minutes to go the store.  They were all

9    using Larry's cocaine, including David Shaw.

10        He and Beth went to Tammy's apartment on Saturday, at around sunset and left

11   between 11 and 12.   Tammy and Petitioner were there.  Julie and Kevin arrived later that

12   evening.  Petitioner was there the entire time David Shaw was.

13        David Shaw was not at the apartment the previous Thursday.

14        In the summer of 1984, Petitioner had a KG-99.  David only saw it the one time.

15        In an interview he told the prosecutor that he didn't know what the dates were, but

16   was relying on his sister Tammy to tell him the dates.  He and his sister had discussed the

17   events to refresh his recollection.

18        **James Prince** - James Prince testified (Exhibit TTT, R.T. 4/1/96 at 68-105) that he

19   is the Petitioner's brother, he had known Kenny Hatch since the first grade, and had known

20   Kevin Cobey and Tom Ellinghausen since the summer of 1984.  He met the victim one time

21   when he came with Petitioner to their grandfather's house on October 8, 1984, the day

22   Petitioner had been arrested.

23        In July of 1984 he purchased a KG-99 from Jeff Pappe for $400, but got $150 back

24   from him when he found out they could be purchased for $189, but Pappe had paid $250 for

25   it.  In early August, 1984, he gave the gun to his brother, Petitioner, to hold  because his

26   grandfather and girlfriend were giving him a hard time about having the gun.

27        In the middle of September, Petitioner gave the gun back to him because Petitioner

28   had moved in with a girl who was giving him a hard time about having the gun.  A week to

1   a week and a half later he sold the gun to someone at the Statler Bar.  He didn't know the

2   buyer's name.  His girlfriend, Kimberly Meldanado, was with him when he sold the gun.

3          His brother had a girlfriend, Randee Rector, who Petitioner would get in fights with.

4   Rector would spit in Petitioner's face and had hit him two or three times.  Petitioner had

5   pushed her away from him, but he had never seen Petitioner hit her.

6          He was with Petitioner in November, 1984 when Petitioner was stopped to be

7   fingerprinted.  There was a .380 gun in the car that belonged to Petitioner.  There were also

8   some 9 millimeter bullets in the glove box that belonged to his girlfriend. He had purchased

9   a P38 9 millimeter gun for her on October 17, 1984.

10          On the Friday after petitioner's release from jail on October 11th, Petitioner invited

11   him to come by Tammy Shaw's apartment. James Prince was at the car races at the time, but

12   stopped by after the races, arriving at 10:00 to 10:30, having left the races early.  He was

13   with Marty Salazar, and three other people: Rick Kinney, Tanya Burrows, and a girl named

14   Lisa. When they arrived, Petitioner, Tammy Shaw, Beth Lebrun and David Shaw were there.

15   Julie Swan was in the bedroom.  Kevin Cobey was not there until 11:30.  Cobey went to the

16   bedroom and he and Julie Swan argued, and Swan left.  At about 12:30 to 12:45 he left with

17   his brother for 10 to 15 minutes to go to a nearby Circle K.  Otherwise, Petitioner did not

18   leave the apartment.  James Prince finally left the apartment at about 6:30 in the morning.

19   Beth Lebrun and David Shaw left several hours before he did.

20          He was also with Petitioner the next night, arriving at around 10:00 to 10:30, after

21   leaving the races.  Only Martin was with him on that night.  Only Petitioner, Tammy Shaw,

22   Beth LeBrun and David Shaw were there.  They stayed until about 6:00 or 7:00 the next

23   morning.  Petitioner did not leave while James Prince was there.

24          In 1984 or 1985 he went with Marty Salazar, in Salazar's van, to a party thrown by

25   Michael Curry.  Petitioner, Art and Kenny Hatch went with them.  They stopped to pick up

26   beer. Marty and Art were in the front, James Prince and Kenny Hatch were on the back seat,

27   and Petitioner was on the floor.  He could hear the conversation between Petitioner and

28   Kenny Hatch, but did not remember hearing anything about the shooting of the victim.

He denied buying a box of Remington 9 millimeter shells at Smitty's on September 15, 1984.

**Kimberly Meldonado** - Kimberly Meldonado testified (Exhibit TTT, R.T. 4/1/86 at 105-121) that she was previously James Princes' girlfriend. She recognized the box and KG-99 gun. She first saw the gun at Petitioner's apartment on his birthday in August, 1984. At some time, James Prince told her he had given the gun to Petitioner to hold. She saw the gun for the last time in September, 1984 in her car when she and James Prince went to the Statler Bar. Prince talked to a man, went outside with him, and then came back in and told her that he had sold the gun, and showed her the money. They had had problems because she did not like having the gun around.

After he sold the KG-99, in October, 1984, James Prince used the money to purchase her a 9 millimeter gun, a case, and some bullets to keep in the apartment because he was going to move in. She was with him when he purchased it at a gun shop in Glendale. The gun cost about $200. She kept it in her bedroom closet, and never carried it in her purse, but did carry it to Michael Curry's party. She sold the gun when she moved to California. She had met Kevin Cobey several times.

In late October or November, 1984, she went with Tammy Shaw to a party thrown by Michael Curry. Kenny Hatch was at the party and was extremely intoxicated and out of control toward the middle or end of the party.

**Martin Salazar** - Martin Salazar testified (Exhibit TTT, R.T. 4/1/86 at 121-153) that he has known Petitioner, James Prince and Kenny Hatch since he was about six years old. He had done work on Kevin Cobey's cars. In October, 1984, he went to a party at Petitioner's apartment on a Friday after the races. He was with James Prince. They arrived around 10:30 or close to 11:00, and stayed until Saturday morning between 6:00 and 6;30. He had to be at work around 7:00 or 7:30 that morning. Petitioner was there the whole time. James Prince was there the whole time and left with him in the morning.  Tammy Shaw was there, but may have left to go to the store.

The next night, a Saturday, he and James Prince went back to the apartment after the

1  races, arriving about the same time and leaving around sunrise on Sunday morning.
2  Petitioner was at the apartment the entire time.

3  Around the same date, he went to Michael Curry's party. Petitioner, James Prince,
4  Kenny Hatch, and Salazar's cousin Art rode in his van to the party with him. Kenny had a
5  gun with him. They stopped to pick up a keg on the way. Petitioner, Kenny and James were
6  sitting in the back of the van. He could not hear their conversation, but they did not seem to
7  be having a serious conversation. When they picked up Kenny, Petitioner and James, Kenny
8  was hyper. After they opened the keg, Kenny started acting out of control and knocked down
9  a fence. Kenny did not ride home with them after the party. They did not leave the party
10 together to go get beer.

11 **Geno MiComi** - Geno MiComi testified (Exhibit UUU, R.T. 4/2/86 at 22-26) that the
12 victim had dated his daughter Tami MiComi, and that he had discussions with Rob Richards
13 about opening a restaurant together, with Rob providing the money. They met the Friday
14 before the victim's death, and set an appointment to meet again the following morning,
15 Saturday, at 12:00, at his restaurant, Angelo's. When the victim did not show, his daughter
16 attempted to call him and left a message.

17 **Lucien Haag** - Lucien Haag testified (Exhibit UUU, R.T. 4/2/86 at 46-174) that he
18 was a self-employed criminalist, who previously worked for the City of Phoenix Police
19 Department. He spoke with an employee at Intratech, manufacturer of the TEC-9, which he
20 described as the successor to the KG-99 manufactured by Inter Dynamics. Based on the
21 information from that employee, he concluded that there were no operations differences or
22 rifling characteristic differences between the two weapons. The distance a cartridge would
23 be ejected could be no more than to fall at a shooters feet or some distance dependent upon
24 the power of the cartridge and the tension in the bolt spring. He would expect the cartridge
25 to go at most three feet forward and eight feet out to the right. The presence of a towel
26 around the gun would affect where the cartridge went after being ejected. He tested firing a
27 TEC-9 through a car window to see if the cartridge would land inside or outside the vehicle.
28 They landed outside the vehicle.

1    Haag agreed with Gieszl's identification of the make, type and caliber of the bullet

2    taken from the victim, and of the potential firearms which could have been used to fire the

3    bullet, including the KG-99.  He disagreed that the land to groove ratio would change as a

4    gun was fired.  Haag agreed with Gieszl's estimation that the shot was fired from two to six

5    inches from the victim.  Microscopic examination of the type of powder from the tattooing

6    on the victim, as well as the chemical composition of the bullet and the jacket could be used

7    to compare or contrast different bullets.

8    The blood droplets on the windshield and glove box indicated that they were

9    deposited straight on, and not at an angle.  The droplets on the side window showed they

10   were deposited at an angle, and those on the door seal indicated they were straight down.

11   There were no splatters on the white seat cover on the passenger seat.  The splatter evidence

12   was more consistent with the victim being shot while in the passenger seat than while in the

13   drivers seat.  But, he could not testify that the victim was not in the drivers seat when he was

14   shot, and then falling over onto the passenger side.  The blood on the victim indicated he

15   continued to bleed for some time before ending up in the position his body was found in.

16   **Larry Prince** - Petitioner testified (Exhibit VVV, R.T. 4/3/86 at 3-137) that he was

17   born in 1963, and in 1984 worked in his grandfather's business delivering ice. He worked

18   fifteen to sixteen hours a day.  In August, 1984, he started taking some time off, and was

19   introduced to the victim as a cocaine dealer by someone he knew from the Service Station

20   Bar.

21   He met Tammy Shaw and Julie Swan  the middle of August, 1984.   At the end of

22   August, he moved out of his apartment after a month and a half of renting, and moved into

23   Tom Ellinghausen's apartment in the same complex.  Kevin Cobey was also living there.  He

24   had just met Ellinghausen and Cobey after moving into the apartment complex.  He met Ron

25   Rango two weeks later. He moved into Shaw's apartment between the 10th and 15th of

26   September, 1984, and Cobey was staying there but had not moved in by the middle of

27   October.

28   The victim would bring cocaine by and they would either use it or sell it.  Petitioner

1   was not selling to make money off of it.  He was buying about a half an ounce per week for

2   $1250.  Cobey's co-workers and Ellinghausen's friends were buying.

3          On a Thursday or Friday, two or three weeks before the last time he saw the victim,

4   Petitioner was at the victim's apartment and was helping him fold his laundry.  On that

5   occasion, the victim changed his clothes several times before they left to go bowling.  They

6   went bowling so the victim could practice for a bowling league he had joined. Because they

7   had been drinking beer, the victim was wobbly so Petitioner offered to drive them back to

8   Shaw's apartment. The victim agreed and Petitioner drove them to the apartment. Shaw and

9   Swan were not yet home from work, and no one else was there. The victim stayed a few

10  minutes then left.

11         On the Monday a week before Petitioner was arrested on October 8, 2004, the victim

12  stopped by the apartment, and invited Petitioner to go for a ride.  Petitioner went with him,

13  and the victim stopped to meet some guys in a parking lot behind Lunt Avenue Marble Club.

14  They ate at McDonalds then went back to Shaw's apartment.  The victim left.

15         Some time after noon on Monday, October 8, 2004, the victim came to the apartment

16  and picked up Petitioner.  They drove to his grandparents house, he introduced the victim to

17  his grandmother, and they waited 15 or 20 minutes for his brother Jimmy to return.

18  Meanwhile, the victim used the telephone.  They all agreed to meet at the Pony Express that

19  evening.  They left, stopped at a Circle K at about 3:30 or 4:00 to buy beer, and then went

20  back to Shaw's apartment.  The victim stayed for a few minutes and then left him cocaine

21  that Petitioner sold that evening for $1250 to Ken and Dave.  Petitioner did not tell Detective

22  Butler about going with the victim to his grandparents.

23         He did not drive the victim's car that day.  He had been in the car two other times.

24  And he had driven it only once and that was on the day he was at the victim's apartment

25  helping with laundry and they went bowling.  He was not in the victim's car after Monday,

26  October 8, 1984.

27         At about 7:30 or 8:00 on October 8th, he left the apartment, and was pulled over in a

28  traffic stop.  He was driving without a license, and was arrested on a warrant for assault from

1    early in 1984.

2         He was released the following Thursday between 6:30 and 8:30 in the evening.  Swan

3    and Shaw picked him up in Swan's car.  Swan dropped them off at their apartment and went

4    to the hospital.  Cobey was there, and at about 9:30 or 10:00 Ron Rango, Cheryl and Tom

5    Ellinghausen arrived and they had a party.  Swan returned home about the same time.  Rango

6    left at about 1:00 a.m.  Cheryl was drunk so stayed longer, and left between 2:30 and 3:00.

7         At about 1:00, Randee Rector called and asked him to come over.  Ellinghausen and

8    Petitioner left at about 1:30.  Petitioner stayed at Rector's for about an hour and a half or two

9    hours, got into an argument with Rector and she hit him in the mouth and took his money out

10   of his pockets, about $200.  When he discovered the money missing, he started knocking on

11   the door asking her to open the door, and threatening to call the police if she did not return

12   the money.  She refused so he ultimately punched a hole in the door.  He walked to a nearby

13   store and called Cobey for a ride.  Cobey missed him the first time and Petitioner called the

14   apartment again to tell Swan where to send Cobey back to get him.  Cobey picked him up at

15   about 3:30 or 4:00, Friday morning.

16        He had not seen the victim at all on the Thursday.

17        That Friday, Petitioner slept until noon when Shaw came home for lunch.  About 1:00

18   or 1:30  a friend called asking for cocaine and they arranged it for that afternoon.    About

19   3:00 or 4:00 p.m., shortly before Shaw returned from work, the buyers, two Mexican males,

20   Phil and Sam, dropped off $2500 to purchase an ounce of cocaine.  He expected to be able

21   to buy an ounce and a quarter for $2500 and sell the other quarter ounce for $500.  He met

22   Phil and Sam at Grand Central Station through some acquaintances Tim and Dave.  He had

23   sold cocaine to them twice before.   He eventually paid the $2500 back to Sam.

24        Cobey was at the apartment all afternoon.  About 5:15, Shaw came home from work

25   without Swan.  Between 5:00 and 6:00 p.m., the victim called and Petitioner asked when he

26   was going to pickup his money from the cocaine he received the prior Monday.  At about

27   6:30 or 6:45, David Shaw and Beth LeBrun arrived, putting Petitioner, Tammy Shaw, Kevin

28   Cobey, David Shaw and Beth LeBrun at the house.  Then, the victim called back and said he

would be right over.   Petitioner went out by the jacuzzi, and at about 6:30 or 7:00 saw or heard the victim drive past in the parking lot, so he began walking to the parking lot.  The victim had turned around and pulled up and Petitioner walked around to the drivers side.  He met the victim in the apartment parking lot, walked around the car  and gave him the $1250 from the cocaine he got on Monday, and $2500 for the cocaine his friend had asked him to buy.  The victim was alone, and was driving.  The victim rolled down the window, and turned the dome light on.  The money was all in cash.  The victim did not count it, but put it in a notebook.  Petitioner did not expect to get that cocaine for a day or two.  When asked about timing, the victim said he would call Petitioner.  The victim said he was headed up north.  That was the last time Petitioner heard from the victim.  He wasn't concerned about being observed by the police because the victim always listened to the police surveillance teams on the radio scanner.

As he returned to the apartment, Cobey asked what was up and Petitioner told him that he had given the victim the money and what he was expecting.  Other than Petitioner and the victim, Cobey was the only other person who knew how much money Petitioner gave the victim.  Petitioner did not give the anonymous tip to the police that he had given the victim $1250 plus $2500.

At about 7:30 or 8:00, Tom Ellinghausen arrived.  About ten minutes later, Ron Rango stopped by for about ten minutes.  The group drank and did cocaine.  After about 20 to 25 minutes Ellinghausen and Cobey left.  About ten minutes later, Julie Swan came home, and went straight to her room.  Swan was mistaken when she testified that Shaw was the only one home.

At about 10:30 or 11:00 Petitioner's brother, Jim Prince, Martin Salazar, Lisa, two other girls and a guy came over.  Kevin Cobey and Tom Ellinghausen returned at 11:30 or 12:00.  Everyone else was still there.  Cobey went into Swan's room and then Swan came storming out with her purse and went out the front door.  Cobey followed her and Tammy Shaw followed them both outside.  Eventually Cobey and Shaw returned.  Ellinghausen left again about ten minutes after he arrived.

1      Later, Shaw and LeBrun went to the liquor store to get Seagrams Seven, and then later

2  Petitioner and his brother went to Circle K to buy beer.

3      Martin Salazar's friends left at about 12:30 or 12:45.   Everyone else stayed most of

4  the night. At about 1:00 or 2:00 a.m., the apartment complex guard came because of the loud

5  music.  As Petitioner went to open the door, Swan brushed past and went back to her room.

6  At about 4:30 a.m. Tammy and David Shaw's mother called looking for David  and LeBrun.

7  Tammy Shaw told them they had already left, but later called back and said they were on

8  their way home.  Jim Prince, Martin Salazar and Jamie left at about 5:30.

9      Petitioner attempted to call the victim late that night or 1:00 Saturday morning, and

10  left a message saying "Rob, call me" that he believes to be on the seized answering machine

11  tapes.

12      He was never at Tom Ellinghausen's apartment on October 12, 1984.  He did not

13  shoot the victim.

14      At the end of August, 1984 he got a KG-99 gun that his brother asked him to hold on

15  to because his grandparents didn't want it in their house.  About a week later, he and Cobey

16  took the gun to a water hole and fired a couple rounds.   As Cobey fired the gun, the

17  cartridges flew back about five or six feet to the right, comparable to Haag's testimony of the

18  expected ejection pattern.  It was the only time he fired the gun.  In the middle of September,

19  he told his brother that Swan and Shaw didn't want the gun in their apartment, so he returned

20  it to  his brother and did not see the gun again.

21      He lied to the police about having the gun because he did not know  if it was legal to

22  have or if it had been stolen. The only other gun he had in the summer and fall of 1984 was

23  a Colt 380 he bought from a black guy in South Phoenix that he met through some friends.

24  That is the weapon he had in the vehicle when he was stopped on November 6, 1984.  He had

25  gotten the gun the week prior to when he was fingerprinted.  He refused to tell the police

26  where he got the gun.

27      From August 12th to the middle of October, he was supplying cocaine to Kevin Cobey.

28  He was not supplying Kenny Hatch, but was supplying cocaine to Tom Ellinghausen and

- 34 -

1   periodically to Ron Rango.   They were cutting it and selling it to their friends.  In January,

2   1986, he was convicted of possessing cocaine that was found during the search of the

3   apartment on November 6, 1984.

4       He saw Kenny Hatch a few times in 1984, and took Hatch's apartment in the complex

5   where Cobey and Ellinghausen lived.  He didn't see Hatch for a while after that, and didn't

6   know where he moved to.

7       He saw Hatch at the Deer Head bar.  Hatch looked at Randee Rector, grabbed her by

8   the neck and pushed her up on the wall.  Petitioner told Hatch to let her go.  Hatch didn't so

9   Petitioner hit him in the head, knocking him under a pool table.

10      Petitioner and Kevin Cobey were together most of the time in 1984.  Ellinghausen was

11  around most of the time until he started teaching again in September.  They saw Ron Rango

12  almost every evening or night.  Ellinghausen eventually moved in with his girlfriend

13  somewhere he didn't know, and Cobey and Swan moved to an apartment that they had rented

14  somewhere he didn't know.  He only talked to Cobey once on the phone after Cobey moved

15  out of Shaw's apartment, until he and Julie broke up.  Cobey called him once to ask if he

16  wanted to try some cocaine, and he saw him three times: once at Chapter 11, but they did not

17  speak, once at Tammy's apartment where he was helping wash a car, and at Petitioner's

18  birthday party on August 4, 1985, which was thrown by Marty Salazar.

19      He stopped seeing Tammy Shaw on an everyday basis after the November 6, 1984

20  search, but would still see her every couple of weeks.  Of the cocaine paraphernalia found

21  in the house, only the sifter and the inositol belonged to Petitioner.  Shaw and Swan put the

22  stuff in the blue bag.

23      He learned before the summer of 1985 that Kenny Hatch was seeing Randee Rector.

24  A few days after his birthday on August 4, 1985, he called Kenny and spoke with Kenny and

25  Randee.   Randee was coming by in the middle of the night to see Petitioner at his

26  grandfather's house, and he wanted to know what was going on.

27      He wanted to find out who killed the victim.  The victim's death caused him problems

28  because the people who had given him the $2500 he gave the victim, wanted their money

back. He told Swan and Shaw that he was concerned that the killer might come after him.

He told Detective Butler about driving the victim's car at the bowling alley, touching the car, and that he thought the victim might have been killed because the victim had said he owed $10,000 in gambling debts. He told the detective that he had seen 50 pair of pants in the victim's closet. He told the detective who he thought the victim's supplier was. When Petitioner and the victim got to Shaw's apartment from the bowling alley, Petitioner parked the car, removed the keys and they got out of the car. He had no problem getting the keys out of the car. They were on a twist-type key ring. The detective asked him about the victim's sexual orientation, and he responded he was uncertain. It was not raining while he drove the car, but when making a sharp turn he knocked the windshield wipers on and had to turn them off.

He was nervous when talking to the detective because of the murder investigation and because the people wanting their $2500 were inside the house.[6]

He first learned of the victim's death when Cobey called him on that Sunday and told him what channel to watch. He saw them pulling the victim's body out of the car. He was alone. Later that afternoon he told Swan and Shaw when they came home. He was mistaken when he told Detective Butler that he saw it on TV on Monday.

On November 6, 1984, he was pulled over by a policewoman. Other police cars arrived, and Detective Rea asked if he was Larry Prince, and put handcuffs on him and told him there was a court order for his fingerprints. They asked his brother for permission to search the car, and he gave it. Petitioner told the officers that the Colt was in car. There was a clip in the gun, but the clip was empty and there were no bullets in the gun. The clip found in the apartment also had no bullets. He was transported to DPS where he was fingerprinted.

His appearance has changed. His hair is shorter and he is 15 pounds lighter. His color has remained the same, and he has always been clean shaven.

He misunderstood when he was supposed to get his fingerprints done. He did not tell

---

[6]  At the voluntariness hearing, Butler testified that the meeting with Petitioner was by appointment. (*See* Exhibit HHH, R.T. 3/19/86 (voluntariness hearing) at 20.)

1   Detective Butler that he had parked the victim's car, but that he had driven from the bowling

2   alley to Shaw's home.

3          At the beginning or middle of September, he gave the victim directions to Randee

4   Rector's house. The victim came to drop off some cocaine.   While the victim was there, he

5   and Petitioner had played with the victim's key ring.   The victim was offering to sell

6   Petitioner his motorcycle and was showing him the key.  Petitioner playingly took the keys,

7   took it apart, and removed the key.

8          He never fought with or argued with the victim. Petitioner had never cheated him, and

9   they had a good relationship.

10         He talked with Detective Butler about seeing the KG-99 box in his brother's room at

11  his grandparents house.  He told him his brother had a 9 millimeter Lugar type of weapon.

12         He spoke to Hatch one time about the victim's death.  Hatch had stopped by

13  Petitioner's grandparents, and they told him they were going to Michael Curry's party.

14  Hatch showered, and Marty Salazar picked them up in his van.  Petitioner, Marty Salazar,

15  Art, Jim Prince and Kenny Hatch were in the van.  They stopped for a keg of beer and went

16  to the party. They did not talk about the victim's death during the van ride.  Hatch had a .44

17  Magnum with him in the van.  After about two hours at the party, Hatch was pretty drunk and

18  they had to stop him from tearing down a fence in the back yard.  At the end of the party

19  when everyone was pretty drunk.  Hatch called him over to the van, where he was sitting

20  with his gun in his lap.  Hatch claimed he knew that Petitioner killed the victim, but wouldn't

21  tell who had told him that.  He did not tell Hatch that he had killed the victim.

22         **Edward Gould** - Edward Gould testified (Exhibit VVV, R.T. 4/3/86 at 148-167) that

23  he was employed as an investigator for the public defender's office.  On September 30, 1985

24  he interviewed Jim Prince about his KG-99 gun.  Jim Prince told him that he purchased the

25  gun from Jeff Pappe, had it for three or four months, and then sold it to some cowboy at the

26  Statler Bar.  He sold it about two months before the murder.  He said he let his brother use

27  it for a couple of weeks, three or four months before the shooting.

28         He interviewed Martin Salazar on October 8, 1985.  Salazar told him that on October

12, 1984 he was at the races until 10:30 or 11:00, and left in his van with Jim Prince, and Salazar's cousin, Art Basuto.  They were being followed by Rick, Kenny, Tanya Burrows and another girl.  It took twenty to twenty-five minutes to get to the apartment, and they arrived at about 11:30 p.m.. He described being in his van after the party in January on the south side of Phoenix with Petitioner, Ken Hatch, and Art, but did not mention anyone else being in the van.  In a later phone interview Salazar described the seating as Art driving, Salazar in the passenger seat, Hatch and Petitioner in the back on the bed or sitting on the floor.

**Conclusion of Trial and Appeal** - Petitioner was found guilty and sentenced to death. (Exhibit F, Mem. Dec. 3/5/96 at 2.)

Petitioner filed a direct appeal, arguing, *inter alia*:  the jury was "polluted" through various juror misconduct, including perjury on voir dire, coercion of a juror, prejudice by a juror, exclusion of a juror for deliberations, and deliberation by an unauthorized alternate.[7] (Exhibit M, Opening Brief.)    In a 1989 opinion, his conviction was affirmed, but his sentence was reduced to life imprisonment on the basis that the state failed to prove the sole aggravating circumstance, pecuniary gain, beyond a reasonable doubt. *See State v. Prince*, 160 Ariz. 268, 772 P.2d 1121 (1989).  Moreover, the court remanded for a determination

─────────────────────

[7]   Other claims presented included: (1) the death sentence was disproportional;  (2) the trial court improperly found aggravating circumstances; (3) the judge had not been selected by merit selection; (4) prejudicial hearsay had been improperly admitted; (6) petitioner was not allowed to impeach prosecution witnesses and prosecution witnesses vouched for each other; (7) the verdict was contrary to the weight of the evidence; (8) violation of *Miranda* by admission of un-counseled statements by Petitioner; (9) various trial errors; (10) failure to properly balance mitigating and aggravating circumstances; (11) the death sentencing procedures violated the federal right to a jury trial; (12) the death sentencing procedures violated the state right to a jury trial; (13) the death sentencing procedures violated the federal right to jury participation; (14) the death sentencing procedures violated the federal right to proof beyond a reasonable doubt;  (15) the death sentencing procedures improperly placed the burden of proof on mitigating factors on the defendant; (16) the death sentencing procedures failed to provide adequate standards for weighing aggravating and mitigating circumstances;  (17) the death sentencing procedures violated due process because of the lack of opportunity to voir dire the judge; and (18) the fruits of the search warrants should have been suppressed.  (Exhibit MM, Opening Brief.)

whether the life sentence for murder should be consecutive or concurrent with the sentence on the drug charge.

On August 22, 1989, Petitioner was resentenced to "life imprisonment without possibility of parole for 25 calendar years," to be concurrent with his other conviction. (Pet. Exhibit 1, Sentence 8/22/89.)

Some 13 years later, on October 17, 2002, Petitioner filed a Motion to Recall the Mandate (Reply Exhibit 1),  arguing that his challenge to participation by juror Milam had been wrongly denied based on an illegally altered trial transcript.   That motion was summarily denied on December 23, 2002. (Pet.Exhibit 8, Order 12/23/02.)


**C. PROCEEDINGS ON FIRST AND SECOND POST-CONVICTION RELIEF**

**First PCR Petition** - Petitioner initiated his first post-conviction relief (PCR) proceeding by filing his PCR Notice on March 22, 1994 (Exhibit A).  Petition filed a PCR Petition (Exhibit B), arguing claims for:

> (1)     violation of due process as a result of perjured testimony by Cobey and Hatch (*id.* at 7);

> (2)     denial of due process as a result of failure to apply a change in the law on instructions on lesser included offenses (*id.* at 27);

> (3)     due process right to new trial based on newly discovered evidence (*id.* at 45);

> (4)     violation of due process as a result of the prosecutor's use of perjured testimony (*id.* at 50); and

> (5)     ineffective assistance of counsel as a result of failure to adequately cross-examine witnesses and introduce favorable evidence (*id.* at 54).

As his newly discovered evidence in Ground 3, Petitioner presented affidavits of Jimmy Pechac and his wife, Debbie Pechac. The Arizona Court of Appeals summarized the

1    affidavits as follows:[8]

2            In the trial court, petitioner offered an affidavit from James Pechac
             stating that, two or three weeks before Halloween of 1984, he
3            purchased "gold nugget" bracelets from Cobey.  Petitioner also offered
             an affidavit from Debbie Pechac, James Pechac's wife, stating that, in
4            late 1985, Cobey telephoned her about the bracelets and stated "that
             gold could send us away forever" if it was recovered by the police.

5    (Exhibit F. Mem. Dec. 3/5/96 at 10-11.)

6            The trial count found claims 1 and 4 were waived by failure to raise them on direct

7    appeal, claim 2 was without merit because the change in law did not apply to Petitioner's

8    case, claim 3 was without merit because the new evidence likely would not have changed the

9    outcome, and the ineffective assistance of counsel claim was without merit.  (Exhibit C, M.E.

10   2/27/95.)

11           **First Petition for Review** - Petitioner then filed a Petition for Review (Exhibit E),

12   arguing that the trial court had improperly found Claims 1 and 2 waived, and improperly

13   rejected the remainder of his claims.  On March 5, 1996, the Arizona Court of Appeals found

14   the claims related to impeachment of Cobey and Hatch waived at trial, but remanded for a

15   decision on the related ineffective assistance claim as to perjury by Cobey.  The claims of

16   prosecutorial misconduct were deemed waived at trial, and the related claims of ineffective

17   assistance were without merit.  The newly discovered evidence claim was rejected on the

18   basis that it likely would not have changed the outcome.  The decision on the change in the

19   law/lesser included offense was upheld.  (Exhibit F, Mem. Dec. 3/5/96.)

20           **Second PCR Petition** - Petitioner initiated his second PCR proceeding by filing his

21   PCR Notice on September 29, 1995 (Exhibit G), and filing his PCR Petition (Exhibit H) on

22   January 13, 1997.  Petitioner asserted claims that:

23           (1)     newly discovered evidence showed juror misconduct in the form of perjury

24

25   ────────────────

26           [8] The Pechac affidavits have apparently not been provided to this Court.  Petitioner
     does not suggest that the Arizona Court of Appeals' summary of the affidavits is incorrect
27   or incomplete.  Moreover, James Pechac testified in the evidentiary hearing on Petitioner's
     third PCR petition, and that testimony reflects the same story related by the Arizona Court
28   of Appeals.  (*See* Exhibit EEEE, R.T. 5/21/02 at 71-81.)

1    during voir dire by a juror concerning a relationship with witness Hatch (*id.* at

2         3);

3    (2)    newly discovered evidence showed a conspiracy to murder the victim and

4         Petitioner (*id.* at 6); and

5    (3)    counsel was ineffective in failing to investigate to discover this newly

6         discovered evidence (*id.* at 16).

7         The trial court rejected Claim 1 on the basis that it had been presented on direct

8    appeal, and was known to Petitioner at the time of his first PCR, and thus was precluded, and

9    on the basis that the claim was without merit.  Because the claim was without merit, the court

10   rejected the related ineffectiveness claim in Claim 3. (Exhibit I, M.E. 3/14/97.)

11        **<u>Decision on Remaining Claims</u>** - .  An evidentiary hearing was set on Claim 2, and

12   on the ineffective assistance of counsel claim remanded in the first PCR proceeding. (Exhibit

13   I, M.E. 3/14/97; Exhibit J, M.E. 11/3/97; Exhibit K, M.E. 11/4/97.)  Testimony ws presented

14   from the original prosecutor, Greg Thurston(Exhibit AAAA, R.T. 11/3/97 at 3-117), defense

15   counsel Henry Florence (*id.* at 117-127), defense counsel Joel Thompson (*id.* at 127-158),

16   and defense counsel Sherry Bell (Exhibit BBBB, R.T. 11/4/97 at 4-25), and defense

17   investigator David Brewer (*id.* at 26-36)  testified about the investigation and course of the

18   trial in this case and Petitioner's drug case.[9]  In addition, Petitioner presented testimony of

19   Rocky Wheeler, and James Pechac. The prosecution presented testimony by Larry Roskey.

20        <u>Rocky Wheeler</u> - Rocky Wheeler testified (Exhibit BBBB, R.T. 11/4/97 at 39-73) that

21   in 1984 he worked with Larry Roskey and Kenny Hatch on a jobsite at the Elm Street

22   Apartments.  On October 12, 1984, in the afternoon or evening,  he went to a Circk K with

23

24

25
_____

26   [9]  The only portions of this testimony relevant to the Petition are the defense's lack
     of knowledge of the undisclosed information, which is undisputed.  Defense counsel's
27   opinions about the likely affect of the undisclosed information is not factual in nature, but
     opinions on matters which this Court must independently resolve.  Consequently, the
28   undesigned does not summarize that testimony.

1   Hatch to get some beer.  As they passed the Quail Tree Apartments[10], Hatch said he had been
2   told that a guy from South Phoenix lived in the apartment who was dealing a lot of cocaine
3   and it "would be an easy score."  After purchasing the beer, they returned to their vehicle and
4   Hatch pulled from under the seat a white towel wrapped around Hatch's Browning nine
5   millimeter pistol.  They pulled into the Quail Tree Apartments, Hatch asked Wheeler to look
6   for a brown Ford Torino (a description of Shaw's vehicle) and a red Honda with tinted
7   windows (a description of the victim's vehicle).  The found the brown Torino, but not the red
8   Honda, and Hatch was insistent on finding it.  Hatch subsequently pressured Wheeler to help
9   him rob the drug dealers.  Later, Hatch and Roskey had a conversation at the job site in
10  which the name Cobey was mentioned.  Wheeler went home around 6:30 or 7:00.

11      The next morning, he saw Hatch and Roskey at the job site, having an animated
12  conversation.  Roskey told Hatch that "he really fucked up and that he was nuts."  Hatch had
13  what appeared to be clothes and something wrapped up in a towel.  Later that morning, Hatch
14  offered to sell Wheeler two pistols, a Browning 9 millimeter and a Colt .357, but insisted on
15  a quick sale because the guns "were hot as hell."  Hatch had previously expressed a desire
16  to buy a .357 magnum.   Wheeler later spoke with Roskey who complained that Hatch had
17  messed up and expected Roskey to clean it up.  Roskey warned him not to buy the guns from
18  Hatch.  Roskey said Hatch had gotten a bunch of cocaine the night before.  In his last
19  conversation with Wheeler, three or four days later, Hatch warned him not to talk about their
20  going to the Quail Tree Apartments.

21      Wheeler recalled the events as being on October 12th by timing them to a payday,
22  although they were paid weekly.  Wheeler admitted to being in prison since 1988 for
23  trafficking in stolen property.  While in prison, he was charged with aggravated assault.

24      He never knew the victim or of his murder, and did not connect the events until
25  discussing them with Petitioner in prison in 1994.

26      Petitioner unsuccessfully proffered IRS and employment records of Wheeler to

27
_____

28  [10]   The "Quail Tree Apartments" is where Petitioner and Cobey lived with Shaw and
    Swan.  (*See* Exhibit LLL, R.T. 3/21/86 at 41 (Cobey trial testimony).)

establish his employment in 1984.

Jimmy Pechac - Pechac testified (*id.* at 73-79) that he knew Cobey, Ellinghausen, Dave Brown, and Jim Prince. Petitioner proffered testimony by Pechac that Cobey sold him jewelry, but the court ruled that line of questioning irrelevant.

Larry Roskey - Larry Roskey testified (Exhibit CCCC, R.T. 11/12/97 at 3-20) that in 1984 he worked with Rocky Wheeler and Ken Hatch at the Elm Street Apartments. Hatch was his brother-in-law through marriage. He denied recalling anything of the events testified to by Wheeler. He initially denied recalling seeing Hatch pull a gun on someone, but recanted when presented with a police report of an incident between Hatch and Hatch's wife. Hatch had a volatile temper in the fall of 1984. Hatch and Roskey were police informants for U.S. Customs in drug cases and got paid. Roskey was paid thousands of dollars as an informant.

Hatch Affidavit - In addition, the prosecution admitted into evidence an affidavit of Kenny Hatch, who was living in Judsonia, Arkansas at the time. (Exhibit BBBB, R.T. 11/12/97 at 70-73.)[11]  According to Petitioner, the Hatch affidavit corroborated Wheeler's story of Hatch offering to sell him a .357 magnum pistol. (Reply, Doc. 55 at 13.)

On March 31, 1998, the court issued its decision on both claims. As to the ineffective assistance of counsel claim remanded by the Court of Appeals in Petitioner's first PCR proceeding, the court found defective performance in counsel's failure to obtain transcripts of Cobey's drug trial testimony, but found a lack of prejudice because the omitted evidence would not have changed the result. (Exhibit M, M.E. 3/31/98 at 1-4.)

As to the newly discovered evidence claim from his second PCR proceeding, the court found that the newly discovered evidence was of such limited credibility that it would not

---

[11]  The Hatch affidavit has apparently not been provided to this Court. It would be relevant to these proceedings only in so far as it would buttress Petitioner's claim of actual innocence. Given it's introduction by the prosecution and opposition by Petitioner (*see e.g.* Reply, Doc. 55 at 13-14), the undersigned concludes that it would not be favorable to Petitioner's claims beyond the corroboration discussed herein, and the impeachment of Hatch. (*See* Exhibit O, PFR at 22 (summarizing testimony from affidavit).) As it thus would not alter the outcome, its production has not been ordered.

have changed the outcome of the trial.  (*Id.* at 4-6.)

**Second Petition for Review** - On December 29, 2000, Petitioner filed his second Petition for Review (Exhibit O), arguing that the PCR court had improperly resolved his newly discovered evidence and ineffective assistance claims, and that the PCR court had wrongly precluded him from presenting evidence to support his claims.  Petitioner further argued that he could not have raised his juror misconduct claim until he had the supporting affidavit.  The Petition was summarily denied.  (Exhibit P, Order 7/24/03.)

**D.  PROCEEDINGS ON THIRD POST-CONVICTION RELIEF**

During the pendency of his first and second PCR proceedings, Petitioner filed his third PCR Notice (Exhibit Q).  On February 7, 2001, he filed his third PCR Petition (Exhibit R), arguing that:

(1)    an alternate and impaneled juror had switched during deliberations, without authorization from the court;

(2)    counsel was ineffective for failing to pursue this juror switch issue,

(3)    newly discovered evidence reflected that Cobey had been involved in a drug robbery at the location where the victim's body was found, and showed Petitioner's actual innocence;

(4)    newly discovered evidence showed that the prosecution had failed to disclose impeachment evidence on the witness Tabola in violation of *Brady*; and

(5)    counsel was ineffective for failing to pursue the information on Cobey and Tabola.

In 1987, the state had submitted an amended transcript to reflect that the alternate had not participated in deliberations.  (Exhibit S.)

On July 10, 2001, the PCR court issued a minute entry rejecting most of the petition, finding that the first claim was waived and without merit, the fourth claim was without merit because the impeachment of Tabola likely would not have changed the outcome.  The court set a hearing on the Cobey issue, and did not discuss the ineffective assistance claims.

1    Evidentiary hearings were held on May 21, 2002 (Exhibit U, M.E.; Exhibit EEEE,

2    R.T. 5/21/02) and May 22, 2002 (Exhibit V, M.E.; Exhibit FFFF, R.T. 5/21/02)

3    **Brown's Testimony** - At the hearing on Petitioner's third PCR petition, David Brown

4    testified (Exhibit EEEE, R.T. 5/21/02 at 4-71) that he had known Petitioner for 19 or 20

5    years, and purchased drugs from Petitioner in 1983, 1984, and 1985. He knew Kenny Hatch,

6    Randee Rector, Jim Prince, and Tammy Shaw.  He made one transaction in 1984 for $1200.

7    He attempted to make a second deal but Petitioner was in jail.  Subsequently, he arranged a

8    second purchase from Petitioner and paid him $2500, but never received the drugs. Brown

9    testified that he has a brother named Kenny Brown, and that he it was he and his brother, and

10   a guy named Jerry Whitley that had given money to Petitioner in 1984.

11   A few days later Brown ran into Petitioner in a bar, but Petitioner said he did not have

12   the money.  He then lost track of Petitioner.  He attempted to find Petitioner through a mutual

13   friend, Jimmy Pechac, but Pechac did not know where Petitioner was, but told Brown where

14   Cobey was and that Cobey had tried to sell him some gold jewelry.  Brown eventually

15   encountered Cobey at a bar, took him to a parking lot, put a gun to his head and demanded

16   his money.  He did not ask Cobey where Petitioner was.

17   Cobey began paying him back for the purchase price, and to pay off the balance he

18   invited Brown to rob the drug dealer Howk near Cobey's house.  Cobey told him to show his

19   gun but not shoot Howk because he didn't "want to go through that again after what Kenny

20   did to Rob." (*Id.* at 17.)  Brown and an accomplice, Steve Schmitt, attempted to rob Howk,

21   took money and drugs from him, but a fight ensued.  Howk escaped, rammed Brown's

22   vehicle disabling it, so Brown and his accomplice took off on foot.  Brown left his wallet and

23   fingerprints in the car. The police contacted the owner of the car, Brown's girlfriend, told her

24   the victims had identified Brown, but they were not going to pursue the matter because they

25   considered it a drug deal gone bad. The robbery occurred near where the victim's body was

26   found.

27   **Pechac Testimony** - Petitioner also called as a witness James Pechac who  testified

28   (Exhibit EEEE, R.T. 5/21/02 at 71-81) that he knew Petitioner, James Prince, Kevin Cobey,

David Brown, Kenny Hatch, and Tom Ellinghausen. He has known Dave Brown and Petitioner since he was 10 or 12 years old.   In 1983 and 1984, Cobey worked at Graham's with Pechac's brother, Mark Pechac.  Pechac worked for Petitioner's grandfather, and traded in cocaine and jewelry.  In 1984, a couple of weeks before Halloween, he purchased three gold nugget bracelets and a gold chain from Cobey for about $500.  Ellinghausen may have been with Cobey at the time. A month or two later he told Dave Brown about the jewelry from Cobey, and he told Petitioner's brother James about it after Petitioner's trial. He did not tell anyone about this information because he did not know it was relevant.

**Randee (Rector) Ely Testimony** - Randee (Rector) Ely testified (Exhibit EEEE, R.T. 6/10/10 at 103-113) that she had known Petitioner since she was 14, and knew Sherryl Pierzchalski, Ron Rango, Larry Roskey, and Kenny Hatch.  Sheryl's birthday was October 12th, 13th or 14th.  The week of her birthday in 1984, Sheryl stayed a couple of nights at Randee's house.  Randee called Sheryl on her birthday, but she was not at home.  Kenny Hatch worked at Chapter 11, the bar, and used cocaine that he confiscated from patrons at Chapter 11.  Randee used cocaine with Hatch at his house.

**Detective Applegate** - Detective Applegate testified (Exhibit FFFF, R.T. 5/22/02 at 30-47) that he was formerly a police detective involved in the investigation of the robbery of John Howk.  He was investigating it as possession of narcotic drugs for sale, and arrested Howk on January 11, 1986.  He was not contacted on the case after the arrest. He does not know what fingerprints were found on the drugs confiscated.  He was not contacted when Kevin Cobey was arrested in connection with the murder of the victim.  He believed Howk to be a drug dealer, but he did not recall doing any followup investigations on Howk's suppliers or customers.

**Ronald Clements Testimony** - Ronald Clements testified (Exhibit FFFF, R.T. 5/22/02 at 48-67) that in August, 1985, he worked with Kevin Cobey.  While Cobey was in jail after being arrested for murder, he called Clements and mentioned that Petitioner had also been arrested and that the police were looking for Kenny Hatch.  After Cobey was released in September, he lived with Clements for three weeks to a month.  Clements was dealing

cocaine at the time, and Cobey used cocaine at Clements' house.  Kenny Hatch visited in

Clements' home with Kevin Cobey, did cocaine together, reviewed the police reports and

talked about the murder.  Kevin Cobey and Kenny Hatch admitted their involvement in the

murder.  At first Cobey said Petitioner was not involved, then on another occasion said he

was, and then when Clements asked him directly about Petitioner's involvement, Cobey said

it didn't matter and he would say whatever he needed to save  himself.  Based on their

comments, Clements believed Petitioner was innocent, but did not report that to anyone.  If

called to testify in 1985, he may have exercised his Fifth Amendment rights.  Clements was

at the time of his testimony  imprisoned at the Central Detention Unit of the Arizona

Department of Corrections.

**Other Evidence** - In addition, Petitioner called Amy Robinson aka Aimee Jamison,

who refused to testify due to threats to her family if she testified in Petitioner's behalf  and

was excused (Exhibit EEEE, R.T. 5/21/02 at 94-97).  In its written closing arguments, the

state summarized the affidavit of Robinson as follows:

> This affidavit said, in summary, that at the time of the murder she knew
> the victim Rob Richards, Cheryl Pierzchalski, Ron Rango, Cobey, and
> Prince.  The affidavit states that Rango and the others knew that they
> couldn't make any money without Prince's help.  Further, her affidavit
> says, Rango told Cobey to "scuff up" Richards and Cobey told Rango
> that he would have someone else take care of it.
>
> The affidavit says that on the night of the murder Ms. Jamison
> went to Cheryl Pierzchalski's apartment.  Pierzchalski and Richards
> were there with a lot of cash and cocaine.  Cobey called on the phone
> for Richards and arranged a meeting with him, and Richards left.  An
> hour later Rango came to the apartment and told Robinson and
> Pierzchalski to get in his car.  As he drove away, Rango told the women
> that "Rob's dead and Larry's gonna find out why," and Pierzchalski
> said Larry would be "pissed" and started crying.  The affidavit also says
> that Robinson discovered that Yates and Pierzchalski had planned to
> throw suspicion on Prince to keep the cops away from them.

(Exhibit X, Resp. Clos. Arg. at 3-4.)[12]

---

[12]  The Robinson Affidavit has apparently not been produced in this case.  Petitioner's
summary of the affidavit in his Petition of Review to the Arizona Supreme Court is
comparable to the state's summary in the PCR court.  (*See* Exhibit CC, PFR at 16-17.)  It
would only be relevant to this case to the extent that it would bolster Petitioner's claim of
actual innocence.  Because it does not alter the outcome, the undersigned presumes that this
description is accurate, complete and would reflect Robinson's testimony if compelled to

1    Petitioner also presented testimony of trial counsel Henry Florence (*id.* at 114-121)

2    who offered little testimony because of objections on relevance.  In addition, Detective Butler

3    testified (Exhibit FFFF, R.T. 5/22/20 at 15-29) that he retired in 1992, had no notes, and due

4    to a medical condition affecting his memory had no independent recollection of the case.

5    **<u>Results of Hearing</u>** - On July 15, 2002, the court issued its ruling, finding that either

6    the evidence could have been discovered earlier, or that it likely would not have changed the

7    outcome at trial.  The Petition was denied.  (Exhibit W, M.E. 7/15/02.)  Petitioner filed a

8    motion for rehearing which was summarily denied.  (Exhibit Y, M.E. 5/15/03.)

9    Petitioner filed his third Petition for Review (Exhibit Z), arguing, *inter alia:* (1)  the

10   transcript had been illegally changed (*id.* at 10); and (3) the trial court failed to consider the

11   cumulative effect of the undisclosed evidence (*id.* at 15).[13]  The Arizona Court of Appeals

12   summarily denied review.  (Exhibit AA, Order 1/14/04.)

13   Petitioner then filed a consolidated Petition for Review to the Arizona Supreme Court

14   (Exhibit CC), raising claims that:

15   (1)    the transcript concerning the alternate juror was illegally altered (*id.* at 10);

16   (2)    the PCR court failed to make a cumulative effect analysis on the undisclosed

17   _____

18   testify.

19   [13]  The other claims included: (2) counsel was ineffective for failing to challenge the
20   transcript change (Exhibit Z at 14); (4) counsel was ineffective in failing to raise the
     cumulative effect issue (*id*. at 18); (5)  the PCR court erred by failing to appoint counsel (*id*.
21   at 19);  (6)  the PCR court erred by failing to appoint an investigator (*id*. at 21); (7) the state
     had improperly destroyed the evidentiary exhibits from the trial (*id*. at 22); (8) the state had
22   held improper *ex parte* communications with the PCR court (*id*. at 26); (9) the PCR court had
     wrongly excluded testimony by trial counsel as to the effect of undisclosed evidence (*id*. at
23   27); (10) the PCR court erred in refusing to liberally construe Petitioner's questions at trial
24   to avoid self-incrimination issues for the witnesses (*id*. at 29); (11) the PCR court erred in
     excluding certain hearsay testimony (*id*. at 30); (12) the PCR court abused its discretion in
25   adopting the State's statement of the facts (*id*. at 30); (13)  the PCR court's reliance on the
     State's statement of facts exacerbated its failure to make a cumulative effect determination
26   on undisclosed evidence (*id*. at 34); (14) the PCR court abused its discretion in finding that
27   Petitioner was not diligent in pursuing newly discovered evidence (*id*. at 34); and (15) the
     PCR court improperly refused to grant sanctions against the State for failure to provide notice
28   of or information on witness interviews (*id*. at 36).

1    evidence (*id.* at 11); and

2        (3)    the newly discovered evidence entitled Petitioner to a new trial (*id.* at 15).

3    The Arizona Supreme Court summarily denied review.  (Exhibit DD, order 2/14/05.)

4

5    **E.  PROCEEDINGS ON FOURTH POST-CONVICTION RELIEF**

6        On February 23, 2004, during the pendency of his petition for review to the Arizona

7    Supreme Court, Petitioner instituted his fourth PCR proceeding by filing his PCR Notice

8    (Exhibit EE).  On December 1, 2004, he filed his fourth PCR petition (Exhibit FF), asserting:

9        (1)    failure to disclose interviews with Ronald Flood showing cocaine dealings

10           among Cobey, Hatch, and the victim (*id.* at 5);

11       (2)    newly discovered evidence in the form of Cobey's presentence report and a

12           written declaration by Cobey referenced in it had not been disclosed by the

13           State (*id.* at 16); and

14       (3)    newly discovered evidence in the form of evidence of witness Rosky's cocaine

15           use and Roskey and Hatch's concealment of Hatch's cocaine thefts had not

16           been disclosed by the State (*id.* at 20); and

17       (4)    Petitioner right to pro se representation was denied as a result of shackling of

18           Petitioner at his prior PCR hearing (*id.* at 26).

19       A hearing was held on the Petition on November 22, 2005.  (Reply re Exhibits, Doc.

20   70, R.T. 11/22/05.)

21       On January 12, 2006, the PCR court denied Petitioner's petition, finding that the

22   claims were waived and thus precluded, and that: (1) Cobey did not provide the only

23   evidence of premeditation; (2) the Flood testimony was not credible and likely would have

24   not made a difference at trial; and (3) the Cobey presentence report did not exist at the time

25   of trial or sentencing, was at most impeaching evidence, was not relevant to Cobey's case,

26   there was no reasonable likelihood that it would have changed the outcome, and was not

27   *Brady* material because it was immaterial and was not in the State's possession.

28       Petitioner filed a Petition for Review (Exhibit HH), arguing that:

1      (1)    the PCR court improperly concluded his claims were waived (*id.* at 7);

2      (2)    the PCR court erred in denying his failure to disclose claims without

3              conducting the proper analysis and having an evidentiary hearing, and on the

4              basis that there was other evidence of premeditation (*id.* at 9);

5      (3)    the PCR court's conclusion that the Flood testimony would not have altered

6              the outcome was an abuse of discretion (*id.* at 13);

7      (4)    Cobey's presentence report was newly discovered evidence of recantation, was

8              entitled to consideration, and was in the state's possession at the tme of trial

9              (*id.* at 18);

10     (5)    the PCR Court failed to rule on the Roskey and Hatch cocaine use and theft

11            issues (*id.* at 19).

12 The Arizona Court of Appeals summarily denied review (Exhibit II, Order 8/23/07).

13       Petitioner then filed a Petition for Review by the Arizona Supreme Court (Exhibit JJ),

14 which was summarily denied.  (Exhibit KK, Order 1/3/08.)

15

16 **F.  PRESENT FEDERAL HABEAS PROCEEDINGS**

17       **Petition** - Petitioner commenced the current case by filing his Petition for Writ of

18 Habeas Corpus pursuant to 28 U.S.C. § 2254 on July 14, 2008 (Doc. 1).  Petitioner's Petition

19 asserts the following three grounds for relief:

20      (1)    violation of due process under *Brady v. Maryland*, 373 U.S. 83 (1963) as a

21            result of the prosecution's failure to disclose: (a) the August 19, 1985 Phoenix

22            Police report identifying the witness Dave Brown and connecting Cobey with

23            a "drug rip-off"; (b) 1985 Phoenix Police reports on witness Tabola; (c)

24            interviews of exculpatory witness Flood; (d) Cobey's May, 1986 presentence

25            report; and (e) a written declaration by Cobey referenced in the presentence

26            report; and as a result of the PCR court's consideration of the evidence on an

27

28

1              item by item basis[14]

2      (2)     violation of his right to due process as a result of: (a) juror Pigg's false denial

3              of a relationship to witness Hatch; (b) excused juror Milam's participation in

4              jury deliberations, and the alteration of trial transcripts to hide the matter;

5      (3)     violation of his right to effective assistance of counsel as a result of trial

6              counsel's failure to adequately challenge inconsistent testimony by Cobey.

7      **Response** - On October 27, 2008, Respondents filed their Response ("Answer") (Doc.

8    16).  Respondents concede that Petitioner has exhausted his state remedies on Grounds I

9    (*Brady*), but contend that his state remedies on the remainder of his claims were not properly

10   exhausted, and are now procedurally defaulted.  Respondents argue that all of the claims are

11   either entirely without merit, or the state courts' decisions were not sufficiently erroneous to

12   merit relief under the limitations of 28 U.S.C. § 2254.

13          On January 28, 2009, the Court ordered Respondents to supplement their response to

14   address whether presentation to the Arizona Supreme Court was required because of

15   Petitioner's life sentence, in light of the 1989 amendments to Ariz. Rev. Stat. § 12-120.21,

16   which granted the Arizona Court of Appeals jurisdiction over appeals from life sentences.

17   The purpose of the supplement was to assist the Court in determining whether, under

18   *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999), presentation of claims to the Arizona

19   Supreme Court was necessary for Petitioner to have exhaust his state remedies.

20          On February 13, 2009, Respondents filed their Supplemental Answer (Doc. 27)

21   reiterating the legislative history, and conceding the applicability of the 1989 amendments

22   to Petitioner's PCR proceedings.

23          **Reply** - On March 2, 2010, after protracted extensions as a result of Petitioner's

24   efforts to secure a typewriter to assist in preparation of his reply, Petitioner filed a

25   ─────────────

26          [14]  Petitioner also complains in the 10 pages of his Ground One of a variety of
     purported improprieties by the prosecution and the PCR courts, *i.e.* presenting false
27   testimony, denying Petitioner a hearing, etc.  The undersigned construes these allegations to
     be part of the *res gestae*.  The only items of evidence alleged by Petitioner to have been
28   existent and not disclosed are those  identified herein.

1  handwritten Reply (Doc. 55).  Petitioner argues that his claims were properly exhausted and

2  are meritorious.

3      **Supplements to Record** - On May 13, 2010, the undersigned noted that Exhibit FF

4  was incomplete, and directed (Doc. 56)   provision of the balance. On the same date,

5  Respondents provided a complete copy of their Exhibit FF (Doc. 57).

6      On May 21, 2010, the undersigned noted the potential need to review various records

7  in connection with Petitioner's claims of actual innocence, suppressed evidence, and his

8  ineffective assistance claims.  Respondents were directed (Doc. 58) to supplement the record

9  to include various transcripts and documents.  On June 10, 2010, Respondents filed their

10  response with various exhibits.  (Docs. 59, 60, 61, 62, 53, 64, 65, and 66.)  Upon review, it

11  appears that duplicates of the exhibits have been filed at Docs. 59 and 60, and at 61 and 63.

12      Because these latter supplemental exhibits were filed in no certain order, with several

13  exhibits spread across multiple docket entries, the undersigned includes herein an index of

14  the exhibits and their location in the docket, including docket page numbers:

| **Exh** | **Description** | **Docket** | **Page** |
|---|---|---|---|
| QQ | Phoenix PD interview of Kevin Cobey, 8/23/85 | 64-4 | 1 |
| RR | Kevin Cobey presentence report, 5/27/86 | 64-4 | 20 |
| SS | Phoenix PD interview of James Tabola, 11/07/84 | 64-4 | 28 |
| TT | Phoenix PD report of Det. Williams, re: Tabola, 3/19/85 | 64-4 | 30 |
| UU | Phoenix PD report of Det. Taugner, re: Tabola, 3/19/85 | 64-4 | 38 |
| VV | Phoenix PD report of Det. Maxwell, re: Tabola, 3/19/85 | 64-4 | 43 |
| WW | Mesa PD report of Ofc. Otañez, re: Tabola, 5/14/85 | 64-4 | 46 |
| XX | Mesa PD report of Det. Sowards, re: Tabola, 5/14/85 | 66-1 | 1 |
| YY | Mesa PD report of Det. Byers, re: Tabola, 5/14/85 | 66-1 | 7 |
| ZZ | Phoenix PD report of Ofc. Driscoll, re: Howk, 8/19/85 | 66-1 | 23 |
| AAA | Phx. PD report of Ofc. Antonini, re: Howk, Brown, 8/19/85 | 66-1 | 27 |
| BBB | Phoenix PD report of Det. Applegate, re: Howk, 8/20/85 | 66-1 | 31 |
| CCC | Phoenix PD report of DPS Sgt. Capp, re: Howk, 8/22/85. | 66-1 | 33 |
| DDD | Phoenix PD lab report of Criminalist Leister, re: Howk | 59-6 | 1 |
| EEE | AZDOC information for inmate Ronald T. Flood | 59-6 | 3 |
| FFF | Transcript, separate drug trial, 1/07/86 | | |
| | Part 1 | 59-8 | 1 |
| | Part 2 | 59-7 | 1 |
| GGG | Transcript, murder trial (jury selection), 3/17/86 | | |
| | Part 1 (Pages 1-79) | 61-2 | 1 |
| | Part 2 (pages 80-134) | 61-1 | 1 |
| HHH | Transcript, murder trial (voluntariness hearing), 3/19/86 | | |
| | Part 1 (pages 1-79) | 61-4 | 1 |
| | Part 2 (pages 80-155) | 61-3 | 1 |
| III | Transcript, murder trial, 3/20/86 morning session | | |
| | Part 1 (Pages 1-50) | 61-6 | 1 |

| | | | | |
|---|---|---|---|---|
| JJJ | Transcript, murder trial, 3/20/86 afternoon session | | 61-7 | 1 |
| KKK | Transcript, murder trial, 3/21/86 morning session | | 61-8 | 1 |
| LLL | Transcript, murder trial, 3/21/86 afternoon session | | | |
| | | Part 1 (Pages 1-69) | 61-9 | 1 |
| | | Part 2 (Pages 70-97) | 61-10 | 1 |
| MMM | Transcript, murder trial, 3/24/86 morning session | | 62-1 | 1 |
| NNN | Transcript, murder trial, 3/24/86 afternoon session | | | |
| | | Part 1 (Pages 1-50) | 62-3 | 1 |
| | | Part 2 (Pages 51-106) | 62-2 | 1 |
| OOO | Transcript, murder trial, 3/25/86 | | | |
| | | Part 1 (Pages 1-80) | 62-4 | 1 |
| | | Part 2 (Pages 81-140) | 62-5 | 1 |
| | | Part 3 (Pages 141-189) | 62-6 | 1 |
| PPP | Transcript, murder trial, 3/26/86 | | | |
| | | Part 1 (Pages 1-80) | 62-7 | 1 |
| | | Part 2 (Pages 81-140) | 62-8 | 1 |
| | | Part 3 (Pages 141-165) | 62-9 | 1 |
| QQQ | Transcript, murder trial, 3/27/86 | | | |
| | | Part 1 (Pages 1-80) | 64-1 | 1 |
| | | Part 2 (Pages 81-140) | 64-2 | 1 |
| | | Part 3 (Pages 141-175) | 64-3 | 1 |
| RRR | Transcript, murder trial, 3/28/86 | | | |
| | | Part 1 (Pages 1-50) | 64-5 | 1 |
| | | Part 2 (Pages 51-90) | 64-6 | 1 |
| SSS | Transcript, murder trial, 3/31/86 | | | |
| | | Part 1 (Pages 1-95) | 64-9 | 1 |
| | | Part 2 (Pages 96-194) | 64-7 | 1 |
| | | Part 3 (Pages 195-198) | 64-8 | 1 |
| TTT | Transcript, murder trial, 4/01/86 | | | |
| | | Part 1 (Pages 1-80) | 65-2 | 1 |
| | | Part 2 (Pages 81-153) | 65-1 | 1 |
| UUU | Transcript, murder trial, 4/02/86 | | | |
| | | Part 1 (Pages 1-70) | 65-5 | 1 |
| | | Part 2 (Pages 71-140) | 65-3 | 1 |
| | | Part 3 (Pages 141-175) | 65-4 | 1 |
| VVV | Transcript, murder trial, 4/03/86. | | | |
| | | Part 1 (Pages 1-89) | 65-8 | 1 |
| | | Part 2 (Pages 90-180) | 65-6 | 1 |
| | | Part 3 (Pages 181-194) | 65-7 | 1 |
| WWW | Transcript, murder trial, 4/04/86 | | | |
| | | Part 1 (Pages 1-70) | 65-10 | 1 |
| | | Part 2 (Pages 71-131) | 65-9 | 1 |
| XXX | Transcript, motion for new trial, 5/02/86 | | | |
| | | Part 1 (Pages 1-70) | 66-3 | 1 |
| | | Part 2 (Pages 71-126) | 66-2 | 1 |
| YYY | Transcript, motion for new trial, 5/07/86 | | | |
| | | Part 1 (Pages 1-60) | 66-5 | 1 |
| | | Part 2 (Pages 61-75) | 66-4 | 1 |
| ZZZ | Transcript, sentencing, 5/15/86 | | 66-6 | 1 |
| AAAA | Transcript, Rule 32 evidentiary hearing, 11/03/97 | | | |
| | | Part 1 | 59-2 | 1 |
| | | Part 2 | 59-1 | 1 |
| BBBB | Transcript, Rule 32 evidentiary hearing, 11/04/97 | | 59-3 | 1 |
| CCCC | Transcript, Rule 32 evidentiary hearing, 11/12/97 | | 59-4 | 1 |
| DDDD | Transcript, Rule 32 evidentiary hearing, 5/20/02 | | 59-5 | 1 |

| | | | |
|---|---|---|---|
| EEEE Transcript, Rule 32 evidentiary hearing, 5/21/02 | | | |
| Part 1 | | 59-11 | 1 |
| Part 2 | | 59-10 | 1 |
| FFFF  Transcript, Rule 32 evidentiary hearing, 5/22/02 | | 59-9 | 1 |

Petitioner asserted various objections (Doc. 67) to these supplements, where were denied. (*See* Order 9/15/10, Doc. 72.)  Petitioner then submitted copies of several transcripts from his 2005 PCR hearings (Doc. 70).  The Court accepted those as a part of the record.  (*See* Order 9/15/10, Doc. 72).

**III. APPLICATION OF LAW TO FACTS**

**A.  EXHAUSTION, PROCEDURAL BAR  & PROCEDURAL DEFAULT**

      Respondents argue that Petitioner's state remedies on the claims in Ground  II (Juror Misconduct) as to Juror Pigg's relationship to witness Hatch, and Ground III (Ineffective Assistance) were not properly exhausted because Petitioner failed to raise them to the Arizona Supreme Court.  Respondents argue that Petitioner has failed to exhaust his state remedies as to his claims in Ground II (Juror Misconduct) as to Juror Milam's participation in the state proceedings, because the matter was never raised as a federal claim. Respondents argue that the claims with unexhausted state remedies are now procedurally defaulted.

**1.  Exhaustion Requirement**

      Generally, a federal court has authority to review a state prisoner's claims only if available state remedies have been exhausted.  *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (*per curiam*). The exhaustion doctrine, first developed in case law, has been codified at 28 U.S.C. § 2254(b) and (c).  When seeking habeas relief, the burden is on the petitioner to show that he has properly exhausted each claim.  *Cartwright v. Cupp,* 650 F.2d 1103, 1104 (9th Cir. 1981)(*per curiam*), *cert. denied,* 455 U.S. 1023 (1982).

     **a.  Proper Proceeding**

      Ordinarily,  "to exhaust one's state court remedies in Arizona, a petitioner must first raise the claim in a direct appeal or collaterally attack his conviction in a petition for post-

1  conviction relief pursuant to Rule 32." *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir.

2  1994).  Only one of these avenues of relief must be exhausted before bringing a habeas

3  petition in federal court.  This is true even where alternative avenues of reviewing

4  constitutional issues are still available in state court.  *Brown v. Easter*, 68 F.3d 1209, 1211

5  (9th Cir. 1995); *Turner v. Compoy*, 827 F.2d 526, 528 (9th Cir. 1987), *cert. denied*, 489 U.S.

6  1059 (1989).

7  **b.  Proper Forum**

8  Ordinarily, a petitioner has not satisfied the exhaustion requirement unless he has

9  fairly presented his claim to the highest state court.  *Roettgen v. Copeland*, 33 F.3d 36, 38

10  (9th Cir. 1994).  Nonetheless, in *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999) the Supreme

11  Court recognized that it is only "available" remedies that must be exhausted, and that

12  requiring prisoners to pursue discretionary review by state courts may result in an unwelcome

13  increase in filings with state courts. 526 U.S. at 847.  Thus, the Court instructed that habeas

14  courts are not to ignore state rules or law making a given procedure "unavailable." *Id.*  In his

15  concurrence in *O'Sullivan*, Justice Souter noted: "I understand that we leave open the

16  possibility that a state prisoner is likewise free to skip a procedure even when a state court

17  has occasionally employed it to provide relief, so long as the State has identified the

18  procedure as outside the standard review process and has plainly said that it need not be

19  sought for the purpose of exhaustion." *Id.* at 1735 (Souter, J. concurring).

20  In *O'Sullivan*, the Supreme Court specifically cited *State v. Sandon*, 161 Ariz. 157,

21  777 P.2d 220 (1989).  In *Sandon*, the Arizona Supreme Court noted that there was no right

22  to appeal to the Arizona Supreme Court except in cases where the death sentence or life

23  imprisonment was imposed, citing Ariz. Rev. Stat. § 12-120.21(A)(1). *Sandon*, 161 Ariz. at

24  158, 777 P.2d at 221.  Thus, the Arizona Supreme Court held that a petition for review to the

25  Arizona Supreme Court was not required to exhaust state remedies for federal habeas

26  purposes.

27  In *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999), the Ninth Circuit relied

28  on *O'Sullivan* and *Sandon* to conclude that absent a death penalty or life sentence, Arizona

1    state prisoners have exhausted claims presented in habeas petitions if they have been ruled

2    upon by the Arizona Court of Appeals.  In so doing, the Swoopes court cited Justice Souter's

3    concurrence.  *Id.* at 1009-10.

4         Respondents argue (Answer, Doc. 16 at 11) that, notwithstanding *Swoopes*,

5    presentation to the Arizona Supreme Court (not just the Arizona Court of Appeals) is

6    required for exhaustion, citing *Baldwin v. v. Reese,* 541 U.S. 27, 30–33 (1999).  The Ninth

7    Circuit's subsequent reliance on *Swoopes* in *Castillo v. McFadden*, 370 F.3d 882, 887 n. 3

8    (9th Cir. 2004), notwithstanding *Baldwin*, dispels this argument.  Moreover, nothing in

9    *Baldwin* precludes the reasoning in *Swoopes*.

10        However, this case is not squarely under the language of *Swoopes*, because Petitioner's

11   direct appeal and resentencing straddled the April, 1989 amendments to Ariz. Rev. Stat. §

12   120.21 which granted the Arizona Court of Appeals jurisdiction over cases with life

13   sentences. *See* Arizona Session Laws 1989, Ch. 58, § 1 (amending Ariz. Rev. Stat. § 12-

14   120.21 giving jurisdiction of life sentence appeals to Arizona Court of Appeals) (effective

15   April 19, 1989).  Respondents concede that these amendments were applicable to all of

16   Petitioner's PCR proceedings.   (Supp. Answer, Doc. 27 at 2-3.)  Thus, review by the

17   Arizona Supreme Court of those PCR proceedings was discretionary.

18        The *Swoopes* decision refers to there being no right of appeal to the Arizona Supreme

19   Court "except in capital cases or when a life sentence is imposed." *Swoopes*, 196 F.3d at

20   1009.  Indeed, the decision concludes that "except in habeas petitions in life-sentence or

21   capital cases, claims of Arizona state prisoners are exhausted for purposes of federal habeas

22   once the Arizona Court of Appeals has ruled on them." *Id.* at 1010.  However, in reaching

23   its decision, the Ninth Circuit was faced with a habeas petitioner whose appeal to the Arizona

24   Court of Appeals was denied in 1988, prior to the 1989 amendments eliminating

25   life-sentences from the exceptions to Arizona Court of Appeals jurisdiction. *See State v.

26   Swoopes*, 155 Ariz. 432, 747 P.2d 593 (App. 1988).  Similarly, the Ninth Circuit was

27   required to draw on decisions applying the pre-1989 amendments law.  In *State v. Sandon*,

28   161 Ariz. 157, 777 P.2d 220 (1989), the Arizona Supreme Court considered the review rights

1   of a defendant whose appeal was denied in 1986. *Sandon*, 161 Ariz. at 157, 777 P.2d at 220.

2   Although the Sandon court noted the adoption of the 1989 amendments in a footnote, they

3   were not applying that law. *Id.* at 158 n. 1, 777 P.2d at 221 n.1.

4        Similarly, the decision in *State v. Shattuck*, 140 Ariz. 582, 684 P.2d 154 (1984), also

5   relied on in *Swoopes*, predated the 1989 amendments. Indeed, the only Arizona decision

6   relied upon in *Swoopes* and made after the 1989 amendments was *Moreno v. Gonzalez*, 192

7   Ariz. 131, 962 P.2d 205 (1998).   *Moreno* did not, however rely upon Ariz. Rev. Stat. §§

8   12-120.21 or 13-4031, or specifically discuss the death/life sentence limitation. Rather,

9   *Moreno* focused on the "nature and scope of discretionary review by petition for review,"

10  *Moreno*, 192 Ariz. at 134, 962 P.2d at 133, and was concerned with whether such

11  discretionary review was an "appeal" within the meaning of the exceptions to Arizona's

12  timeliness bar for claims not presented on "appeal" for good cause.

13       Moreover, the import of *Sandon* was the Arizona Supreme Court's apparent desire to

14  stop the flood of "large numbers of prisoner petitions seeking to exhaust state remedies."

15  *Sandon*, 161 Ariz. at 157, 777 P.2d at 220.   The *Sandon* court concluded that "'[o]nce the

16  defendant has been given the appeal to which he has a right, state remedies have been

17  exhausted." *Id.* at 158, 777 P.2d at 221, quoting *Shattuck*, 140 Ariz. at 585, 684 P.2d at 157.

18  Thus, their recitation of the death/life sentence limitation is not properly read as the limit of

19  their holding, but as a reiteration of the pre-1989 holding of *Shattuck*. Thus *Sandon* may

20  only be reasonably read as an attempt by the Arizona Supreme Court to remove their

21  discretionary review from the cycle of review required for exhaustion of Arizona's state

22  remedies. While a given  respondent may desire to require its Arizona prisoner to file a

23  petition for review with the Arizona Supreme Court, it is not the respondents'' desire,

24  however, but that of the Arizona court that is controlling.

25       Finally, *Swoopes* itself did not hinge on any reading of Ariz. Rev. Stat. §§ 12-120.21

26  or 13-4031 themselves, but upon the question "whether Arizona has identified discretionary

27  Supreme Court review 'as outside the standard review process and has plainly said that it

28  need not be sought for the purpose of exhaustion.' " *Swoopes*, 196 F.3d at 1010, quoting

*O'Sullivan*, 526 U.S. 838, 850 (1999).   The only basis for identifying that  discretionary review as being tied to death/life sentences was the language of *Shattuck* and *Sandon*, and their reliance upon the then applicable pre-1989 versions of Ariz. Rev. Stat. § § 12-120.21 and 13-4031.

Thus, until this issue is resolved by the Ninth Circuit, the Arizona District Courts are faced with either applying the exact language of *Swoopes*, or applying the principle of *Swoopes* to the facts as they exist in this case.  The latter holds truer to the function of a trial court in attempting to apply appellate court precedent.

> Using the techniques developed at common law, a court confronted with apparently controlling authority must parse the precedent in light of the facts presented and the rule announced. Insofar as there may be factual differences between the current case and the earlier one, the court must determine whether those differences are material to the application of the rule or allow the precedent to be distinguished on a principled basis.

*Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001).

Applying the rule of *Swoopes*, the undersigned concludes that in light of the 1989 amendments,  claims fairly presented by Petitioner to the Arizona Court of Appeals in his PCR proceedings are exhausted notwithstanding any failure to fairly present them to the Arizona Supreme Court.

Effect of Skipping Intermediate Courts - While presentation to the Arizona Supreme Court was not necessary in Petitioner's PCR proceedings, neither was it sufficient absent presentation to the trial court and the  Arizona Court of Appeals.

In *Casey v. Moore*, 386 F.3d 896 (9th Cir. 2004), the court reiterated that to properly exhaust a claim, "a petitioner must properly raise it on every level of direct review."

> Academic treatment accords: The leading treatise on federal habeas corpus states, "Generally, a petitioner satisfies the exhaustion requirement if he properly pursues a claim (1) throughout the entire direct appellate process of the state, or (2) throughout one entire judicial postconviction process available in the state."

*Casey*, 386 F.3d at 916 (quoting Liebman & Hertz, *Federal Habeas Corpus Practice and Procedure*, § 23.3b (4th ed. 1998).

In Arizona, review of a petition for post-conviction relief by the Arizona Court of

Appeals is governed by Rule 32.9, Arizona Rules of Criminal Procedure, which clarifies that review is available for "issues which were decided by the trial court." Ariz. R. Crim. P. 32.9(c)(1)(ii). *See also State v. Ramirez*, 126 Ariz. 464, 468, 616 P.2d 924, 928 (Ariz.App., 1980) (issues first presented in petition for review and not presented to trial court not subject to review). Accordingly, PCR claims presented for the first time to the Arizona Court of Appeals are not fairly presented.

Similarly, the Arizona Supreme Court does not grant review of claims not raised below, absent special considerations. *See State v. Logan*, 200 Ariz. 564, 565, 20 P.3d 631, 632, n.2 (2001). Presentation to the Arizona Supreme Court for the first time is not sufficient to exhaust an Arizona state prisoner's remedies. "Submitting a new claim to the state's highest court in a procedural context in which its merits will not be considered absent special circumstances does not constitute fair presentation." *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

On the other hand, in a direct appeal, failure to present to the trial court does not necessarily prevent exhaustion; all that is required is presentation "at all appellate stages." *Casey*, 386 F.3d at 916 (emphasis added). "If the petitioner fails to raise a federal claim at trial (or if the claim was not cognizable at all or did not arise until after trial), the petitioner satisfies the exhaustion requirement by raising the claim on appeal, on a motion for rehearing of the appeal, or even in a delayed appeal." Liebman & Hertz, *Federal Habeas Corpus Practice and Procedure*, § 23.3b (5th ed. 2001).[15] However, failure to present a claim to the trial court in a PCR proceeding may result in a finding that the claim has not been fairly presented, *id.* at n. 26, *i.e.* if the failure to present to the trial court results in the appellate court applying a procedural bar which qualifies as an "independent and adequate state ground." *See Harris v. Reed*, 489 U.S. 255, 260 (1989).

/ /

---

[15] Nonetheless, the failure to present to the trial court might prevent habeas review if it results in the appellate court applying a procedural bar which qualifies as an "independent and adequate state ground".

### c.  Fair Presentment

To result in exhaustion, claims must not only be presented in the proper forum, but must be "fairly presented."  That is, the petitioner must provide the state courts with a "fair opportunity" to apply controlling legal principles to the facts bearing upon his constitutional claim.  28 U.S.C. § 2254;  *Picard v. Connor,* 404 U.S. 270, 276-277 (1971).  A claim has been fairly presented to the state's highest court if the petitioner has described both the operative facts and the federal legal theory on which the claim is based.  *Kelly v. Small*, 315 F.3d 1063, 1066 (9th Cir. 2003) (overruled on other grounds, *Robbins v. Carey*, 481 F.3d 1143, 1149 (9ᵗʰ Cir. 2007)).

While the petitioner need not recite "book and verse on the federal constitution," *Picard v. Connor*, 404 U.S. 270, 277-78 (1971) (quoting *Daugherty v. Gladden*, 257 F.2d 750, 758 (9th Cir. 1958)), it is not enough that all the facts necessary to support the federal claim were before the state courts or that a "somewhat similar state law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982)(per curiam).

On the other hand, both the federal and state courts are tasked with enforcement of the federal constitution.  *See Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003).  Thus, "a citation to a state case analyzing a federal constitutional issue serves the same purpose as a citation to a federal case analyzing such an issue." *Id.*

### d.  Application to Petitioner's Claims

**(1)  Ground II (Juror Misconduct)** - In his Ground II, Petitioner argues that his due process rights were violated because: (a)  juror Pigg falsely denied a relationship to witness Hatch; and (b) excused juror Milam participated in jury deliberations, and the trial transcripts were altered  to hide the matter.

**Misconduct by Juror Pigg** - Respondents argue that Petitioner's state remedies on the claims in Ground  II (Juror Misconduct) as to Juror Pigg's relationship to witness Hatch,[16]

---

[16]  Respondents also argue that Petitioner failed to exhaust his remedies on a claim of a relationship between Juror Pigg and the victim.  (Answer, Doc. 16 at 15-16.)  The undersigned does not understand Petitioner to assert such a relationship, and Petitioner

1   were  not properly exhausted because Petitioner failed to raise them to the Arizona Supreme

2   Court.  However, as discussed above, presentation to the Arizona Supreme Court was not

3   required to exhaust Petitioner's state remedies on his PCR petitions.  However, this claim

4   was not fairly presented to either the Arizona Court of Appeals or the Arizona Supreme

5   Court.

6        Presentation to PCR Court - Respondents point out that this matter was raised in

7   Petitioner's second PCR petition.  (Answer, Doc. 1 at 16 (citing Exhibit H, PCR Pet. at 3-5.)

8   Petitioner asserted that the misconduct by Pigg denied him his right to an impartial jury in

9   violation of the 6th and 14th Amendments.  (*Id.* at 5.)  However, the PCR court found that the

10  claim had been raised on direct appeal, and was thus precluded from further review.  The

11  PCR Court also found that the matter was known by Petitioner at the time of his first PCR

12  petition and was waived by failure to present it in that proceeding.[17]  Finally, the trial court

13  rejected the claim on its merits, finding that Petitioner had failed to show prejudice because

14  disclosure of the information would not have necessarily resulted in Pigg being excused, and

15  there was no probability that the outcome of the trial would have been different.  (Exhibit

16  I, M.E. 3/14/97 at 1-2.)

17        Presentation to Arizona Court of Appeals - Petitioner argued in his Petition for

18

19  explicitly denies asserting such a claim.  (Reply, Doc. 55 at 8.)  The only reference to the
    victim in Ground II is to explain that during voir dire the trial court referenced the names of

20  the victim and the witnesses.  (*See* Petition, Doc. 1 at 6.)

21        [17]  The undersigned notes that Respondents do not assert that the rejection of this
    claim on preclusion and waiver grounds amount to an independent and adequate state

22  grounds, barring habeas review of the merits. (*See* Answer, Doc. 16 at 15-16 (discussing
    failure to exhaust Ground II.))  Perhaps this is because Petitioner's appellate brief plainly

23  limits its challenge to Juror Pigg on the basis of his general bias against drug usage, and does
    not reference any issue concerning a relationship with a witness (*see* Exhibit MM, Open.

24  Brief at 5-8), and there is nothing in the record to suggest that Petitioner was aware of the
    relationship between Pigg and Hatch prior to his receipt of the Brannen Affidavit (Exhibit

25  NN) in November, 1995.  Petitioner explicitly contends that the trial court's finding of
    presentation on direct appeal (and thus preclusion of the claim) is false on this basis. (Reply,

26  Doc. 55 at 8-9.)  That would further explain Petitioner's failure to assert that the PCR Court's

27  ruling established his exhaustion, and he instead points to his Petition for Review to establish

28  exhaustion.  (*Id.* at 11.)

Review (Exhibit O) that this claim was improperly deemed waived because he had not raised Juror Pigg's misconduct on direct appeal, and did not have evidence of the misconduct until November 22, 1995, after his first PCR petition had already been decided and was the subject of a petition for review.  (Exhibit O, PFR at 41-42.)  Petitioner further argued that he had made a colorable claim, citing *State v. Stolze*, 112 Ariz. 124, 126-127, 539 P2.d 881 (1975) and *State v. Robinson*, 127 Ariz. 324, 620 P.2d 703 (1980).  While the latter makes no reference to federal law, the former cited *United States v. Crosson*, 462 F.2d 96 (9th Cir. 1972), *cert. denied* 409 U.S. 1064 .  However, that decision was not based upon any particular federal guarantee, but simply referenced the jury being qualified as "fair and impartial." *Crosson*, 462 F.2d at 104.  The citation to *Crosson* would not served to alert the Arizona Court of Appeals that the claim being asserted was a federal one.  Petitioner did not reference any constitutional provision, nor cite any federal authorities in his Petition for Review.

The Arizona Court of Appeals issued a summary denial of review.  (Exhibit P, order 7/24/03.)

It might be argued that the underlying presentation of the claim as a federal one to the PCR court should have carried over to the Arizona Court of Appeals.  Indeed, Petitioner argues that he attached the prior PCR rulings to his petitions for review.  (Reply Doc. 55 at 6-7.) However, "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).  The Arizona habeas petitioner "must have presented his federal, constitutional issue before the Arizona Court of Appeals within the four corners of his appellate briefing." *Castillo v. McFadden*, 370 F.3d 882, 887 (9th Cir. 2004).

Based upon the foregoing, the undersigned finds that Petitioner did not fairly present his challenge to Juror Pigg's misconduct to the Arizona Court of Appeals as a federal claim.

<u>Presentation to the Arizona Supreme Court</u> - Petitioner asserts in his Petition and

1  Reply that he sought review of his second PCR proceeding in the Arizona Court of Appeals

2  in his November, 2004 Petition for Review.  (Petition, Doc. 1 at 3; Reply, Doc. 55 at 6.)

3  However, Petitioner's November, 2004 Petition for Review did not include any reference to

4  misconduct by Juror Pigg.  (*See* Exhibit CC, PFR.)  Moreover, even if Petitioner had

5  presented this claim to the Arizona Supreme Court, it would not have been fairly presented

6  because Petitioner had failed to first present it to the Arizona Court of Appeals. *See Roettgen,*

7  33 F.3d at 38.[18]

8      Motion to Recall Mandate - Petitioner asserts in his Petition that he exhausted his state

9  remedies by presenting his claims in Ground II in his Third PCR petition and the  Motion to

10  Recall Mandate. (Petition, Doc. 1 at 6.)  However, the third PCR petition (Exhibit R at 4-8)

11  and the motion to recall the mandate (Reply Exhibit 1) were limited to arguing the

12  misconduct by excused Juror Milam and the related alteration of the trial transcript.

13      Summary re Misconduct by Juror Pigg - Petitioner presented his federal claim on

14  misconduct by Juror Pigg to the PCR court, but failed to present it as a federal claim to the

15  Arizona Court of Appeals or to present it at all to the Arizona Supreme Court.  Accordingly,

16  

17      [18]   Petitioner makes the novel argument that presentation to the Arizona Supreme
    Court would have been futile because the Court of Appeals issued a summary denial and thus

18  there was no " 'decision' the court can review."  (Reply, Doc. 55 at 7.) In support, Petitioner
    cites *State v. Aguilar*, 170 Ariz. 292, 823 P.2d 1300 (App. 1991), in which the Arizona Court

19  of Appeals held that it had no jurisdiction to consider on a petition for review on a city court
    decision or an appellate decision thereon by the superior court.  In rejecting the attempt to

20  invoke by analogy the normal petition for review to the Arizona Supreme Court from a
    judgment originating in the superior court and reviewed in the court of appeals, the *Aguilar*

21  court noted that the Arizona Supreme Court's jurisdiction under Ariz. R. Crim. P. 31.19 was
    limited to review of "a court of appeals *decision*."  170 Ariz. at 294, 823 P.2d at 1302

22  (emphasis added).  Because there had been no presentation to (and thus no decision by) the
    Arizona Court of Appeals, no jurisdiction by the Arizona Supreme Court was possible, and

23  therefore the analogy failed. However, nothing in *Aguilar* suggests that a summary denial by
    the Arizona Court of Appeals does not qualify as a "decision" within the meaning of Rule

24  31.19.  *Cf.* Ariz. R. App. P. 28(a) (differentiating between "opinion", "memorandum

25  decision," and "order").
        Regardless, it is irrelevant whether on this basis review by the Arizona Supreme Court

26  was available.   The undersigned has concluded that presentation to that court was

27  unnecessary for exhaustion pursuant to *Swoopes*.  Moreover, Petitioner failed to present his

28  claim to the Arizona Court of Appeals.

1   this claim was not properly exhausted.

2        **Misconduct by Juror Milam** - Respondents argue that Petitioner has failed to

3   exhaust his state remedies as to his claims in Ground II (Juror Misconduct) as to Juror

4   Milam's participation in the state proceedings and the alteration of the transcript showing that

5   participation, because the matter was never raised as a federal claim.

6        <u>Presentation on Direct Appeal</u> - Petitioner raised the facts of the participation by Juror

7   Milam on direct appeal.  (Exhibit MM, Open. Brief at 7, 28.)  However, Petitioner asserted

8   no federal claim in connection with this argument.  Rather, he cited only Ariz. R. Crim. P.

9   24.1(c)(3) and 24(d), and *State v. Garcia*, 141 Ariz. 580, 688 P.2d 206 (App. 1984).  The

10  latter case does cite *Smith v. Phillips,* 455 U.S. 209, 217 (1982) ("due process does not

11  require a new trial every time a juror has been placed in a potentially compromising

12  situation").  However, *Garcia* was cited by Petitioner solely for the proposition that the

13  "standard of review is whether or not the Court abused its discretion."  (Exhibit MM, Open.

14  Brief at 27.)  That portion of the discussion in *Garcia* did not rely upon *Smith*, or any federal

15  law, but upon another state case.  Thus, the mere citation to *Garcia* was not sufficient to alert

16  the Arizona Supreme Court[19] to the federal nature of Petitioner's claim.

17       <u>Motion to Recall Mandate</u> - As noted above, Petitioner asserts in his Petition that he

18  exhausted his state remedies by presenting his claims in Ground II in  the  Motion to Recall

19  Mandate. (Petition, Doc. 1 at 6.)  In the motion to recall the mandate,  Petitioner argued that

20  he was entitled "to a jury trial by the Sixth Amendment of the United States Constitution."

21  (Reply Exhibit 1, at 10.  *See also id.* at 6.)  Arguably, he also asserted that the alteration to

22  the transcript was a "denial of due process of law . . . in violation of . . . the United States

23  Constitution."  (*Id.* at 13.)  However, presentation of a claim for the first time in a motion to

24  recall a mandate is not fair presentation.  "Submitting a new claim to the state's highest court

25  in a procedural context in which its merits will not be considered absent special

26  circumstances does not constitute fair presentation." *Roettgen*, 33 F.3d at 38.  In Arizona,

27  ───────────────

28       [19]  Because, at the time of his direct appeal Petitioner was subject to a death sentence,
     presentation to the Arizona Supreme Court was necessary to exhaust his claims.

1   a motion to recall a mandate is only issued based upon a "balancing of competing interests

2   . . . the interests of justice. . . [and] the interest in bringing litigation to an end . . [or] where

3   there has been either fraud, imposition, or mistake of fact" *Lindus v. Northern Insur. Co. Of*

4   *New York*, 103 Ariz. 160, 162, 438 P.2d 311, 313 (1968).

5       Accordingly, presentation in the Motion to Recall Mandate was not fair presentation

6   of any claims raised therein.

7       Presentation to PCR Court - Petitioner also raised the facts of this claim in his third

8   PCR Petition.  (Exhibit R, 3rd PCR Pet. at 4-8.)  However, he cited only state law in support

9   of his claim, including Ariz. Rev. Stat. Const. Article 2, §§ 23 and 24, Ariz. Rev. Stat. §§ 12-

10  221, and 21-102(A), Ariz. R. Crim. P. 18.2 and 18.5(h), and 31.8(h).  (*Id.* at 8-11.)

11      Presentation to the Arizona Court of Appeals - Conversely, in his Petition for Review

12  to the Arizona Court of Appeals, Petitioner specifically asserted that he was denied his "right

13  to a fair trial in accordance with the Due Process Clause of the 14th Amendment of the U.S.

14  Constitution and Article 2, Section 4, 23 and 24 of the Arizona Constitution (which includes

15  a required unanimous 12 person verdict in a death penalty case and the right to appeal that

16  conviction."  (Exhibit Z, PFR at 11.) [20]  However, this was buried in a section of his brief

17  discussing Petitioner's claim that the transcript of the jury polling had been improperly

18  altered.

19      Perhaps it would be tempting to suggest that this was nonetheless sufficient to assert

20  the federal claim of jury misconduct.  However, the PCR court had already determined that

21  the facts of that claim had already been asserted to and rejected by the Arizona Supreme

22  Court on direct appeal.  (Exhibit T, M.E. 7/10/01.)  Thus, Petitioner's Petition for Review

23  asserted only the claim "that the 1986 trial court reporter illegally altered a trial transcript of

24  the jury's 1986 trial verdict."  (Exhibit Z, PFR at 3 (summary of issues presented for

25

26      [20] Petitioner also cited *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479 (2000).  (*See*

27  Exhibit Z, PFR at 13.)  However, that case dealt with diligence in developing in the state
    courts the the factual basis for federal claims.  Petitioner cited it for the proposition that

28  diligence may be shown despite failure.

1  review).)   It is not surprising then, that the reference to the actual participation issue is

2  mentioned as an aside in the transcript argument.

3       Moreover, Petitioner did not assert that the transcript alteration was itself a federal

4  violation.   Rather, Petitioner relied upon Ariz. R. Crim. P.  31.8(c) and (h) and *State v.*

5  *Chavarria*, 569 P.2d 831 (Ariz. 1977) and *State v. Bass,* 12 P.3d 796 (Ariz. 2000).  These

6  cases dealt with the standard of proof required to show a waiver to a jury trial, and were cited

7  by analogy to reference the courts' presumption for relying upon transcripts.  The opinion

8  in  *Chavarria* did cite *Boykin v. Alabama*, 395 U.S. 238 (1969), for the proposition that the

9  "record must affirmatively show that the appellant waived his right to a jury trial." 569 P.2d

10  at 832.  But no discussion of a federal right to an unaltered transcript was considered.  *Bass*

11  dealt directly with purported errors in the original transcript, but made no reference to any

12  related federal constitutional right.  12 P.3d at 801.   Thus the citation of these cases did not

13  raise a federal claim based on the alteration.

14       Moreover, even if Petitioner did manage to adequately assert his federal claims to the

15  Arizona Court of Appeals, because Petitioner failed to present his federal claims to the PCR

16  court, his  presentation of them to the Arizona Court of Appeals was not a fair presentation.[21]

17       Presentation to the Arizona Supreme Court - Finally, in his Petition for Review to the

18  Arizona Supreme Court in his 3rd PCR proceeding, Petitioner relied solely upon the alteration

19  to the transcript, and asserted no federal claims, referencing only "Arizona's constitutional

20  framework" and his "constitutional right to a jury trial.".  (Exhibit CC, PFR at 10-11.)

21       Summary re Misconduct by Juror Milam - Petitioner did not fairly present his federal

22  claims of jury misconduct concerning deliberation by Juror Milam and the related alteration

23  to  the  transcript  to  the  Arizona  Court  of  Appeals  or  the  Arizona  Supreme  Court.

24

---

25       [21]  Because the claim had not been previously presented, this Court need not "look
26  through" the appeals court's summary denial  to the trial court decision, *Ylst v. Nunnemaker*,
   501 U.S. 797 (1991), nor apply a presumption that the summary decision was on federal
27  grounds, *Harris v. Reed*, 489 U.S. 255, 263 (1989).  The issue is not how the claim was
   disposed of, but rather whether it was fairly presented.  *Casey v. Moore*, 386 F.3d 896, 918,
28  n. 23 (9th Cir. 2004).

1    Accordingly, Petitioner's state remedies on these claims were not properly exhausted.

2        **(2) Ground III - Ineffective Assistance** - In his Ground 3, Petitioner asserts that his

3    rights to effective assistance of counsel were violated when trial counsel failed to adequately

4    challenge inconsistent testimony by Cobey.  (Petition, Doc. 1 at 7.)

5        Petitioner asserts that he presented this claim in his first PCR proceeding.

6    Respondents argue that Petitioner's state remedies on this claim were not properly exhausted

7    because the claim was not asserted to the Arizona Supreme Court.  As discussed above,

8    however, presentation of Petitioner's PCR claims to the Arizona Supreme Court were not

9    required to exhaust his remedies for federal habeas purposes.

10       Presentation to PCR Court - Petitioner argued to the PCR Court that he received

11   "ineffective assistance of counsel," citing "U.S. Const. Amends., VI and XIV."  (Exhibit B,

12   PCR Pet. at 54.)   He argued that trial counsel failed to adequately impeach Cobey.  (*Id.* at

13   54-60.)

14       Presentation to Arizona Court of Appeals - Petitioner again raised the facts of this

15   claim in his Petition for Review to the Arizona Court of Appeals on his first PCR petition.

16   (Exhibit E, PFR at 15-18.)  There, Petitioner did not cite the federal constitution directly.

17   However, Petitioner did quote the portions of *State v. Vickers*, 180 Ariz. 521, 525, 885 P.2d

18   1086, 1090  (1994) which quoted *Strickland v. Washington*, 466 U.S. 668 (1984) for the

19   standard for ineffective assistance claims.  (Exhibit E, PFR at 17.)  Moreover, *Vickers* was

20   explicitly based upon an assertion of a "right to effective assistance of counsel at trial. U.S.

21   Const. Amend VI."  180 Ariz. at 525, 885 P.2d at 1090.

22       The Arizona Court of Appeals remanded that issue to the trial court for an evidentiary

23   hearing.  Following that hearing and the PCR court's order, Petitioner raised the facts of this

24   claim in his consolidated, second Petition for Review filed December 29, 2000 (Exhibit O

25   at 32-33).  Petitioner did not directly identify the legal basis for his claim.  But he did cite the

26   instructions by the Arizona Court of Appeals upon remand of the first PCR petition, which

27   included citations to a variety of federal cases to establish the standard for an ineffective

28   assistance of counsel claim.  (*I.d* at 13-14.)   That was sufficient to alert the Arizona Court

of Appeals to the federal nature of his ineffectiveness claim.

Presentation to the Arizona Supreme Court - Although Petitioner contends in the Petition that he submitted this claim to the Arizona Supreme Court in his first post-conviction relief proceeding (Petition Doc. 1 at 7), which he in turn asserts was through his November, 1994 consolidated Petition for Review (*id.* at 2.)   However, Petitioner's November, 1994 Petition for Review to the Arizona Supreme Court did not include a claim of ineffective assistance based upon counsel's failures with regard to Cobey.  (*See generally* Exhibit CC.)

Nonetheless, as discussed above, Petitioner was not required to present his PCR claims to the Arizona Supreme Court in order to exhaust his state remedies for federal habeas purposes.

Summary re Exhaustion of Ineffective Assistance Claim - Petitioner fairly presented his ineffective assistance claims to the Arizona Court of Appeals.  His failure to present them to the Arizona Supreme Court was not required.  Consequently, Petitioner's state remedies on his claims in Ground III were properly exhausted.

**e.  Summary re Exhaustion**

Respondents concede that Plaintiff properly exhausted his claims in Ground I (*Brady*). (Answer, Doc. 16 at 15.)  The undersigned concludes that  Petitioner has properly exhausted his state remedies on his claims in Ground III (Ineffective Assistance), and that he did not properly exhaust his state remedies on his claims in Ground II (Jury Misconduct).

**2.  Procedural Default**

Ordinarily, unexhausted claims are dismissed *without prejudice.  Johnson v. Lewis*, 929 F.2d 460, 463 (9th Cir. 1991).  However, where a petitioner has failed to properly exhaust his available administrative or judicial remedies, and those remedies are now no longer available because of some procedural bar, the petitioner has "procedurally defaulted" and is generally barred from seeking habeas relief.  Dismissal *with prejudice* of a procedurally barred or procedurally defaulted habeas claim is generally proper absent a "miscarriage of justice" which would  excuse the default.  *Reed v. Ross*, 468 U.S. 1, 11

1    (1984).

2        Respondents argue that Petitioner may no longer present his unexhausted claims to

3    the state courts.  Respondents rely upon Arizona's preclusion bar, set out in Ariz. R. Crim.

4    Proc. 32.2(a), and its timeliness bar in Ariz. R. Crim. P. 32.4.  (Answer, Doc. 16 at 14-15.)

5        **Remedies by Direct Appeal** - Under Ariz.R.Crim.P. 31.3, the time for filing a direct

6    appeal expires twenty days after entry of the judgment and sentence.  The Arizona Rules of

7    Criminal Procedure do not provide for a successive direct appeal.  *See generally*

8    Ariz.R.Crim.P. 31.  Accordingly, direct appeal is no longer available for review of

9    Petitioner's unexhausted claims.

10       **Remedies by Post-Conviction Relief** - Petitioner can no longer seek review by a

11   subsequent PCR Petition.

12       <u>Waiver Bar</u> - Under the rules applicable to Arizona's post-conviction process, a claim

13   may not ordinarily be brought in a petition for post conviction relief that  "has been waived

14   at trial, on appeal, or in any previous collateral proceeding."   Ariz.R.Crim.P. 32.2(a)(3).

15   Under this rule,  some claims may be deemed waived if the State simply shows "that the

16   defendant did not raise the error at trial, on appeal, or in a previous collateral proceeding."

17   *Stewart v. Smith*,  202 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002) (quoting Ariz.R.Crim.P.

18   32.2, Comments).  For others of "sufficient constitutional magnitude," the State "must show

19   that the defendant personally, "knowingly, voluntarily and intelligently' [did] not raise' the

20   ground or denial of a right."  *Id.*  That requirement is limited to those constitutional rights

21   "that can only be waived by a defendant personally."  *State v. Swoopes*  216 Ariz. 390, 399,

22   166 P.3d 945, 954 (App.Div. 2, 2007).  Indeed, in coming to its prescription in *Stewart v.*

23   *Smith*, the Arizona Supreme Court identified: (1) waiver of the right to counsel, (2) waiver

24   of the right to a jury trial, and (3) waiver of the right to a twelve-person jury under the

25   Arizona Constitution, as among those rights which require a personal waiver.  202 Ariz. at

26

27

28

1    450, 46 P.3d at 1071.[22]

2         Here, Petitioner's unexhausted claim as to misconduct by Juror Pigg on voir dire does

3    not fit within the list of claims identified as requiring a personal waiver.  Nor is it of the same

4    character.[23]  Therefore, it appears that this claim would be precluded by his failure to raise it

5    in an earlier proceeding.

6         On the other hand, the purported participation in deliberations by excused Juror Milam

7    and the related transcript alteration could be construed as affecting the right to a twelve

8    person jury, and thus requiring a knowing waiver.  *See e.g. State v. Prince*, 142, Ariz. 256,

9    258, 689 P.2d 515, 517 (984) (knowing waiver of right to twelve member jury required).[24]

10   <u>Timeliness Bar</u> - Even if not barred by preclusion, Petitioner would now be barred

11   from raising his claims by Arizona's time bars.  Ariz.R.Crim.P. 32.4 requires that petitions

12   for post-conviction relief (other than those which are "of-right") be filed "within ninety days

13   after the entry of judgment and sentence or within thirty days after the issuance of the order

14   and mandate in the direct appeal, whichever is the later."  *See State v. Pruett*, 185 Ariz. 128,

15   912 P.2d 1357 (App. 1995) (applying 32.4 to successive petition, and noting that first petition

16   _____

17        [22]  Some other types of claims addressed by the Arizona Courts in resolving the type
     of waiver required include: ineffective assistance (waived by omission), *Stewart,* 202 Ariz.
18   at 450, 46 P.3d at 1071; right to be present at non-critical stages (waived by omission),
     *Swoopes*, 216Ariz. at 403, 166 P.3d at 958; improper withdrawal of plea offer (waived by
19   omission), *State v. Spinosa*, 200 Ariz. 503, 29 P.3d 278 (App. 2001); double jeopardy
     (waived by omission), *State v. Stokes*, 2007 WL 5596552 (App. 10/16/07); illegal sentence
20   (waived by omission), *State v. Brashier*, 2009 WL 794501 (App. 2009); judge conflict of
     interest (waived by omission), *State v. Westmiller*,  2008 WL 2651659 (App. 2008).
21

22        [23]  In the unpublished decision in *State v. Marietta*, 2009 WL 1804167 (App. 2009),
     the Arizona Court of Appeals found that such a claim of juror misconduct by false testimony
23   on voir dire was waivable under Ariz. R. Crim. P.  32.2 by failure to raise it.  *But see* Ariz.
     R. Crim. P.  31.24 (no precedential effect and citation of unpublished decisions).
24

25        [24]  Petitioner presented the facts of his unexhausted claims to the state courts.  To the
     extent that he may have asserted the related federal claims on one of the levels (albeit
26   inadequately to result in exhaustion), it is possible that the claims would be deemed
     precluded under Ariz. R. Crim. P.  32.2(a)(2)  by prior presentation rather than waived.
27   Because the effect would be the same, and the undersigned finds the claims also time barred,
     no attempt is made to discern whether these claims would be deemed precluded.
28

of pleading defendant deemed direct appeal for purposes of the rule).   That time has long since passed.

Exceptions - Rules 32.2 and 32.4(a) do not bar dilatory claims if they fall within the category of claims specified in Ariz.R.Crim.P. 32.1(d) through (h). *See* Ariz. R. Crim. P. 32.2(b) (exceptions to preclusion bar); Ariz. R. Crim. P. 32.4(a) (exceptions to timeliness bar). Petitioner has not asserted that any of these exceptions are applicable to his claims. Nor, with one exception, does it appears that such exceptions would apply. The rule defines the excepted claims as follows:

> d. The person is being held in custody after the sentence imposed has expired;
> e. Newly discovered material facts probably exist and such facts probably would have changed the verdict or sentence. Newly discovered material facts exist if:
> (1) The newly discovered material facts were discovered after the trial.
> (2) The defendant exercised due diligence in securing the newly discovered material facts.
> (3) The newly discovered material facts are not merely cumulative or used solely for impeachment, unless the impeachment evidence substantially undermines testimony which was of critical significance at trial such that the evidence probably would have changed the verdict or sentence.
> f. The defendant's failure to file a notice of post-conviction relief of-right or notice of appeal within the prescribed time was without fault on the defendant's part; or
> g. There has been a significant change in the law that if determined to apply to defendant's case would probably overturn the defendant's conviction or sentence; or
> h. The defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would have found defendant guilty of the underlying offense beyond a reasonable doubt, or that the court would not have imposed the death penalty.

Ariz.R.Crim.P. 32.1.

Paragraph 32.1 (d) (expired sentence) generally has no application to an Arizona prisoner who is simply attacking the validity of his conviction or sentence. Where a claim is based on "newly discovered evidence" that has previously been presented to the state courts, the evidence is no longer "newly discovered" and paragraph (e) has no application. Here, Petitioner has long ago asserted the facts underlying his unexhausted claims. Paragraph (f) has no application where the petitioner filed a timely notice of appeal.  Paragraph (g) has

1   no application because Petitioner has not asserted a change in the law since his last PCR

2   proceeding.   Finally, paragraph (h), concerning claims of actual innocence, has no

3   application to Petitioner's procedural claims. *See State v. Swoopes*, 216 Ariz. 390, 404, 166

4   P.3d 945, 959 (App. 2007) (32.1(h) did not apply where petitioner had " not established that

5   trial error ...amounts to a claim of actual innocence").

6   <u>Summary</u> - Accordingly, the undersigned must conclude that review through

7   Arizona's direct appeal and post-conviction relief process is no longer possible for

8   Petitioner's unexhausted claims.

9   **Summary re Procedural Default** - Petitioner failed to exhaust his federal claims in

10   Ground II (Juror Misconduct), and is now procedurally barred from doing so.  Accordingly,

11   these unexhausted claims are procedurally defaulted, and absent a showing of cause and

12   prejudice or actual innocence, must be dismissed with prejudice.

13

14   **3.  Cause and Prejudice**

15   If the habeas petitioner has procedurally defaulted on a claim, or it has been

16   procedurally barred on independent and adequate state grounds, he may not obtain federal

17   habeas review of that claim absent a showing of "cause and prejudice" sufficient to excuse

18   the default. *Reed v. Ross*, 468 U.S. 1, 11 (1984).  Although both "cause" and "prejudice"

19   must be shown to excuse a procedural default, a court need not examine the existence of

20   prejudice if the petitioner fails to establish cause. *Engle v. Isaac*, 456 U.S. 107, 134 n. 43

21   (1982); *Thomas v. Lewis*, 945 F.2d 1119, 1123 n. 10 (9th Cir.1991).

22   "Cause" is the legitimate excuse for the default. *Thomas*, 945 F.2d at 1123. "Because

23   of the wide variety of contexts in which a procedural default can occur, the Supreme Court

24   'has not given the term "cause" precise content.'" *Harmon v. Barton*, 894 F.2d 1268, 1274

25   (11th Cir. 1990) (quoting *Reed*, 468 U.S. at 13), *cert. denied*, 498 U.S. 832 (1990).  The

26   Supreme Court has suggested, however, that cause should ordinarily turn on some objective

27   factor external to petitioner, for instance:

28   ... a showing that the factual or legal basis for a claim was not

1
2

reasonably available to counsel, or that "some interference by officials", made compliance impracticable, would constitute cause under this standard.

3   *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citations omitted).

4       Here, Petitioner does not overtly assert any cause to excuse his failure to exhaust.

5       Petitioner does argue that his efforts to pursue his claims as to the deliberation by

6   Juror Milam were stymied by alteration of the transcript and the failure of the prosecution

7   to serve copies of the amended transcript, so that the Arizona Supreme Court's reliance upon

8   it in denying that claim was a surprise and was thus unopposed. (Reply, Doc. 55 at 16-17.)

9   Petitioner goes so far as to assert that the altered transcript "has never appeared in any record

10  in this case."  (Reply, Doc. 55 at 16.)  However, Petitioner was able to quote the altered

11  transcript in his third PCR petition.  (Exhibit R, PCR Pet. at 7.)

12      More importantly, Petitioner does not suggest how knowledge of the existence of the

13  amended transcript would have affected his failure to challenge on direct appeal Juror

14  Milam's participation on federal grounds, rather than just on state grounds.   Perhaps

15  Petitioner confuses the lack of success on this claim (as a result of his lack of opportunity to

16  rebut the alteration because he was unaware of it until after the Arizona Supreme Court

17  ruled), with the failure to assert the claims as a federal ones.

18      Nor does Petitioner suggest how the delay in obtaining the transcript prevented him

19  from challenging the alteration on federal grounds in his third PCR proceeding. By that time,

20  Petitioner was well aware of the alteration.  Any lack of access to the actual transcript did not

21  preclude the assertion of his federal claim.

22      Thus, Petitioner has failed to show "cause" to excuse his failure to properly exhaust

23  his state remedies, and is not entitled to be relieved from his procedural defaults under the

24  "cause and prejudice" standard.

25

26  **4.  Actual Innocence**

27      The standard for "cause and prejudice" is one of discretion intended to be flexible and

28  yielding to exceptional circumstances.  *Hughes v. Idaho State Board of Corrections*, 800

F.2d 905, 909 (9th Cir. 1986).  Accordingly, failure to establish cause may be excused "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (emphasis added).

Petitioner asserts he has garnered evidence of his "actual innocence."

The Supreme Court has instructed that "a federal court faced with allegations of actual innocence whether of the sentence or of the crime charged, must first address all non-defaulted claims for comparable relief and other grounds for cause to excuse the procedural default." *Dretke v. Haley,* 541 U.S. 386, 394 (2004).  Having already addressed the other grounds to excuse the default, the claims of actual innocence will be addressed after the merits of the non-defaulted claims are disposed of.

## B.  GROUND I - BRADY

In his Ground I, Petitioner asserts that his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963) were violated:

(1)  as a result of the prosecution's failure to disclose:

> (a)   the August 19, 1985 Phoenix Police report identifying the witness Dave Brown and connecting Cobey with a "drug rip-off";
>
> (b)   1985 Phoenix Police reports on witness Tabola;
>
> (c)   interviews of exculpatory witness Flood;
>
> (d)   Cobey's May, 1986 pre-sentence report; and
>
> (e)   a written declaration by Cobey referenced in the pre-sentence report; and

(2) as a result of the PCR court's consideration of the evidence on an item by item basis[25]

---

[25]   Petitioner also complains in the 10 pages of his Ground One of a variety of purported improprieties by the prosecution and the PCR courts, *i.e.* presenting false testimony, denying Petitioner a hearing, etc.  The undersigned construes these allegations to

- 74 -

1    **1.  Duty of Disclosure Under *Brady***

2         In *Brady,* the Supreme Court held that a defendant's due process rights are violated

3    when the state fails to disclose to the defendant "evidence favorable to an accused . . . where

4    the evidence is material either to guilt or to punishment, irrespective of the good faith or bad

5    faith of the prosecution." 373 U.S. at 87.   A failure of the prosecutor to disclose evidence

6    to the defense is a due process violation, only if three conditions are met: "The evidence at

7    issue must be favorable to the accused,  either because it is exculpatory, or because it is

8    impeaching; that evidence must have been suppressed by the State, either willfully or

9    inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282

10   (1999).

11        **Favorable Evidence** - *Brady* mandates the disclosure of "favorable" evidence.  This

12   obligation extends to impeachment evidence as well as directly exculpatory evidence, and

13   to evidence that was not requested by the defense.  *Paradis v. Arave,* 240 F.3d 1169, 1176

14   (9th Cir. 2001) (citations omitted).

15        However, the favorability of evidence is determined by the evidence itself, not based

16   upon the potential use to which a defendant may have eventually put it, e.g. by discovering

17   additional evidence based on the undisclosed evidence, or by adjusting his trial strategy. *See*

18   *U.S. v. Agurs*, 427 U.S. 97, 109-110 (1976) (discussing absence of requirement of disclosure

19   of all information, albeit in the context of materiality).  In *Agurs*, the Court discussed the

20   distinctions and correlations between the prosecutor's before-the-fact determination of

21   favorability and the reviewing court's afer-the-fact determination of materiality. *Id.* at 108.

22   To require disclosure of evidence that in hindsight was material (e.g. may have changed the

23   outcome), but which viewed prospectively was not favorable evidence would be to mandate

24   disclosure of the prosecution's entire file.  "If everything that might influence a jury must be

25   disclosed, the only way a prosecutor could discharge his constitutional duty would be to

26   allow complete discovery of his files as a matter of routine practice." *Id.* at 109. Thus, in

27   _____

28   be part of the *res gestae*.  The only items of evidence alleged by Petitioner to have been
     existent and not disclosed are those  identified herein.

1   *Weatherford v. Bursey*, 429 U.S. 545 (1977), the Court found no *Brady* violation despite the

2   prosecution's failure to disclose the identity of a prosecution witness prior to trial, who was

3   an informant known to the defendant, despite allegations that the disclosure would have

4   permitted a fuller opportunity to prepare cross-examination of the witness.

5   That is not to imply that information available to the prosecution must itself be

6   admissible evidence.  Although expressed in terms of materiality, the Ninth Circuit has

7   plainly held that information is subject to *Brady* even if not admissible, so long as it could

8   lead to admissible evidence.  *See Coleman v. Calderon*, 150 F.3d 1105, 1116-1117 (9th Cir.

9   1998), *rev'd on other grounds*, 525 U.S. 141 (1998); *U.S. v. Kennedy*, 890 F.2d 1056, 1059

10   (9th Cir. 1989). *But see* Seder, *A Search for the Truth or a Game of Strategy? The Circuit*

11   *Split over the Prosecution's Obligation to Disclose Inadmissible Exculpatory Information*,

12   51 Syracuse L. Rev. 139 (2001) (noting split among circuit on whether inadmissible evidence

13   is subject to disclosure).

14   Neither is it to suggest that favorability is determined based upon the subjective state

15   of mind of the prosecutor as to the nature of the information.  It is the impact on the fairness

16   of the trial which is at issue, not the culpability of the prosecutor.  *U.S. v. Price*, 566 F.3d

17   900, 907-908 (9th Cir. 2009).  Thus, for example, it is not necessary to show that prior to trial

18   the prosecutor knew the testimony at trial for which the evidence would be impeaching.  In

19   *Kyles,* the Supreme Court rejected a proposal to change it's materiality standard because

20   under it prosecutors were "forced to make judgment calls about what would count as

21   favorable evidence, owing to the very fact that the character of a piece of evidence as

22   favorable will often turn on the context of the existing or potential evidentiary record." *Kyles*

23   *v. Whitley,* 514 U.S. 419, 439 (1995).

24   **Suppression** - The prosecution's duty to disclose favorable evidence is not dependent

25   upon a request from the accused, and even an inadvertent failure to disclose may constitute

26   a violation. *See United States v. Agurs*, 427 U.S. 97, 107, 110 (1976). "The term

27   'suppression' does not describe merely overt or purposeful acts on the part of the prosecutor;

28   sins of omission are equally within *Brady's* scope." *U.S. v. Price,* 566 F.3d 900, 907 (9th Cir.

2009).  The prosecution is responsible for disclosing not only what is in the prosecutor's case file, but any information known to the prosecutor or any investigating officers or members of the prosecution team.  "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley,* 514 U.S. 419, 437 (1995).[26]

However, "*Brady* and its progeny do not require the government to conduct an investigation for the defense." *U.S. v. Senn*, 129 F.3d 886, 893 (7th Cir. 1997). Nor is there a *Brady* violation where the substance of the evidence is otherwise known to the defense. "When, as here, a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government." *U.S. v. Aichele,* 941 F.2d 761, 764 (9th Cir. 1991). *See also U.S. v. Bond*, 552 F.3d 1092, 1095-1097 (9th Cir. 2009).  As Justice White said, "any allegation of suppression boils down to an assessment of what the State knows at trial in comparison to the knowledge held by the defense." *Giles v. Maryland*, 386 U.S. 66, 96 (1967) (White, J., concurring).

**Prejudice** - "To determine whether prejudice exists, we look to the materiality of the suppressed evidence." *Jackson v. Brown,* 513 F.3d 1057, 1071 (9th Cir. 2008).  Evidence is deemed material for Brady purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability," in turn, "is a probability sufficient to undermine confidence in the outcome." *Id.* "A

---

[26]   Petitioner goes to some lengths to show that the participants in this case (investigating officers, prosecutors, judges, witness' counsel, etc.) were intertwined with Petitioner's drug prosecution, the Howk/Brown/Cobey investigation, the prosecutions of Tabola based upon the raid of his home and the undercover operation in which Tabola was providing counter-surveillance, the prosecution of Cobey, the prosecution of Hatch, etc. The undersigned is unaware of any assertion by Respondents that any of Petitioner's *Brady* materials were not within the control of the prosecution and thus properly deemed "suppressed."  To the contrary, Respondents counter Petitioner's *Brady* arguments based solely on the failure of the other two components: favorability and materiality. Accordingly, no effort is made to analyze Petitioner's claims on the intertwining of the various investigations and prosecutions.

'reasonable probability' does not require showing by a preponderance that the outcome would have been different." *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997) (*en banc*). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Once a reviewing Court has found a failure to disclose "material evidence," *i.e.* evidence whose absence caused prejudice, no further harmless-error analysis is required. *Id.* at 435.

The materiality of a particular item of suppressed evidence is not decided in isolation. Rather, the Court must determine whether the suppressed evidence was material based on the cumulative impact of all the evidence the government suppressed. *Kyles*, 514 U.S. at 436-38. Moreover, in "determining whether the failure to disclose Brady material undermines our confidence in the outcome of the trial," the court must "weigh the withheld evidence 'in the context of the entire record.' " *U.S. v. Price,* 566 F.3d 900, 913 (9th Cir. 2009). Nonetheless, "[w]e evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion." *Kyles*, 514 U.S. at 437, n. 10.

## 2. AEDPA Limitations on Relief

**Legal Determinations** - While the purpose of a federal habeas proceeding is to search for violations of federal law, not every error justifies relief. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U. S. 19, 24-25 (2002) (per curiam). Rather, to justify habeas relief, a state court's decision must be "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.". 28 U.S.C. §2254(d)(1).

**Factual Determinations** - Federal courts are further authorized to grant habeas relief

1    in cases where the state-court decision  "was based on an unreasonable determination of the

2    facts in light of the evidence presented in the State court proceeding."   28 U.S.C. §

3    2254(d)(2).   "Or, to put it conversely, a federal court may not second-guess a state court's

4    fact-finding process unless, after review of the state-court record, it determines that the state

5    court was not merely wrong, but actually unreasonable."   *Taylor v. Maddox*, 366 F.3d 992,

6    999 (9th Cir. 2004).

7          **Presumption of Correctness** - Moreover, a state prisoner is not free to attempt to

8    retry his case in the federal courts by presenting new evidence.   There is a well established

9    presumption of correctness of state court findings of fact.   This presumption has been

10    codified at 28 U.S.C. § 2254(e)(1), which states that "a determination of a factual issue made

11    by a State court shall be presumed to be correct" and the petitioner has the burden of proof

12    to rebut the presumption by "clear and convincing evidence."

13

14    **3.  Police Report re Brown**

15         Petitioner asserts he was wrongly denied access to the August 19, 1985 Phoenix

16    Police report identifying the witness Dave Brown and connecting Cobey with a "drug rip-

17    off."   Petitioner contends that Brown ultimately testified at the hearing in his third PCR

18    proceeding that he was the person who gave Petitioner $3700 the week the victim was

19    murdered, and that Cobey and Hatch were involved in the murder, rather than Petitioner, and

20    that Cobey had orchestrated a drug rip-off at the location where the victim was found.

21    (Petition, Doc. 1 at 5B.)

22         **Undisclosed Evidence** - The referenced police reports have now been provided as

23    Exhibits VV, ZZ, AAA, BBB, and CCC. They reflect that on August 19, 1985, Officer

24    Driscoll was dispatched to investigate a possible fight or shots fired.  While in route, he was

25    advised that an off-duty DPS officer was following possible suspects. Two witnesses had

26    observed the altercation, and reported it to the off duty DPS officer, who had pursued the

27    people leaving the scene. Ultimately, the suspects, John Howk and Kevin "Kobie"  were

28    apprehended.  Howk related that after leaving Cobey's residence he had stopped to assist

1    people with a vehicle pulled over at 2300 W. Hartford, and they robbed him at gun point of

2    $800. He returned and got Cobey and they began to search for the robbers.  Ultimately,

3    Howk was found to be in possession of narcotic drugs, and admitted he was selling drugs.

4    Howk denied that the robbery was drug related.  Detectives Applegate and Maxwell located

5    a vehicle at the scene with a firearm under the seat, and fingerprints of David Brown were

6    found on a beer can in the car, and his drivers license in a wallet.

7          **Additional Evidence** - At the PCR hearing on this issue, Petitioner presented

8    testimony of Dave Brown that he and his brother Ken were the two that at the time of the

9    murder had given Petitioner $2500 to buy cocaine which was not delivered.  Brown testified

10    that he subsequently was told where Cobey was and that Cobey was attempting to sell gold

11    jewelry, and that he attempted to collect the $2500 from Cobey.  The robbery of John Howk

12    was instigated by Kevin Cobey as a means of paying off the debt.  In the course of setting

13    up the robbery, Cobey cautioned Brown not to shoot anyone because he didn't "want to go

14    through that again after what Kenny did to Rob."  (Exhibit EEEE, R.T. 5/21/02 at 17.)  To

15    corroborate Brown's testimony, Petitioner offered testimony of the mutual friend, Jimmy

16    Pechac, who Brown had gone to looking for Petitioner and who had told Brown about

17    Cobey's attempts to sell him jewelry and how to contact Cobey.  Petitioner also offered

18    testimony of an investigating officer, Officer Applegate, to show that Howk was a drug

19    dealer, and that the robbery of Howk occurred near where the victim's murder occurred.

20          **State Court's Decision** - The last reasoned decision on Petitioner's claim concerning

21    the police reports on Brown was the trial court's decision in his third PCR proceeding.

22    (Exhibit W, M.E. 7/15/02.  *See also* Exhibit AA Order 1/14/04 (Ariz. Ct. App. summary

23    decision); Exhibit DD (Ariz. Sup. Ct. summary decision).)  In its first order on that PCR

24    petition, the trial court noted that the claim was based upon "an exculpatory police report

25    involving Kevin Cobey and a 1985 drug transaction was withheld from him improperly."

26    (Exhibit T, M.E. 7/10/01 at 2.)  However, the trial court analyzed the claim only under the

27    state law "newly discovered evidence" standard, and set a hearing.  (*Id.* at 3-4.)  In its

28    ultimate decision, however, the trial court again did not address Petitioner's claim as a *Brady*

claim, but as the assertion of a state-law claim of newly discovery evidence, *i.e.* the testimony of Brown.[27]  Accordingly, no state court has addressed the merits of this portion of Petitioner's *Brady* claim, and this Court is left to address the claim *de novo*.[28]  "Because the [state] courts did not reach the merits of [the defendant's federal] claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.'" *Cone v. Bell*, 129 S.Ct. 1769, 1784 (2009) (quoting 28 U.S.C. § 2254(d)).

**Respondents' Arguments** - Respondents contend that the evidence was not favorable because Brown's testimony contradicted Petitioner's own testimony at trial, citing as authority *U.S. v. Luis-Gonzalez*, 719 F.2d 1539, 1548 (11th Cir. 1983). (Answer, Doc. 16 at 25.)[29]  Respondents also contend that this Court should defer to the state court's findings that Brown's testimony was not credible.  (Answer, Doc. 16 at 25.)  However, the testimony is only relevant as potential fruit of the reports (and thus indicative of their materiality)  only after it is determined that the reports themselves were favorable and thus subject to disclosure.

**Evidence Not Favorable** - Petitioner does not show that the police reports themselves were favorable.  They showed little more than that Cobey's friend Howk had been the victim

---

[27]  Perhaps the trial court was addressing the newly discovered evidence standard as a precursor to addressing the merits under Arizona's preclusion and timeliness bars. In doing so, however, the Court addressed solely the hearing testimony of Brown, and did not address the underlying police reports which were the materials subject to *Brady*.

[28]  It was not that the *Brady* claim was not fairly presented. Indeed, in its written closing argument in the third PCR proceeding, the State characterized Petitioner as asserting claims of "newly discovery evidence and a *Brady* violation."  (Exhibit X, Responding Closing Arguments at 2.)  Nonetheless, the state argued solely the "newly discovered evidence" standard under state law (*id.* at 21-31) and made only passing reference to *Brady* (*see e.g. id.* at 42).  (*See also* Exhibit Z, Pet. Rev. at 17-18 (arguing *Brady* claim to Ariz. Ct. App.).)  The trial court appears to have followed suit, and failed to address the *Brady* claim at all.

[29]  While that case notes the "favorable evidence" component of the *Brady* standard, it does not address whether conflicts with a defendant's testimony necessarily renders evidence unfavorable.

1  of a robbery in the area where the victim's body was found and near where Cobey was living,
2  that it appeared to be a drug related robbery, and that a Dave Brown was involved in the
3  robbery.  This evidence was not favorable, but neutral.

4          It is only the addition of the information provided by Brown's testimony that would
5  makes the police reports favorable, *i.e.* that Brown was acting at the invitation or direction
6  of Cobey, that Cobey had made incriminating comments to Brown, and that this Dave Brown
7  was the Dave who had provided $2500 for cocaine to Petitioner.[30]  Petitioner does not
8  suggest that this additional information was known to the prosecution (or any member of the
9  prosecution team).

10          Petitioner would have this Court extend the *Brady* disclosure duty beyond favorable
11  information, to include any information that might lead to favorable information.  Petitioner
12  shows no authority for such a broad reading of the *Brady* duty.  Rather, the disclosure duty
13  is limited to information which is itself either "exculpatory" or "impeaching."  *Strickler*, 527
14  U.S. at 281-282.

15          *Brady*...established that the prosecution's suppression of "evidence
        favorable to an accused upon [his] request violates due process where
16      the evidence is material either to guilt or punishment."  Thus, the rule
        applies only to impeachment and exculpatory evidence; neutral or
17      inculpatory evidence lies outside its coverage.

18  *U.S. v. Nixon,* 881 F.2d 1305, 1308 (5th Cir. 1989).  *See also U.S. v. Grintjes*, 237 F.3d 876,
19  880 (7th Cir. 2001) (inculpatory evidence not subject to *Brady* even if defendant could have
20  used it to conduct investigation leading to exculpatory evidence). "The most that can be said
21  of these materials is that they might have provided investigatory leads.  *Brady* does not
22  require a prosecutor to turn over files reflecting leads and ongoing investigations where no

23          [30] Moreover, this additional information was problematic for petitioner.  Petitioner's
24  testimony was that the lost drug money came from "Phil" and "Sam" that he met through a
   "Dave" and "Tim".  (Exhibit VVV, R.T. 4/3/86 at 71-73.) In contrast, Brown testified that
25  the drug money came from him and his brother Kenny Brown (Exhibit EEEE, R.T. 5/21/02
   at 29), and maybe "Jerry Whitley" (*id.* at 43).  Petitioner claimed he was nervous because
26  the buyer's who lost the $2,500, "a couple of Mexican males", were in his apartment when
   he was interviewed by Detective Butler.  (Exhibit VVV, R.T. 4/3/86 at 39, 46.)  In contrast,
27  Brown claimed his contacts with Petitioner after delivering the money were by phone
28  (Exhibit EEEE, R.T. 5/21/02 at 6-7)  and in a bar (*id.* at 44-45).

1  exonerating or impeaching evidence has turned up." *Downs v. Hoyt,* 232 F.3d 1031, 1037

2  (9th Cir. 2000).

3      Accordingly, the undersigned concludes that because the Brown police reports

4  themselves were not favorable evidence, no duty of disclosure applied.

5      **Reports Requested** - The undersigned notes that the defense filed a motion

6  specifically requesting "Copies of all police reports, surveillance notes and field

7  interrogations regarding Robert Dana Richards, Kevin Cobey, Kenneth Hatch and Tom

8  Ellinghausen."  (Reply, Exhibits, Doc. 55-4, at physical p. 6.  Thompson Affidavit at ¶ 4

9  (referencing  Motion for Disclosure requesting).)  The Howk/Brown/Cobey reports would

10  have fallen into this request.

11      However, the requirement for disclosure does not depend upon the existence of a

12  specific request.  It is true that in his dissent in *U. S. v. Bagley*, Justice Stevens would have

13  applied a less strict standard of materiality (not favorability),where requested material had

14  not been disclosed, *i.e.* the evidence "could have affected" the outcome.  473 U.S. 667, 710-

15  711 (1985) (Stevens, J., dissenting).  However, that formulation was rejected by the Court

16  which instead held it's single standard for materiality "sufficiently flexible to cover the 'no

17  request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose

18  evidence favorable to the accused."  473 U.S. at 682. Nor does a request necessarily render

19  evidence favorable.

20      In *Bagley*, the Court did note that although no request is required to impose an

21  obligation to disclose, the existence of a request may impact the evaluation of the effect of

22  a failure to disclose because of the negative implication that favorable evidence does not

23  exist. *Id.* at 682-683.  Here, because the reports themselves were not related to any fact at

24  issue in the instant case, there was no negative implication to be made from their non-

25  disclosure.

26

27  **4.  Police Reports re Tabola**

28      Petitioner complains that he was not provided the 1985 Phoenix Police reports on

1   witness Tabola. He argues that with this information, the defense could have impeached

2   Tabola by showing: (1)  his perjury about his own drug dealing; and (2) he was afforded

3   favorable treatment for his testimony.  He also argues that it denied the defense evidence of

4   "third party culpability" and other impeaching evidence, and that it would have shown that

5   the prosecution used Tabola to obtain the search warrant when they knew he was a cocaine

6   dealer and not telling everything he knew.  (Petition, Doc. 1 at 5D.)

7   　　　　The police reports have been produced as Exhibits TT, UU, VV, WW, XX, andYY.[31]

8   Exhibits TT and UU reflect that based upon information from a confidential informant of

9   illegal drug possession and sales, Detectives Applegate and Maxwell, among others,

10  executed a search warrant at Tabola's house on March 19, 1985.  They discovered "large

11  quantities" of cocaine and marijuana, packaging materials, scales, grinders, cutting agents,

12  etc. and two handguns, one of which had been stolen.  One handgun was a .25 caliber Raven

13  automatic and the other was a .38 caliber Colt Mark IV automatic.  Tabola and Arthur Halley

14  were arrested at the scene on charges of possession of cocaine for sale.

15  　　　　Exhibits WW, XX, and YY relate that on May 13, 1985, Tabola was arrested in

16  connection with an undercover drug operation, on the basis of his serving as counter-

17  surveillance for the drug sellers.

18  　　　　**State Court Decision** - Petitioner raised his *Brady* claim concerning the Tabola

19  reports in his third PCR Petition (Exhibit R at 23-27).  The state court summarily denied the

20  claim, finding "no likelihood or reasonable probability that had the evidence been disclosed,

21  the result of the trial would have been different."  (Exhibit T, M.E. 7/10/01 at 4.)[32]  Thus the

22  _____

23  　　　[31]  The November 7, 1984 police report (Exhibit SS) reflected that Tabola told police

24  the victim had been at his home on October 12, 1984 at 7:45pm, and called someone who
    owed him $1100, and that the victim intended to get his money back by selling the guy flour.

25  This report largely matched Tabola's trial testimony.

26  　　　[32]  Had the trial court simply employed the language of a "likelihood" of a different
    outcome, the decision would have been contrary to Supreme Court law.  *See Kyles*, 514 U.S.

27  at 434 (noting that a likelihood of a different result is not necessary, but rather a "reasonable
    probability", *i.e.* a sufficient probability that the verdict is not "worthy of confidence").

28  Instead, the trial court's use of the disjunctive ("no likelihood *or* reasonable probability")

1  trial court applied  the standard applicable under *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

2       However, as noted by Petitioner, the trial court considered the materiality of this

3  evidence individually, and not cumulatively with the other withheld information, *i.e.* the

4  Brown/Howk/Cobey Report.  (*See* Petition, Doc. 1 at 5D; Exhibit T, M.E. 7/10/1.)  Thus, the

5  state court's decision was contrary to Supreme Court law mandating consideration of the

6  cumulative effect of all withheld evidence.[33]  *See Kyles*, 514 U.S. at 436-38.  However, the

7  undersigned has concluded that the *Brown/Howk/Cobey* reports were not, of themselves,

8  favorable information, and thus no disclosure was required.  Consequently, the undersigned

9  cannot say that the decision to determine the materiality of the Tabola reports in isolation was

10  improper.

11       That does not resolve, however, whether the Tabola reports were properly deemed

12  immaterial.

13       **Drug Dealing** - Petitioner argues that these reports would have allowed the defense

14  to impeach Tabola based upon his drug dealing.  Petitioner contends that on cross-

15  examination Tabola denied dealing drugs.  (Petition, Doc. 1 at 5C.)  The record reflects that

16  Tabola admitted his drug dealing conviction, but denied that he was involved with dealing

17  with the victim.    On direct examination, Tabola plainly admitted his conviction of

18  possession for sale:

19            Q. [by Mr. Thurston, prosecutor] Now, before you came here
            today, at some time in 1985 and, more particularly in July of 1985,
20            were you convicted and sentenced for the felony offense here in
            Maricopa County of possession narcotic drug for sale?
21            A.  Yes, sir.
            Q.  Has that fact, that you got convicted of a felony, changed
22            your testimony in this case?

23  _____

     indicates a finding that not only was there no "likelihood" there also was not a "reasonable
24  probability."

25       [33]  It is true that the undersigned has concluded that the Brown/Howk/Cobey reports
26  were not, of themselves, favorable and thus not subject to disclosure.  *See infra* at ___.
    However, the state court did not reach that conclusion but instead ignored Petitioner's *Brady*
27  claim and simply addressed the Brown testimony under a state law standard for newly-
    discovered evidence.  *Id.*  As such, the state court had no basis to fail to consider the
28  materiality of the Tabola reports in conjunction with the Brown/Howk/Cobey reports.

1          A.  No, sir.

2  (Exhibit HHH, R.T. 3/19/86 at 112.)  On cross-examination, Tabola testified:

3          Q. [by Mr. Thompson, defense counsel] Mr. Tabola, you were
           convicted of possession of narcotic drug for sale.  Where you involved
4          in any sales with Rob Richards?
              A.  No, sir.
5             Q.  Were you involved in any transactions with him, other than
           his gift to you of cocaine in return for the use of your apartment?
6             A.  No, sir.

7  (Exhibit HHH, R.T. 3/19/86 at 114.) Petitioner does not show any additional impeachment

8  regarding Tabola's drug dealing which would have been suggested by these police reports.

9          To be sure, Petitioner argues that in the related prosecutions "it was discovered that

10  . . . (3) Tabola and Halley were dealing cocaine from that house and owed Rob [the victim]

11  $4095 when he was murdered."  (Petition, Doc. 1 at 5C; Reply, Doc. 55 at 26 ($4,095 and

12  $1,725.)  However, Petitioner proffers nothing from the police reports to establish that that

13  debt.[34]

14  _____

15      [34] Petitioner does argue that the debt was established by the victim's ledger.  At the
    hearing on his fourth PCR proceeding, Petitioner's counsel argued for such an inference:
16          Now, the other thing that happened, and this speaks for itself in
        terms of the effect on potential cross-examination, is that Tabola and
17      Halley not only had a lengthy criminal history but arrests and
        subsequently it was learned Richards' drug ledger reflected debts to
18      Richards by both Tabola and Halley.
19          Now the State correctly says, well, we don't know that.  We just
        know that Rob Richards use initials L.Y. equals Larry prince, for
20      instance.  But we do know that the Supreme Court in its case on Prince
        established as law of the case the formula for interpreting Ron
21      Richards' drug ledger.  And if you follow that formula, indeed L.Y.
        equals Prince and A.R.T. equals Art Halley and you go on from there.
22      That information wasn't known and would have been dynamic
        information to cross-examine these witnesses.
23
24  (Doc. 70, Reply, Exhibit, R.T. 11/22/05 at 10-11.)  Counsel for the state summarized the
    evidence on the issue:
25          Ms. Gieszl [Petitioner's PCR counsel] said that the [Arizona]
        Supreme Court or said that the drug ledger established that A.T. was
26      Arthur Halley; oh, come on.  We don't - - we simply don't know.
27          We argued at trial that L.Y. might mean Larry and some of the
        other things might mean other people.  But we don't know.  And we
28      never will.  The victim is not going to come back to life to tell us what

1    **Relationship with Victim** - Petitioner argues that Tabola falsely claimed he was not

2    friends with the victim.  Tabola testified:

3          Q. [By Mr. Thurston, prosecutor] In reference to the questions
the defense lawyer asked you about Finney Bones [a comedy club];

4    when Rob came over to your house was he ever trying to get you to go
to Finney Bones with him?

5          A. He was.  Anybody that wanted to, yeah, he would have took
me if I wanted to go, sure.

6          Q. What was your problem that night?
      A. Well, one thing, I was sick.  And the other thing, I wouldn't

7    have gone someplace with him.
      Q. You and he didn't hang around together?

8          A. No.  We weren't buddies, pals, or nothing.

9    (Exhibit HHH, R.T. 3/19/86 at 124.)   Nothing in the police reports counters that testimony.

10   Petitioner asserts that Tabola's pre-sentence report indicated Tabola "'shared the apartment

11   with Robert Richards who was a dealer of narcotics' and that 'he let Mr. Richards use the

12   premises in exchange for drugs.'"  (Exhibit R. 3rd PCR Pet. at 24-25.)  Perhaps Petitioner

13   extrapolates from the pre-sentence report writers statement that Tabola and the victim

14   "shared the apartment" that there was some relationship beyond landlord and tenant.

15   However, even that writer apparently clarified that the relationship was one of "use [of] the

16   premises in exchange for drugs." (Exhibit R. 3rd PCR Pet. at 24-25.)  However, Tabola

17   testified to essentially those same facts:

18         Q. [By Mr. Thurston, prosecutor] Any [sic] in reference to your

19   _____

20   he meant by his ledger.
      The drug ledger does not show that Arthur Halley owed the

21   victim anything.  It says in its entirety "A.T. 40.95".  That's all.
      And to assume that A.T. means Arthur Halley and 40.95 means

22   that Arthur Halley owed the victim $4,095 is simply a - - it's a fantasy.
It simply is not evidence enough.  It's not evidence.

23

24   (*Id.* at 25-26.)
      Certainly solid evidence that Tabola was engaged in selling drugs with/through/from

25   the victim would have been usable for impeachment and some indication that Tabola might

26   be the perpetrator.  However, the evidence that Halley owed the victim money was at least
as questionable as the evidence that Petitioner's debts were reflected in the drug debt log.

27   Moreover, the connection of that debt from Halley to Tabola was similarly thin, being little

28   more than their association as drug dealing/using roommates.  Impeachment of Halley was
irrelevant as he was not a witness against Petitioner.

1     residence there, was Rob a roommate or a person staying there with
      you?
2             A.  He was neither.
              Q.  What was he, as far as your residence and you go?
3             A.  He stopped by occasionally to - - to - - he  - - I let him use
      one of my closets to do some business in.
4             Q.  Okay.  In that regard, the business he was doing was storing
      cocaine there?
5             A.  Well, whatever he did, storing it, cutting it up, changing the
      form of it, whatever.
6             Q.  And back at that period of time, in October of '84, did you
      yourself use any cocaine?
7             A.  Pardon me, sir?
              Q.  Did you yourself use any cocaine?
8             A.  Yes, sir.
              Q.  As a matter of fact, would Rob Richards give you anything
9     in return for you letting him store whatever he wanted in a closet there?
              A.  Yes, sir.  That was more or less the deal.  He would give me
10    some for me allowing him to use my premises.
              Q.  He'd give you some cocaine?
11            A.  Yes, sir.

12    (Exhibit HHH, R.T. 3/19/86 at 100-101.)

13            **Favorable Treatment** - Petitioner also argues that these reports would have permitted

14    impeachment based upon Tabola's favorable treatment.  Petitioner argues that Tabola never

15    spent a day in jail as a result of his multiple arrests.  However, Petitioner fails to show how

16    the police reports establish that Tabola was given favorable treatment.

17            At best, the reports reflect that Tabola was arrested based upon the March 19, 1985

18    search of his house, and again based upon the undercover drug operation on May 13, 1985.

19    The subsequent arrest indicates that Tabola was no longer detained as of May 13, 1985 on

20    the earlier arrest.  That by itself, however, establishes no favorable treatment, inasmuch as

21    a defendant's release may be ordered by the court despite an ongoing prosecution.

22            At the pretrial hearing concerning impeachment of Tabola with his drug dealing

23    conviction, the prosecutor related: "I think [Tabola] was out - - he was out on bond, or

24    something and then he was arrested on this case and we were continuing - - continuing the

25    sentencing until after this trial because the outcome might affect what his character is, as far

26    as that sentence."  (Exhibit HHH, R.T. 3/19/86 at 9.)  Moreover, the reports establish neither

27    an express or tacit agreement of favorable treatment in return  for testimony.  "Without an

28    agreement, no evidence was suppressed, and the state's conduct, not disclosing something

- 88 -

1   it did not have, cannot be considered a *Brady* violation." *Todd v. Schomig*, 283 F.3d 842, 849

2   (7th Cir.2002).  Nor does Petitioner suggest that such an agreement existed, let alone that it

3   existed at the time of his trial.  "The government is free to reward witnesses for their

4   cooperation with favorable treatment in pending criminal cases without disclosing to the

5   defendant its intention to do so, provided that it does not promise anything to the witnesses

6   prior to their testimony." *Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir.2003).  The question

7   under consideration, however, is not whether there was an agreement required to be

8   disclosed, but an inference of an agreement and thus bias to be made from evidence that was

9   otherwise subject to disclosure.

10        Moreover, the defense was aware at the time of trial that Tabola had been prosecuted

11   for drug dealing, and had received a sentence of probation.

12            MR. THURSTON [prosecutor]: Your Honor, there is - - there is
          probably only one issue that's really in dispute here.
13                     There is a conviction against witness James Tabola for
          possession of narcotic drug for sale.  It's a 1985 conviction.  He's our
14        witness.  And I think they can impeach him with that.

15   (Exhibit HHH, R.T. 3/19/86 at 3-4.)

16            THE COURT: With respect to Mr. Tabola, the Court finds that
          in regard to his 1985 conviction for possession of a narcotic drug that
17        the probative value of that prior felony conviction outweighs any
          prejudice [sic] value it may have.
18                     That was an Arizona conviction, counsel?
                MR. THURSTON: Yes, Your Honor.  Here in Maricopa County.
19        He's presently on probation.

20   (*Id.* at 10.)

21        Petitioner does not suggest what additional information on favorable treatment would

22   have been discovered had the Tabola reports been provided, nor does Petitioner even suggest

23   that such additional information exists.  For example, Petitioner does not suggest that there

24   was an undisclosed plea agreement conditioned upon Tabola's testimony in Petitioner's case.

25   The defense was aware of the prosecutions, the release on bond, and the plea to probation.

26   Petitioner does not establish any additional information of favorable treatment which should

27   have been disclosed.

28        In *Schad v. Ryan*, the Ninth Circuit found no prejudicial effect from the prosecution's

1   failure to disclose letters written by the prosecution on a prosecution witness's behalf in an

2   unrelated criminal proceeding, where the defense was aware of the prosecution's promises

3   to assist the witness.  606 F.3d 1022 (9th Cir. 2010).  The court found that "the letters

4   provided no independent basis for impeaching' the witness.  *Id.* at 1036.  The court noted

5   they had consistently been " less likely to find the withholding of impeachment material

6   prejudicial in cases in which the undisclosed materials would not have provided the defense

7   with a new and different form of impeachment."  *Id.*

8        Further, Tabola's testimony at trial was consistent with this statements to Detective

9   Butler in 1984.  At that time, the searches of Tabola's house had not been conducted, nor the

10  sting operation conducted.  Accordingly, no favorable treatment on those later occurring

11  offenses could have prompted his initial statements to Butler.

12       **Search Warrant** - Petitioner also argues that armed with this information he would

13  have fared better at suppressing the results of the search warrant obtained on the basis of

14  Tabola's statements about his interaction with the victim on the night of his murder.

15  Petitioner contends that the warrant was based on "false statements attributed to ...James

16  Tabola."  However, Petitioner does not establish how any material statement by Tabola in

17  his interview with Detective Butler (on which the search warrant affidavit was based) was

18  shown by the Tabola police reports to be false.  Moreover, the fact that an informing witness

19  may have lied does not render a search warrant invalid unless the attesting officer knew or

20  acted in reckless disregard,  at the time the warrant was obtained, that the statements were

21  false. *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  "The deliberate falsity or reckless

22  disregard whose impeachment is permitted today is only that of the affiant, not of any non-

23  governmental informant." *Id.*  Petitioner offers nothing to suggest that Detective Butler knew

24  any statement by Tabola on which he based the search warrant application was false.

25

26  **5.  Interviews of Flood**

27       Petitioner contends his *Brady* rights were violated because the prosecution failed to

28  disclose interviews of exculpatory witness Ronald Flood.  Petitioner presented an affidavit

1    from Flood dated August 29, 2003 in his fourth PCR proceeding (Exhibit PP).    In the

2    affidavit, Flood asserted that in September or October 1984 he was with the victim, who was

3    a friend, at a bar. The victim was approached by a "Kevin" and a "Ken" who discussed

4    purchasing cocaine from the victim.  In the summer of 1985, Flood saw the two men at

5    another bar, Chapter 11, where "Ken" was working as a bouncer, and "Kevin" was a patron.

6    Flood shared his observations with some friends of the victim.  Shortly afterward, he was

7    contacted by Detective Butler who showed him pictures which Flood identified as "Kevin"

8    and "Ken."  Butler told him it was a different "Kevin."  Flood was not contacted again.

9    Flood later identified the two men, Kevin Cobey and Ken Hatch, from photographs.

10       Respondents assert that this purported interview by Detective Butler was never made

11   a part of the record in the case, and his name does not appear until Petitioner's Fourth PCR

12   Proceeding. (Respondents' Submission, Doc. 59 at 1-2.)  Accordingly, no documents other

13   than the Flood affidavit have been produced.

14       **State Court Decision** - The last reasoned decision on Petitioner's claim concerning

15   the Flood interview was the trial court's decision in Petitioner's Fourth PCR proceeding.

16   (*See* Exhibit II, order 8/23/07 (Ct. of App. summary decision); and Exhibit KK, Order 1/3/08

17   (Az. Sup. Ct. summary decision).)  There, the trial court found that "the affidavit's story

18   makes no sense" and concluded  "there is no reasonable likelihood Flood's testimony would

19   have made a difference at trial."  (Exhibit GG, M.E. 1/12/6 at 3.)

20       Failure to Determine Materiality Cumulatively - The court separately concluded that

21   the Cobey Pre-Sentence Report was "not *Brady* material because it is not material to

22   Defendant's guilt or punishment."  (*Id.*.)  To the extent that the court failed to consider these

23   items cumulatively, it's decision appears at first blush to be contrary to Supreme Court law.

24   *See  Kyles*, 514 U.S. at 436-38.

25       Respondents attempt to avoid that impropriety by arguing that the state court found

26   the *Brady* evidence was either not favorable, not suppressed, or separately not material, and

27   thus a cumulative analysis was not necessary.  "In other words, zero multiplied by any

28   number yields zero." (Answer, Doc. 16 a 26.)  Respondents' argument would be correct if

1    limited to findings of unfavorability or lack of suppression.  Once a court proceeds to the

2    third criteria, materiality, *Kyles* mandates that it consider all favorable suppressed

3    information cumulatively.

4            Nonetheless, the trial court rejected Petitioner's claim on the Cobey Presentence

5    Report based upon a finding that "it was not in possession or control of the State or any of

6    its agents", *i.e.* not suppressed.  Although the undersigned concludes hereinafter that this

7    determination was wrong under Federal law applicable in the Ninth Circuit, the undersigned

8    also concludes that it was not contrary to or an unreasonable application of established

9    Supreme Court law.  As such, the state court's failure to consider the Cobey report together

10   with the Flood report, was not contrary to nor an unreasonable application of Supreme Court

11   law.[35]

12           <u>Credibility Determination</u> - While it is tempting to treat the state court's conclusion

13   that the story "makes no sense" as a credibility determination entitled to deference and a

14   presumption of correctness, the court did not find Flood incredible, just his story. There was

15   no evidentiary hearing at which the trial court was able to observe Flood and ascertain his

16   credibility.  Thus this determination cannot be a credibility determination based on the state

17   court's observations of the witness.

18           The undersigned does not perceive the basis for the PCR court's determination, and

19   that court offered no explanation.  The most perplexing part of the Flood story is Detective

20   Butler's failure to pursue the matter.  But then, Butler may have simply concluded that Flood

21   had encountered a "different Kevin."  Or, he could have simply concluded that the

22   investigation was permeated with petty drug users and dealers who all moved in the same

23   social circle, and found nothing remarkable in the simple fact that Cobey and Hatch had

24   made a drug purchase from the victim.

25           Perhaps the state court referred not just to Flood's story, but to Petitioner's grander

26   theory that Flood's story would show that Cobey and Hatch killed the victim to avoid paying

27

28   [35]  The converse would not be true of the state court's failure to consider the Flood
      information when considering the materiality of the Cobey report.

1   their drug debts.  While that theory has little support in either Flood's story, or the balance

2   of the evidence from trial, it cannot be said that it causes Flood's story itself to fail to make

3   sense.  Moreover, support of Plaintiff's blame shifting theory is only one use to which

4   Petitioner could put the Flood story, the others being his attacks upon the credibility of the

5   prosecution, and the impeachment of Cobey and Hatch.

6       Thus, the undersigned finds no support in the record for the state court's determination

7   that the Flood story made no sense.  Therefore, to the extent that the state court's statement

8   that Flood's story "makes no sense" amounts to a factual finding, the undersigned finds it to

9   be "an unreasonable determination of the facts in light of the evidence presented in the State

10  court proceeding,"  28 U.S.C. § 2254(d)(2).  *See Carriger v. Stewart*, 132 F.3d 463, 473 (9th

11  Cir.1997) ("We must defer to the state court's credibility finding unless the finding is not

12  fairly supported by the record considered as a whole.").

13      **Suppression** - Respondents do not assert that the Flood affidavit is untrue insofar as

14  it asserts the provision of information to Detective Butler.  Detective Butler testified that he

15  had lost all memory of the investigation.  No notes or records have been produced to refute

16  the assertions.

17      The suppression prong of *Brady* may be met, however, even though a
        "record is not conclusive as to whether the individual prosecutor [or

18      investigator] ... ever actually possessed" the Brady material. The
        proponent of a *Brady* claim-i.e., the defendant-bears the initial burden

19      of producing some evidence to support an inference that the
        government possessed or knew about material favorable to the defense

20      and failed to disclose it.

21  *U.S. v. Price,* 566 F.3d 900, 910 (9th Cir. 2009).  Petitioner has met that burden through the

22  unrebutted Flood affidavit.

23      Thus, the undersigned finds that Flood did interview with Butler and provided him the

24  information about the purported drug dealings between Kevin Cobey, Ken Hatch, and the

25  victim.  (That is not equivalent to a finding that Flood's narrative to Butler was itself true.)

26  Accordingly, it must be assumed that the information was in fact provided to Butler, and thus

27  was in the constructive possession of the prosecution.

28      With that presumption, the undersigned finds it irrelevant that no written record of the

1   Flood/Butler interview has been located.  *See e.g. U.S. v. Frost*, 125 F.3d 346, 381 (6th Cir.

2   1997) (finding *Brady* duty to disclose statements by witness to prosecutor, and remanding

3   for hearing on materiality).   A perverse incentive would apply if the prosecution could avoid

4   disclosure of exculpatory information simply because the officers possessing it failed to

5   memorialize it in writing or otherwise.

6          **Favorability** - Respondents do not dispute that the statements made by Flood to

7   Butler were favorable to Petitioner.  If the Flood statements were known, and Flood called

8   to testify, they would have served to impeach the testimony of both Cobey and Hatch.

9          The essence of Flood's story is that he observed Cobey and Hatch arranging to

10  purchase cocaine from the victim. In contrast, Cobey testified that only Petitioner, not Cobey,

11  bought cocaine from the victim, and that all of the cocaine Cobey used he obtained from

12  Petitioner.  (Exhibit MMM, R.T. 3/24/86 at 51-52.)  Ken Hatch testified that he had only

13  seen Cobey a few times as of October, 1984, and didn't know him real well, but well enough

14  to recognize him walking down the street.  (*Id.* at 87.)  Hatch testified that he had never met

15  the victim, and had never had any cocaine dealings or transactions with the victim.  (Exhibit

16  OOO, R.T. 3/25/86 at 45.)

17         Thus, the evidence would have been favorable.

18         **Import of Testimony** - Central to Petitioner's defense was his assertion that

19  investigating officers had early become fixated upon Petitioner as the culprit, and proceeded

20  to ignore any evidence to the contrary.  Certainly the failure to pursue Flood's story would

21  have supported that theory.

22         The most significant use of the information would have simply been impeachment of

23  Cobey and Hatch, who provided the only direct evidence of Petitioner's guilt, *i.e.* Cobey's

24  direct testimony of the events of the night of the murder, and both witnesses' claims of

25  Petitioner's confession.   A false denial of a relationship with the victim would be a

26  significant detraction to their credibility; somewhere between impeachment on their

27  testimony about the murder/confession and impeachment on a peripheral issue such as the

28  particular time of a marginal event.

No doubt, some portion of that detraction would have flowed from the suspicions created by a false denial which had no apparent motivation.  Cobey and Hatch were not ingenuous citizens who might be expected to deny a relationship with a drug dealer to preserve their reputations.  Each admitted to drug usage, and Cobey to being involved in dealing drugs.  They all moved in a social circle permeated with cocaine users and dealers, and in which the victim himself was a regular participant.  The balance of their testimony would have been no less believable, and their reputations no more sullied,  if they had testified that they regularly bought drugs from the victim.

Similarly, there is some implication from the Flood statements that the relationship between Hatch and Cobey was greater than they admitted (e.g. just passing acquaintances) - enough so that they were attempting a drug purchase together.  Again, the lack of apparent motive for denying their relationship would (if the implication were made) have cast a shadow over their involvement and their motives in testifying.

Certainly there are plausible explanations which could explain away the discrepancies between Flood's story and Hatch and Cobey's testimony: e.g. Hatch was actually the one buying, not Cobey; and/or having never met the victim before or since, Hatch didn't know the person they had purchased from was the victim. However, there is no indication such explanations were available.

**Impeachment of Investigation** - A major line of attack by the defense at trial was an effort to show that the investigating officers had become fixated upon Petitioner and failed to pursue other lines of inquiry.  (*See* Exhibit WWW, R.T. 4/4/86 at 43, 52-54, 61 (defense's closing argument).)  The Flood story would have bolstered that line of attack by showing that the lead investigator failed to followup on evidence that showed that Petitioner was not the only person living at the Swann/Shaw apartments who was involved in drug transactions with the victim.  *See e.g. Kyles v. Whitley,* 514 U.S. 419, 442, n.13 (1995) (finding prejudice where prosecution failed to disclose "Brady evidence on which the defense could have attacked the investigation as shoddy." ); *Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to discredit the caliber of the

1    investigation or the decision to charge the defendant, and we may consider such use in

2    assessing a possible Brady violation"); and *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir.

3    1985) (*Brady* evidence "carried within it the potential ... for the ... discrediting ... of the

4    police methods employed in assembling the case").   However, apart from the fingerprint

5    ballistics testimony, this case was not dependent upon testimony by the investigating officers

6    about the results of their investigations, but rather upon the lay witnesses.  Indeed, Detective

7    Butler conceded that the investigation had been stalled until Hatch revealed Petitioner's

8    confession. (*See* Exhibit PPP, R.T. 3/26/86 at 158.)

9

10   **6. Cobey Pre-Sentence Report**

11       Petitioner argues that the prosecution suppressed the Cobey Pre-Sentence Report,

12   which was favorable for its potential to impeach Cobey based upon his statements to the

13   report writer that he "remained outside" while Petitioner burgled the victim's apartment, in

14   contrast to his trial testimony that Cobey went inside.[36]  From that discrepancy, Petitioner

15   argues a string of inferences, the most significant of which is that Cobey could not have

16   heard the incriminating statements purportedly made by Petitioner while in the apartment.

17   (Petition, Doc. 1 at 5F-5g.)

18       Petitioner also argues that impeachment on the point would have suggested that

19   Cobey, not Petitioner possessed the victim's key, and thus that Cobey was the murderer.

20   These inferences may have been argued by the defense had they been able to impeach

21   Cobey's credibility generally.  But nothing in the Presentence Report explicitly addresses

22   those matters.

23       At trial, Cobey testified that after the murder, he and Petitioner went to the victim's

24   apartment to look for money or cocaine.  Petitioner had the key and they both went inside.

25   Petitioner proceeded to search the apartment and found some jewelry.  (Exhibit LLL, R.T.

26   _____

27       [36]  Petitioner adds an argument that this was particularly significant becaue he had
     been denied an opportunity to present witness testimony that Cobey had acquired the victim's
28   jewelry during the burglary.

1   3/21/86 at 58.)  On cross examination, Cobey clarified his movements:

2               Q When you got to the apartment, what happened?
                A We went to his apartment.
3               Q Did both of you go inside?
                A Yes.
4               Q What did you do inside Rob's apartment?
                A Stood there in the hallway.
5               Q Were the lights on?
                A I can't remember.
6               Q What do you recall happening while you were at the
    apartment?
7               A Going through some stuff, looking for some coke or money.
                Q Did you do that?
8               A Pardon?
                Q Did you do that?
9               A No.
                Q You didn't go through any stuff?
10              A Standing there in the hallway.
                Q You just stayed and waited?
11              A Yes.
                Q Larry went in?
12              A I walked back in the bathroom.  I walked right back out to the
    hallway.
13                                  * * *
                Q When Larry was in the apartment could you hear him going
14  through drawers?
                A Yes.
15              Q And through closets?
                A I don't remember going through the closets.  Drawers.
16              Q Could you hear from where you were?
                A You could see him from the hall.  I was in the hallway.
17                                  * * *
                Q During that time, except for the one point where you walked
18  in the bathroom and turned around and walked back out, you just stayed
    in the hallway and waited?
19              A Yes.

20  (Exhibit MMM, R.T. 3/24/86 at 28-31.)

21          In contrast, the Presentence Report references a written declaration by the defendant,

22  and summaries it as saying that after the murder "he and Mr. Prince went to the Richards

23  residence where he, the defendant, remained outside and Mr. Prince went inside."  (Exhibit

24  RR at 2.)  The report writer summarized the offense as: "The accomplice [Petitioner] entered

25  the apartment and removed a variety of items while the defendant, Mr. Cobey, stood watch

26  outside."  (*Id.* at 1.)

27          **State Court Decision** - The PCR court rejected Petitioner's claim on this report on

28  the basis that: (1) it was "not material to Defendant's guilt or punishment"; and (2) there was

                                    - 97 -

no disclosure obligation because the report was "not in possession or control of the State or any of its agents."  (Exhibit GG, M.E. 1/12/06 at 3.)

Materiality - In so far as the PCR court determined the materiality of this evidence in isolation from the Flood evidence, the court's decision was contrary to Supreme Court law. *See Barker v. Fleming*, 423 F.3d 1085, 1094 (9th Cir. 2005) (state court decision which analyzed materiality of withheld evidence only separately, and did not proceed to the second step of analyzing it cumulatively was "contrary to clearly established Federal law").

Suppression - The PCR Court did not explain why it concluded that the report was not in the prosecution's control.   The Arizona Rules of Criminal Procedure provide for dissemination of presentence reports to the parties prior to sentencing, and with some limitations, to the public after sentencing.  Ariz. R. Crim. P.  26.6(b) and (c).

In applying the state newly discovered evidence standard, the PCR court noted that the Presentence Report did not exist at the time of trial because it was not written until after Defendant's trial and original sentencing had been completed.  (Exhibit GG, M.E. 1/12/06 at 3.)  The Cobey Report is dated May 27, 1986.  (Exhibit RR at 7.)  Petitioner's guilty verdict was rendered on April 4, 1986.  (Exhibit WWW, R.T. 4/4/86 at 128.)  He was initially sentenced on May 15, 1986.  (Pet. Exhibit 1, Sentence 5/15/86.)  He was re-sentenced on August 22, 1989.  (Pet. Exhibit 1, Sentence 8/22/89.)

To the extent that the PCR court determined that *Brady* did not apply because the report was not prepared until after sentencing, the undersigned would conclude that the PCR court's decision would be in violation of  federal law, based upon *Tennison v. City and County of San Francisco*, 570 F.3d 1078, 1094 (9th Cir. 2009) (decided June 23, 2009).  *See also  Leka v. Portuondo,* 257 F.3d 89, 100 (2nd Cir. 2001) ("*Brady* requires disclosure of information that the prosecution acquires during the trial itself, or even afterward.")  *But see U.S. v. Jones*, 399 F.3d 640, 647 (6th Cir. 2005) ("As such evidence did not exist at the time of trial, it was not *Brady* material."); *U.S. v. Maldonado-Rivera*, 489 F.3d 60 (1st Cir.  2007) (evidence unknown to prosecution until after trial not *Brady* material); and 2 Fed. Prac. & Proc. Crim. § 256 (4th ed.) (citing *Jones*); and *Bell v. Bell,* 512 F.3d 223, 234 (6th Cir. 2008)

1   (declining to extend *Brady* to "post-trial witness favorable treatment-something never

2   previously considered by any court to be within *Brady*'s ambit" absent a formal or tacit pre-

3   trial agreement).

4       However, under 28 U.S.C. § 2254(d)(1), habeas relief may not be granted unless a

5   state court decision is contrary to or an unreasonable application of federal law as determined

6   by the Supreme Court.

7       On June 18, 2009, the Supreme Court held that *Brady* did not apply to a request for

8   DNA testing in a post-conviction proceeding, and instead general notions of due process

9   governed whether the state had properly denied the requested testing.  In doing so, the Court

10  approvingly noted the Ninth Circuit's acknowledgment that "nothing in [the Supreme

11  Court's] precedents suggested that [the *Brady*] disclosure obligation continued after the

12  defendant was convicted and the case was closed."  *District Attorney's Office for Third

13  Judicial Dist. v. Osborne,* 129 S.Ct. 2308, 2319 -2320 (2009).[37]  Thus, it must be concluded

14  that the Supreme Court has not yet determined that *Brady* applies to favorable evidence not

15  obtained by the prosecution until after "the case was closed."

16      What is unclear to the undersigned  is whether by the phrase "closed," the Court

17  referred to the verdicts, entry of a judgement of conviction, sentencing, or the conviction

18  becoming final by the conclusion of direct review.  *But see U.S. v. Santos*, 2010 WL

19  2985913, 7 (E.D.N.Y.,2010) (citing *Osborne*, "As an initial matter, the prosecution's Brady

20  obligation to disclose evidence does not extend to information it discovered after

21  *conviction*.")  If the latter, then, Petitioner's case was not "closed" until after expiration of

22  his time of direct appeal on the August 22, 1989 resentencing, and the material would be

---

23      [37]  It seems to the undesigned that there is a distinction to be made between seeking

24  evidence obtained by the prosecution post-conviction/sentencing which is known to be

    favorable, and seeking post-conviction/sentencing access to pre-existing evidence for testing

25  which is hoped to have favorable results, such as that at issue in *Osborne*.  The former affects

    the fairness of the proceeding and the function of the prosecution, the latter only the

26  correctness of the trial's result.  As suggested by the Supreme Court's continuing refusal to

27  decide whether actual innocence is a valid constitutional claim, wrong results are not

    necessarily unfair results, and the Due Process Clause seems only to be concerned with unfair

28  results.

1   subject to *Brady*.  In addressing the duration of the inception of the *Brady* obligation, the

2   Ninth Circuit had simply noted that it was a "novel question...[whether Due Process] extends

3   the government's duty to disclose ... to post-conviction proceedings," although it summarized

4   "the Supreme Court's cases involving *Brady* rights [as involving] only the right to *pre-trial*

5   disclosure."  *Osborne v. District Attorney's Office for Third Judicial Dist.*, 521 F.3d 1118,

6   1128 (9th Cir. 2008) (emphasis in original).[38]  Nonetheless, the authorities uniformly describe

7   *Brady* as a right applicable to trial.  *See e.g. Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir.2006)

8   ("The animating purpose of Brady is to preserve the fairness of criminal trials.").  As

9   recognized in *Osborne*, "[a] criminal defendant proved guilty after a fair trial does not have

10  the same liberty interests as a free man."  *Osborne,* 129 S.Ct. at 2320.  "In the end, any

11  allegation of suppression boils down to an assessment of what the State knows *at trial* in

12  comparison to the knowledge held by the defense."  *Giles v. State of Md.,* 386 U.S. 66, 96

13  (1967) (White, J., concurring, emphasis added.)

14          The undersigned has found no Supreme Court authority extending *Brady* to

15  discoveries between entry of a judgment and finality on direct appeal, and nothing in the

16  language of the Supreme Court's cases which would necessitate such an extension.  Thus,

17  the undersigned must, at a minimum, conclude that the state court's determination that *Brady*

18  did not extend to the report produced after entry of the judgment of conviction was neither

19  contrary to nor an unreasonable application of Supreme Court law.[39]

---

20          [38]  While it might be tempting to latch upon the Ninth Circuit's use of the phrase "pre-

21  trial" to suggest that the obligation to disclose can no longer accrue upon commencement of

    the trial, the Supreme Court has described the duty of disclosure as "ongoing; information

22  that may be deemed immaterial upon original examination may become important as the

23  proceedings progress, and the court would be obligated to release information material to the

    fairness of the trial."  *Pennsylvania v. Ritchie,* 480 U.S. 39, 60 (1987).  *See also U. S. v.*

24  *Agurs*, 427 U.S. 97, 107 (1976) (" in advance of trial, and perhaps during the course of a trial

    as well, the prosecutor must decide what, if anything, he should voluntarily submit to defense

25  counsel"); and *Banks v. Dretke*, 540 U.S. 668 (2004) (applying *Brady* to penalty phase).

26          [39]  If Petitioner asserted that the suppressed evidence were relevant to sentencing, as

27  opposed to conviction, then the vacating of the death sentence and resentencing in 1989

    would be relevant.  Here, Petitioner only asserts that the suppressed evidence is relevant to

28  his guilt, not to his current sentence.

1    Thus, this Court is faced with a state court's rejection of Petitioner's *Brady* claim on

2    one basis which was contrary to federal law (e.g. deciding materiality in isolation) , and on

3    a second basis (existence during trial) which was neither contrary to nor an unreasonable

4    application of established Supreme Court law.  Because the supportable basis (existence) was

5    not dependent upon an antecedent determination on the unsupportable basis (materiality) ,

6    this Court must still grant deference to the supportable basis.  *Cf. Panetta v. Quarter man*,

7    551 U.S. 930, 953-954 (2007) (antecedent, incorrect rejection on one prong of standard

8    impacted fact finding on other prong).

9    Consequently, this Court may not grant Petitioner relief on the basis of the

10    prosecution's failure to disclose the Cobey presentence report.[40]

11

12    **7.  Cobey Declaration**

13    Petitioner also argues that the prosecution wrongly failed to disclose the written

14    statement by Cobey upon which his presentence report was based.

15    Here, the state court wholly failed to address Petitioner's claim with regard to the

16    underlying statement by Cobey.  To the contrary, it's decision was explicitly limited to "the

17    Presentence Report." [41] (Exhibit GG, M.E. 1/12/06 at 3.)  The limited nature of the state

18    court's determination is further indicated by the failure to analyze when the Cobey

19    declaration came into existence.  Accordingly, there is no state court decision on this claim

20    to which this Court may grant deference. *See Cone,* 129 S.Ct. at 1784.

21    **Suppression** - Petitioner suggests that Cobey's written declaration must have been

22    prepared at an earlier date than the Presentence Report, and perhaps before Petitioner's

23    _____

24    [40]  Even if the undersigned concluded that the pre-sentence report had been mad

25    known to the prosecution at such a time that failure to disclose it was "suppression" under
*Brady*, the outcome would be unchanged. The relevant information from the report was the

26    declaration, and the undesigned concludes hereinafter that the suppression of the declaration
itself does not justify relief.

27

28    [41]  In contrast, Petitioner explicitly asserted a claim based upon the state's failure to
disclose "Cobey's 'written declaration' (date unknown)."  (Exhibit FF, PCR Pet. at 19.)

1   conviction.  However, Petitioner bears the initial burden of showing that the evidence was

2   in the prosecution's possession.  *U.S. v. Price,* 566 F.3d 900, 910 (C.A.9 (Or.),2009) ("The

3   proponent of a *Brady* claim-i.e., the defendant-bears the initial burden of producing some

4   evidence to support an inference that the government possessed or knew about material

5   favorable to the defense and failed to disclose it.")  Petitioner's bare speculation does not

6   meet that burden, and the twelve days differential between Petitioner's sentencing and

7   preparation of the report permits no inference that the statement must have been prepared

8   before sentencing, such as might arise if the gap were only a day or two.

9        Moreover, Petitioner makes no suggestion that the presentence report writer would

10  have delivered Cobey's underlying statement, or notice of it, to the prosecution before

11  delivering the presentence report.

12       Nor does Petitioner suggest that the report writer is himself part of the prosecution

13  team, so as to place a burden of disclosure on the prosecutor.  Arizona law directs that

14  presentence reports be prepared by adult probation officers.  *See* Ariz. Rev. Stat. § 12-253(4).

15   Indeed, the report was submitted by "Jack Mead, Deputy Adult Probation Officer."  (Exhibit

16  RR, at 7.)   Adult probation officers are appointed either directly by or with the approval of

17  the presiding judge of the superior court.  Ariz. Rev. Stat. § 12-251(A).  "As we have noted,

18  this is appropriate because [probation] officers are part of the judicial function."  *Broomfield*

19  *v. Maricopa County,* 112 Ariz. 565, 568, 544 P.2d 1080, 1083 (Ariz. 1975).

20       *Brady v. Maryland* involved evidence withheld by the prosecution.
        Here appellant sought discovery of a presentence report prepared by the
21       probation officer for the court's use in sentencing a co-defendant and
        witness for the Government. A probation officer is not subject to the
22       control of the prosecutor; nor are his reports to the court public records.

23  *U.S. v. Walker,* 491 F.2d 236, 238 (9th Cir. 1974).  *See also U.S. v. Chavez-Vernaza,*  844

24  F.2d 1368, 1375 (9th Cir. 1987) ("Presentence reports are prepared by probation officers for

25  the court's use in sentencing; they are not public documents subject to prosecutorial

26  control."); *U.S. v. Rivera Rodriguez,* 617 F.3d 581, 595 (1st Cir. 2010) (no *Brady* violation

27  where no evidence prosecutor had received witness' presentence report prior to or during

28  trial).  *Cf. U.S. v. Strifler,* 851 F.2d 1197, 1202 (9th Cir. 1988) (finding *Brady* obligation on

1    court to release witness' probation file upon request).

2           That is not to say that had the probation officer delivered the Cobey statement to the

3    prosecution it would not have been subject to *Brady*.  In *U.S. v. Trevino*, the Fifth Circuit

4    declined to find a presentence report in another case of a prosecution witness to be in the

5    possession of the prosecution and thus subject to *Brady*.  The court noted:

6           By the same token we do not attempt to contract Brady by insulating
            such presentence reports entirely from discovery if the prosecution does
7           have in its possession (pursuant to [Federal Rules] providing for its
            provision to the prosecution] and the sentencing court's discretion) a
8           witness' presentence report containing exculpatory material. In such
            instances *Brady* might well compel disclosure of relevant portions of
9           the report.

10   556 F.2d 1265, 1271 n.7 (5th Cir. 1977).[42]  Thus, once the Cobey presentence report was

11   delivered to the prosecution, the information about the Cobey statement was in the

12   prosecution's possession, and subject to *Brady*.  That would not have occurred, however,

13   until after Petitioner's conviction.

14          In disposing of Petitioner's claim with regard to the Cobey presentence report, this

15   Court must give deference to the state court's decision rejecting it, as discussed above.

16   However, that decision was explicitly limited to the presentence report, and did not explicitly

17   encompass the underlying witness statement.  If the state court's decision is read to

18   encompass the underlying statement, this Court might have to reject Petitioner's claim on the

19   same basis that the claim with regard to the presentence report is rejected.

20          "Regardless of whether the state courts have purported to resolve a particular claim

21   on the merits, the federal courts are obliged to determine whether that claim in fact was

22   addressed by the state courts."  *Brown v. Smith,* 551 F.3d 424, 437 (6th Cir. 2008). Given the

23   explicit language in the state court's decision, the undersigned concludes that the Petitioner's

24

25

26

_____

27        [42]  That is particularly true under the Arizona rules which, unlike the Federal Rules,
     provide for disclosure of presentence reports to the prosecution and their being made public.
28   *Compare* Ariz. R. Crim. P. 26.6(a) and (e) with Fed. R. Crim. P. 32.

1   claim concerning the Cobey Statement was not addressed.[43]   Thus there is no state court

2   decision addressing "on the merits" the claim based on the Cobey declaration.  The deference

3   demanded by 28 U.S.C. § 2254(d) only applies to claims that were "adjudicated on the merits

4   in State court proceedings."  *Id.*   In the absence of such an adjudication, the federal habeas

5   court reviews a claim *de novo.*  "For claims for which no adjudication on the merits in state

6   court was possible, however, AEDPA's standard of review does not apply."  *Killian v. Poole,*

7   282 F.3d 1204, 1208 (9th Cir. 2002).

8          In that light, this Court is bound by the Ninth Circuit's decision in *Tennison* (decided

9   after *Osborne*), that favorable material is subject to *Brady's* disclosure requirement even

10  though it did not come into the possession of the prosecutorial team prior to sentencing.[44]

11  Thus, without the deference demanded by 28 U.S.C. § 2254(d), the Cobey Statement would

12  have been subject to disclosure under *Brady*, and this Court is  obligated to resolve whether

13  failure to disclose the *Cobey* statement was favorable and whether it  was prejudicial within

14  the meaning of *Brady's* materiality standard.

15        **Favorability** - The Cobey statement was not clearly favorable to Petitioner.  Petitioner

16  argues that it would have permitted impeachment of Cobey on his in-trial statements that he

17  went inside the victim's apartment.  Respondents make no argument to the contrary.

18        However, the Presentence report does not clearly relate that the written statement

19  makes such  claims. The Report states:

20              The defendant, Kevin Cobey, in his written declaration states that he

21  _____

22  [43]   For the reasons discussed hereinafter in evaluating the import of the Cobey
    Statement, had the state court considered the Cobey statement, its result would likely have
23  been the same as that for the Cobey presentence report, the one being a subset of the other.
    Nonetheless, this Court does not speculate on what a state court might have done, but acts
24  on the basis of what it actually decided. *See Franz v. Hazey*, 533 F.3d 724, 735-739 (9th Cir.
    2008) (discussing limitations on use of hypothetical bases for a state court's decisions).
25

26  [44]   Although one might wonder whether the *Tennison* court considered *Osborne*,
    decided just five days before, the decisions are not irreconcilable.  Arguably, *Osborne* was
27  based not upon a claim of failure to disclose known favorable evidence, but upon failure to
    permit discovery of  potentially favorable evidence.   The case law is replete with
28  determinations that *Brady* did not mandate discovery.

was a witness to the murder of Robert Richards by the accomplice, Larry Prince.  He states at the time he did not come forward because he was in fear of his life.  ***He then informed me*** that following that incident, he and Mr. Prince went to the Richards residence where he, the defendant remained outside and Mr. Prince went inside.  The defendant states he received no property as a result of the burglary. The defendant further states he has been extremely cooperative with the prosecution and has fulfilled all of his terms of the plea agreement to this point.

(Exhibit RR, Cobey Presentence Report at 2 (emphasis added).)  The inference is that the information available in the written declaration was limited to the events of the murder, and that the information concerning the robbery was provided by Cobey's oral statements directly to the probation officer.

However, the statement has not been provided to this Court, was not part of the state court record, and is now apparently lost.  (Resp.'s Submission, Doc. 59 at 1-2.)  Because Respondents do not assert the statement was not favorable, the undersigned presumes for purposes of this Report & Recommendation that the report included the revelation that Cobey "remained outside."

**Import** - Even though "favorable," the import of the Cobey statement is limited.  The language of the presentence report simply summarizes the statement as indicating Cobey "remained outside."   In contrast, at trial, Cobey consistently testified that, although he entered the apartment, he remained in the hallway most of the time, and only entered the bathroom momentarily. (*See infra* at 96 (discussion on Cobey Presentence Report, quoting testimony).)  Clearly, Cobey's trial testimony was intended to convey that he made only limited entry into the apartment.  Thus, by itself, a statement that Cobey remained outside would not provide a significant departure from his trial testimony.

Petitioner attempts to expand the import of the statement by asserting that it would have impeached Cobey's testimony that he heard Petitioner while he was in the apartment. (Petition, Doc. 1 at 5G.)  However, the statement did not suggest that Cobey would not have been able to hear from outside.  For example, Cobey did not indicate that the apartment door was closed, or that he had not gone to the apartment at all.

Moreover, the real import of the related trial testimony was that Petitioner had burgled

the victim's apartment and had taken some jewelry in the process.  Cobey's testimony in that

regard was not dependent upon Cobey's presence inside the apartment:

> Q  When you left the apartment was Larry carrying anything he didn't have when you came in?
> A  Yes.
> Q  What was that?
> A  Some jewelry.
> Q  Describe that jewelry.
> A  I think it was a bracelet, a gold bracelet or something.
> Q  Did you see it or did Larry just tell you about it?
> A  I saw it.
> ***
> Q  What did Larry do with the bracelet?
> A  Put it in his pocket.
> Q  You saw him do that?
> A  That's where he pulled it out to show me.

(Exhibit MMM, R.T. 3/24/86 at 31-31.)

On the other hand, impeachment of Cobey on the burglary would have had some

significance.  There was little other direct evidence to connect Petitioner to the burglary.

Hatch testified that the burglary had been committed by Petitioner and Cobey, but that

testimony was based upon Cobey's statements to Hatch.  (Exhibit NNN, R.T. 3/24/86 at 97-

98.)  On redirect, Hatch asserted he could not remember whether Petitioner or Cobey had

told him about the burglary.  (Exhibit OOO, R.T. 3/25/86 at 58.)

The indirect evidence centered on the victim's keys and the remnant's of his key ring,

found scattered on his kitchen counter, whilst the balance was in his car when his body was

found.  Only if it were accepted that Petitioner was the murderer (or at least in the car with

the victim's body), the inference made that he took the victim's keys (as opposed to some

third party, such as a passerby), would there be any other evidence apart from Cobey of

Petitioner's entry into the victim's apartment.  But that chain of inference pre-presumes the

key fact at issue: Petitioner's guilt of the victim's homicide.

While the prosecution presumably pressed the issue of the uncharged burglary in part

to establish a motive for the murder, as noted by the Arizona Supreme Court, "the trial judge

rejected it" as an aggravating circumstance because he "did not find the existence of

pecuniary gain on the basis of jewelry or money."  *State v. Prince,* 160 Ariz. 268, 275, 772

1  P.2d 1121, 1128 (Ariz.1989).  Indeed, the evidence as whole suggests that the robbery  was

2  more of a crime of opportunity created by the murder, than a motivation for it.

3          On the other hand, the burglary served to tie Petitioner to the murder.  At a minimum,

4  Petitioner's presence at the crime scene was indicated by his possession of the victim's key,

5  and brazen burglary of his apartment.

6          In sum, the Cobey statement would have been useful almost exclusively to impeach

7  Cobey's credibility.

8          **Delayed Disclosure** - This is not the classic case where the prosecution possessed

9  favorable information at trial, and suppressed it as trial proceeded to a verdict and judgment.

10  Rather, here the prosecution did not possess the information on the Cobey Statement until

11  receiving the Cobey Presentence Report, twelve days after sentencing.   According to

12  Petitioner, that information was not "disclosed" until 2001 when it was inadvertently

13  unsealed and delivered to Petitioner by the clerk of the court.  (Petition, Doc. 1 at 5F.)

14          In instances of delayed disclosure, prejudice is not evaluated by asking solely what

15  effect the information would have had on the verdict.  Rather, the court must evaluate what

16  effect the delay in disclosure worked.  *See Tennison*, 570 F.3d 1078, 1093 (evaluating

17  prejudice from post-verdict statement by examining effect on intervening motion for new

18  trial).  *But see Joseph v. Coyle*, 469 F.3d 441, 472 n. 21 (6th Cir. 2006) (the "better approach"

19  is to consider undisclosed and belatedly disclosed items together).

20          Here, the obligation to disclose the Cobey Statement did not accrue until after

21  sentencing, when the Cobey Presentence Report was delivered.  Thus, the relevant delay was

22  from post-sentencing until Petitioner's third PCR petition was pending.  Thus, any prejudice

23  would have occurred only in the course of Petitioner's direct appeal, first, and second, and

24  third PCR proceedings. In evaluating the effect in those proceedings, the undersigned

25  recognizes that Petitioner was ultimately able to bring his claim on the Cobey Statement, and

26  thus looks only to the impact that the inability to bring the *Brady* claim sooner had on the

27  results of those proceedings.  *See U.S. v. Schwartzbaum*, 527 F.2d 249, 255-256 (2d Cir.

28  1975) (no prejudice to motion for new trial, because subsequent motion for new trial

1  permitted).

2      Petitioner's direct appeal focused on the alleged juror misconduct, the propriety of the

3  sentence, the judge's qualifications, various evidentiary objections and trial errors. (Exhibit

4  MM Opening Brief.)  The only relevant determinations in that proceeding were his claims

5  that the verdict was against the weight of the evidence, *see Prince,* 160 Ariz. at 274, 772 P.2d

6  at 1127, and that there was no evidence to support the pecuniary gain aggravating

7  circumstance, *id.* at 275-276, 772 P.2d at 1128-1129.  The latter was not impacted inasmuch

8  as the trial court and the Arizona Supreme Court rejected the burglary as a basis for

9  aggravation.  Thus, the prejudice if any would have affected only the weight of the evidence

10  claim, and only to the extent that the Arizona Supreme Court may have considered the Cobey

11  Statement in making that determination.

12      Petitioner's first PCR proceeding included potentially relevant claims of: (1)

13  prosecutorial misconduct through use of Cobey's perjured testimony as to his drug dealing;

14  (2) newly discovered evidence in the form of Jimmy Pechac's testimony about Cobey selling

15  him gold jewelry, and Debbie Pechac's affidavit that Cobey phoned her and said "that gold

16  could send us away forever" if recovered by the police.  The prosecutorial misconduct claim

17  was deemed waived by failure to raise it at trial.  (Exhibit F, Mem. Dec. 3/5/96 at 6.)  Thus,

18  addition of the Cobey Statement claim would not have impacted that determination.

19      In disposing of the Pechac claim, the PCR court assumed the Pechacs' credibility, but

20  concluded that it "would likely have not altered the verdict at trial since it is not materially

21  inconsistent with the State's evidence against Petitioner." (*Id.* at 11.)  The Arizona Court of

22  Appeals noted that "there was evidence at trial that both Petitioner and Cobey went to

23  Richards' apartment after the murder, found jewelry and took it," and Petitioner had not

24  "offered a persuasive explanation why, if the Pechac' claims were believed by a jury, they

25  would have had a decisive effect on Cobey's credibility and on the outcome of the trial."

26  (*Id.*) The addition of the Cobey statement could have reduced Cobey's credibility on his

27  claim that he had been part of a burglary by Petitioner, and if then coupled with the Pechac

28  story would have lent credence to the implication that it was Cobey alone who had burgled

1   the victim's apartment, and thus that it was Cobey who had killed the victim. Thus there may

2   have been impact on the resolution of the first PCR.

3        Petitioner's second PCR proceeding included: (1) Petitioner's ineffective assistance

4   claim founded upon the failure to impeach Cobey with his drug trial testimony: and (2) a

5   claim of newly discovered evidence in the form of testimony by a Rocky Wheeler that on the

6   day of the murder Hatch had confided to him a plan to rob Petitioner and the victim, that they

7   "cased" the apartment complex, and the next day Hatch tried to sell him weapons matching

8   the murder weapon.

9        As to the ineffective assistance claim, the PCR court rejected the claim on the basis

10  of a lack of prejudice, given that the variances in Cobey's testimony were immaterial,

11  because in both trials he testified that he served as Petitioner's assistant in selling drugs, and

12  the only variance was "whether he admitted to the label of 'cocaine dealer.'" (Exhibit M,

13  M.E. 3/31/98 at 4.)  The court did find a variance in Cobey's testimony that at his drug trial

14  he had not denied cutting cocaine, when he had actually made the denial.  However, in light

15  of his admission of drug dealing, the court found no reasonable likelihood of an affect on the

16  trial.  Assuming the Court would have considered the Cobey statement as part of that

17  determination, there may have been an effect.

18       Petitioner's third PCR proceeding consisted of his: (1)  *Brady* claim based on the

19  Brown/Howk/Cobey report; and (2) his newly discovered evidence claims based upon

20  statements by Aimee Robinson aka Amy Jamison that Cobey and Rango had conspired to

21  kill the victim, and others had conspired to blame it on Petitioner, and testimony of Ronald

22  Clements that he heard Cobey and Hatch confess to the murder.  The trial court disposed of

23  the claims, finding (in part) that the "new" evidence would not likely have altered the

24  outcome of the trial.  Assuming the Court would have considered the Cobey statement as part

25  of that determination, there may have been an effect.   However, as to the

26  Brown/Howk/Cobey report, the state court rejected the claim also on the basis that it was not

27  "newly discovered evidence."  Conversely, the undersigned has concluded that it was not

28  *Brady* evidence.  Consequently, the Brown/Howk/Cobey report need not be considered in

1    determining the prejudice of the Cobey declaration.

2         In sum, the delay in disclosure of the Cobey Statement may have had in impact on the

3    various decisions in the intervening appeal and PCR proceedings, but only to the extent that

4    it would have altered the state courts' findings of the likelihood of a different outcome at

5    trial.  That determination is essentially the same as a normal *Brady* prejudice determination.

6    The distinction would be the need to consider the effect of the Cobey Statement not only with

7    respect to the evidence actually presented at trial, but also in connection with the new

8    evidence asserted in the subsequent proceedings, including: (1) the Jimmy Pechac testimony;

9    (2) the Cobey drug trial evidence; (3) the Rocky Wheeler testimony; (4) the Aimee Robinson

10   statement; and (5) the Ronald Clements testimony.

11

12   **8.  Materiality: Cumulative Effect**

13        The undersigned has concluded that the following information was properly

14   determined to be either not favorable or not suppressed: (a) the Brown/Howk/Cobey reports;

15   and (b) the Cobey Presentence Report.  The undersigned has concluded, at least for purposes

16   of this Report and Recommendation, that the prosecution suppressed the following favorable

17   information: (1) the Tabola police reports, (2) the Flood story, and (3) the Cobey statement.

18   The undersigned has evaluated the import of each of these items, and now must determine by

19   considering them cumulatively whether they were prejudicial, *i.e.* whether there is a

20   reasonable probability that the outcome of the trial would have been different had this

21   evidence been before the jury.

22        As an expedient, and because it does not affect the outcome, the undersigned also

23   considers cumulatively the evidence asserted in Petitioner's PCR proceedings potentially

24   impacted by the failure to disclose the Cobey Statement, *i.e.*: (1) the Jimmy Pechac testimony;

25   (2) the Cobey drug trial evidence; (3) the Rocky Wheeler testimony; (4) the Aimee Robinson

26   statement; and (5) the Ronald Clements testimony.

27        The application of section 2254's deferential review to the cumulative effect of the

28   undisclosed evidence is somewhat troublesome, given the progressive nature of Petitioner's

1    presentation of his *Brady* claims to the state courts.  His claims concerning the Brown and

2    Tabola police reports were presented in his third PCR petition (Exhibit R).   His claims

3    concerning the Flood story and the  Cobey statement were  presented in his fourth PCR

4    petition (Exhibit FF).   It is further complicated by the fact that the state court did not even

5    reach the prejudice of the Cobey statement.

6          Where the habeas court faces a different set of facts than that considered by the state

7    courts, no deference can or need be applied.  *See Brown v. Smith*, 551 F.2d 424, 428429 (6th

8    Cir. 2008). "In making this 'materiality' determination, the third step in any *Brady* analysis,

9    we are unable to accord AEDPA deference on an item-by-item basis to the four items of

10   exculpatory material considered in state court, because we are obliged to assess the materiality

11   of exculpatory evidence 'collectively, not item by item.'" *Monroe v. Angelone,* 323 F.3d 286,

12   298 -299 (4th Cir. 2003).

13         Nonetheless, the undersigned is bound by the credibility determinations of the state

14   courts, at least insofar as they have not been shown to be unreasonable.  In particular, the PCR

15   court found that: (1) the Rocky Wheeler testimony was of limited credibility, being eroded

16   by the 11 year delay in testifying and intervening prison consultations with Petitioner (*see*

17   Exhibit M, M.E. 3/31/98 at 5-6); and (2) the Amy Robinson affidavit and Ronald Clements

18   testimony were not credible.  (*See* Exhibit W, M.E. 7/15/02 at 2-3.)[45]  On the other hand, the

19   undersigned already has rejected as unreasonable the state court's determination that the Flood

20   testimony "makes no sense."

21         With that background, the undersigned concludes that had the suppressed favorable

22   testimony been presented at trial, there is not a reasonable probability that the verdict would

23   have been different.

24         The  evidence  at  trial  was,  apart  from  Tabola, Cobey  and  Hatch's   testimony,

25   circumstantial.  It largely consisted of a drug buyer/seller relationship between Petitioner and

26   the  victim,  evidence  that  Petitioner  owed  the  victim  money,  that  Petitioner  was  at

27

28         [45]  The state courts assumed the credibility of the Jimmy Pechac testimony. (*See*
     Exhibit F, Mem. Dec. 3/5/96 at 11.)

1   Ellinghausen's apartment in the area of the murder the night of the murder, left and was later

2   picked up by Ellinghausen, and that Petitioner had possessed a weapon which could have been

3   the murder weapon.  The only tangible piece of evidence was a fingerprint of Petitioner on

4   the windshield wiper control of the victim's car, which had either been put there during a

5   drive days before and somehow managed to escape destruction from the victim's use and

6   fastidious car cleaning, or was placed there by Petitioner on the possibly rainy night of the

7   murder.

8          Much testimony was introduced  which tended to show Petitioner's presence at the

9   Swann/Shaw apartment at the time of the murder, as opposed to Ellinghausen's apartment and

10  the murder scene.  However, the credibility of these witnesses was largely very low; they

11  reflected a bias in favor of Petitioner, a general lack of consistency internally and between the

12  witnesses as to the events over the days surrounding the murder, and almost uniformly

13  evidenced the witnesses's  own cocaine and alcohol abuse at the time.

14         To that mix was added Tabola's testimony which pointed to a meeting between the

15  victim and Petitioner the night of the murder, and an intent by the victim to rip off Petitioner.

16  Also added was Cobey's eyewitness account of Petitioner conferring with the victim by

17  phone, going to meet him in the parking lot gun in hand, the sound of at least one gunshot, the

18  subsequent pickup of Petitioner, and their joint burglary of the victim's apartment.  Finally,

19  Cobey and Hatch both  testified that Petitioner admitted the murder to them.

20         Cobey's credibility was heartily attacked by the defense based upon his inconsistent

21  statements.  Hatch's credibility was attacked on the basis of his tendency to lie, his bias

22  against Petitioner as a result of a feud over Randee Rector, and direct contradictions of his

23  account of Petitioner's confession in the van on the way to a party.  The prosecution's

24  investigation was attacked based upon it's failure to conduct an adequate investigation of the

25  scene, ballistics evidence, etc. The testimony on the gun was attacked based on competing

26  testimony that Petitioner had returned it to his brother and his brother had sold it prior to the

27  murder.

28         To that mix, Petitioner now seeks to add the Tabola police reports, the Flood story, and

the Cobey Statement.  The **Tabola police reports** do little to rebut the prosecution's story directly.  There is only a marginal inference that Tabola had motive to kill the victim, and a even more marginal inference that he had not been aggressively prosecuted by law enforcement and thus was biased toward the prosecution. The fact that Tabola's story about the victim's plans to cheat Petitioner predated the events of the police reports would diffuse the attacks on his credibility.  Thus, there is no reason to believe this information would have resulted in suppression of the search warrant.

At best, the **Flood story** serves only to impeach Cobey and Hatch on the collateral testimony that they didn't purchase drugs from the victim, and if believed would suggest from their attempts to hide that relationship that there was some guiltiness attached to that relationship.  While it would also serve to attack the credibility of the investigation, this was not a case which turned upon the investigating officers' testimony, but upon the statements of the other witnesses, and the fingerprint evidence.

The **Cobey Statement** affected an even more peripheral issue: Cobey's presence in the apartment during the burglary.  The disparity between the statement and Cobey's trial testimony was hazy (outside vs. waiting in the hallway) and largely inconsequential to the events of the burglary, let alone to the murder.  The statement would have provided little additional traction to efforts discredit Cobey.

If combining only the Tabola police reports, the Flood story and the Cobey Statement, the undersigned finds no reasonable probability that the jury would have elected to reject the testimony of Tabola, Cobey, or Hatch as to Petitioner's involvement in the murder.  The testimony of Ellinghausen as to Petitioner's conduct the night of the murder as well as the fingerprint evidence and other circumstantial evidence still remain the vast weight of the credible evidence.

To evaluate the materiality of the belatedly disclosed Cobey Statement, the undersigned also considers the cumulative impact of  (1) the Jimmy and Debbie Pechac testimony; (2) the Cobey drug trial evidence; and (3) the Rocky Wheeler testimony.  The Aimee Robinson statement; and the Ronald Clements testimony are not considered because

1   this court is bound by the state courts' determination that they were not credible.

2       Jimmy **Pechac** testified that Cobey tried to sell him gold jewelry; his wife avowed that
3   Cobey told her the jewelry "could send us away forever."   The implication Petitioner seeks
4   is that Cobey had obtained the gold from the victim, and that Cobey had killed the victim and
5   was fearful of prosecution.  However, even if credited, this testimony was consistent with the
6   prosecution's story that Cobey had been at least marginally involved in the victim's murder,
7   and actively involved in the burglary.  Further, it was inconsistent with Petitioner's attempts
8   to paint Tabola as the culprit.

9       The **Cobey drug trial testimony** was inconsequential.  At best, it showed that at his
10  drug trial Cobey admitted to helping Petitioner in his drug dealing activities, but denied being
11  a "cocaine dealer" himself, and that he lied at Petitioner's trial when he denied testifying he
12  was not a "cocaine dealer."   Given the obtuseness of admitting being an assistant to a drug
13  dealer in his cocaine dealings and to distributing drugs to ones friends but denying being a
14  "cocaine dealer," it is little wonder that Cobey would take exception with his own statement.
15  It seems unlikely a jury would have been swayed by such impeachment.

16      The **Rocky Wheeler** testimony is a direct attack on the prosecution's story, inasmuch
17  as Wheeler claimed he was a confidant to Hatch's plans to rob his drug dealer the day of the
18  murder, and his attempts to dispose of a weapon the day after.   The absence of any
19  corroboration of this story in the rest of the evidence (apart from corroboration at the PCR
20  hearing that tended to show Wheeler knew Hatch in 1984, and that Hatch had indeed to tried
21  to sell him a pistol), and the limited credibility of this prison produced story, makes it highly
22  incredible.  (*See* Exhibit M, M.E. 3/31/98 at 5-6.)  Moreover, it also contradicted Petitioner's
23  attempts to suggest Tabola as the culprit.

24      In sum, the evidence (admitted and proffered) altogether showed what is often seen in
25  drug related cases: a series of witnesses with vast credibility problems, conflicting stories, and
26  many reasons to lie, including their own potential criminal exposure and the shifting loyalties
27  of people whose primary commitment is to keeping their own party going.

28      Outstanding in that morass is: (1)  the largely unassailed testimony of Ellinghausen,

placing Petitioner at the scene described by Cobey and showing his otherwise unexplained need to be picked up down the road from where the victim was found; and (2) Petitioner's fingerprint in the vehicle.   None of the various stories and discrepancies presented by Petitioner diminish the import or credibility of that evidence.   Those elements of evidence, in turn, bolster the credibility of the testimony from Cobey, Hatch and Tabola.

Accordingly, the undersigned concludes that Petitioner has failed to show a reasonable probability that had the suppressed information been timely disclosed, that the outcome of the proceeding would have been different.

Therefore, Petitioner's *Brady* claims must be denied as without merit.

**8. Summary re *Brady* Claims**

Petitioner raised five separate *Brady* claims: (1) the Brown/Howk/Cobey reports; (2) the Tabola police reports; (3) the Flood interview; (4) the Cobey Presentence Report; and (5) the Cobey declaration. Petitioner has failed to show that (1) the Brown/Howk/Cobey reports were, of themselves, favorable.   Petitioner has failed to show that the state court's decision that the (4) Cobey Presentence Report was not suppressed was contrary to or an unreasonable application of Supreme Court law.  Petitioner has failed to show a reasonable probability that (2) the Tabola police reports, (3) the Flood interview, and (5) the Cobey declaration would have altered the outcome of the proceeding, even when considered together with the other new evidence impacted by the untimely disclosures.   Accordingly, Petitioner's Ground I is without merit and should be denied.

**C.  GROUND III - INEFFECTIVE ASSISTANCE OF COUNSEL**

For his Ground III, Petitioner argues the violation of his right to effective assistance of counsel as a result of trial counsel's failure to adequately challenge inconsistent testimony by Cobey by producing Cobey's testimony from Petitioner's drug trial. (Petition, Doc. 1 at 7, *et seq.*)  The state court found deficient performance, but rejected this claim based upon Petitioner's failure to establish prejudice. Petitioner argues that determination was erroneous.

1    Respondents argue that the state court's determination must be sustained under the deferential
2    review of 28 U.S.C. § 2254.

3         **Standard for Ineffective Assistance Claims** - Generally, claims of ineffective
4    assistance of counsel are analyzed pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).
5    In order to prevail on such a claim, Petitioner must show:  (1) deficient performance -
6    counsel's representation fell below the objective standard for reasonableness; and (2) prejudice
7    - there is a reasonable probability that, but for counsel's unprofessional errors, the result of the
8    proceeding would have been different. *Id*. at 687-88. Although the petitioner must prove both
9    elements, a court may reject his claim upon finding either that counsel's performance was
10   reasonable or that the claimed error was not prejudicial.  *Id*. at 697.

11        The court hearing an ineffective assistance of counsel claim must consider the totality
12   of the evidence with an eye toward the ultimate issue of whether counsel's conduct so
13   undermined the functioning of the adversarial process that the proceeding lacked fundamental
14   fairness.  *Id*. at 686; *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990)(observing that counsel
15   cannot be labeled ineffective for failing to raise issues which have no merit); *Boag v. Raines*,
16   769 F.2d 1341, 1344 (9th Cir.1985) (failing to raise meritless argument on appeal does not
17   constitute ineffective assistance of counsel).

18        **Defective Performance** - The state court found that Petitioner had shown defective
19   performance.

20            Based on his associate's recollection of Cobey's testimony, a reasonable
21            attorney would have ordered the transcript, or portions of it, to be
             prepared. Cobey's credibility was an important factor in the murder trial
22            and if these transcripts offered the potential to impeach Cobey on the
             nature of his relationship with defendant, a reasonable attorney would
             have attempted to obtain them.

23   (Exhibit M, M.E. 3/31/98 at 4.)

24        For the reasons expressed by the state court, the undersigned also finds deficient
25   performance.

26        **Prejudice** - Petitioner asserts, in essence, that because the case hung so heavily upon
27   Cobey and his credibility, and the prosecution's insistence that Petitioner was the lone drug

28

dealer in the group, that prejudice must have flowed from counsel's failure to utilize a transcript of the drug trial to impeach Cobey.

The only issue that Petitioner points out that was impacted by the drug trial transcripts was Cobey's involvement in drug dealing.  At trial, Cobey testified:

> Q  Did you ever help Larry in any way with any of his sales?
> A  Yes.
> Q  How did you do that?
> A  Weigh it up, help him cut it.
> Q  What were you cutting it with?
> A  I don't remember.  Could have been a few different things.
> Q  Did you ever deliver any cocaine for him to people?
> A  Yes.
> Q  Pick up money for it?
> A  Yes.
> Q  How many times would you estimate that you delivered cocaine to someone for Larry?
> A  I don't know.
> Q  You were interviewed in August 1985 by Detective Butler and when you were talking about meeting Rob you said that you weren't sure the exact month you met him and that we just started dealing after that.
>             Do you remember that?
> A  Vaguely.
> Q  Was that a true statement?
> A  That we just started dealing after that?
> Q  Yes.
> A  You might say yeah.
> Q  When you say we, you meant you and Larry?
> A  Uh-huh.
> Q  And you meant that you and Larry started dealing in cocaine after you met Rob?
> A  We had dealt before that.

Exhibit MMM, R.T. 3/24/86 at 53-55.)

> Q  Thank you.  You said that you were involved with Larry in some cocaine dealing.
> A  Correct.
> Q  Is that true?  Did you ever help him cut cocaine?
> A  Yes.
> Q  Did you ever do that over at the Tom Ellinghausen apartment?
> A  Yes.
>             * * *
> Q  You had said something about a first trial.  You testified at a drug trial with Larry Prince or where Larry Prince was the defendant correct?
> A  Correct.
> Q  During that trial didn't you testify that you were never involved in dealing cocaine?
> A  I don't recall saying that, no.

1          Q Didn't you also testify at that trial that you had never been
2   involved in cutting cocaine?
           A  I don't think so.

3   (Exhibit NNN, R.T. 3/24/86 at 4-5.)

4          At Petitioner's drug trial, Cobey had attributed to Petitioner all of the contents of the

5   blue bag of drug using and dealing paraphernalia found at the Shaw/Swan apartment,

6   including the grinder, scales, weights, sifter, inositol, razor blade, straw, etc.  (Exhibit FFF,

7   R.T. 1/7/86 at 103-108.)  As to his own activities, he testified:

8          Q.  Let me show you - - I believe that's it.
                Okay.  Now as far as every one of these items I've shown
9   you, had you used any one of these items before?
           A.  Yeah, I am sure I have used this before.
10          Q.  Okay.  You are pointing to this grinder/sifter unit, Exhibit 1-
    A?
11          A.  Uh-huh.
           Q.  And when would you have used that?
12          A.  The nights of the parties at the house - - at the apartment.
           Q.  Okay.  How many times would you say when you lived in
13  the apartment you would use it?
           A.  Maybe three, four - - three or four times.
14          Q.  The entire time you lived there?
           A.  Yes.
15          Q.  Did you use any one of these other times?
           A.  I am sure I used the razor blade, you know, a few times.
16          Q.  Okay.  Any other items?
           A.  Nope - - no.
17          Q.  Okay.  You would never cut the cocaine with the Inositol or
    weight it out on the scale?
18          A.  No.

19  (*Id.* at 108- 109.)

20          Q.  What about yourself, were you a coke dealer?
           A.  No.
21          Q.  What about Larry Prince, was he a coke dealer?
           A.  Yes.

22
    (*Id.* at 1112.)  On cross examination, Cobey testified:

23
           Q.  So you used the sifter and the grinder?
24          A.  I have used that right there.
           Q.  Which is a sifter and a grinder; right?
25          A.  Okay.
           Q.   Now you testified that during the time you lived in this
26  apartment you were not selling drugs; right?
           A.  Yes.
27          Q.  And yet you used that grinder? Therefore that grinder is not
    used only for people that sell drugs; is that right?
28          A.  Yes.

- 118 -

(*Id.* at 122.)  Cobey eventually admitted that he had said everyone used the grinder.  (*Id.* at 124-126.)  He also admitted to obtaining cocaine for his friends.

> Q.  During the time that you lived in that apartment, Kevin, you sold or obtained coke for your friends; didn't you?
> A.  I would get it for them.
> * * *
> Q.  So, do you remember on how many occasions you obtained coke for your friends?
> A.  No.
> Q.  So it could have been like five times, 10 times?
> A.  Five.
> Q.  In the times that you obtained coke for your friends, you had to purchase it or get it some way; right?
> A.  Yes.
> Q.  Okay.  When you purchased this coke for your friends, you were concerned about whether you were getting the right amount: weren't you?
> A.  Pardon?  Repeat the question.
> Q.  When you purchased coke, in other words you are giving somebody money because you want a certain quantity of cocaine, right?
> A.  Uh-huh, right.
> Q.  You are concerned that you get the right quantity; aren't you?
> A.  Yes.
> Q.  And in a situation like that you would be likely to weight it, wouldn't you?
> A.  No, I never touched that scale.
> Q.  Kevin, would you agree - - that on occasions, when somebody does purchase cocaine, that it would be wise to weigh it to make sure you got the right quantity?
> A.  Yes.
> Q.  Is cocaine expensive?
> A.  Yes.

(*Id.* at 127-128.)  He admitted he may have touched the scales once or twice, and put them away on a shelf.  (*Id.* at 129-130.)  On redirect, Cobey effectively admitted selling cocaine:

> Q.  Do you recall the defense lawyer asking you and you indicating that you, when you provided somebody with cocaine, wouldn't weigh the cocaine that you sold?
> A.  No, I did not weigh it.
> Q.  And what's the reason why you wouldn't weigh it?
> A.  It was not my department.
> Q.  Whose department was that?
> A.  Larry's.

(*Id.* at 138-139.)[46]

---

[46] Petitioner complains that the state court had no basis for its conclusion that the drug trial testimony showed Cobey "aided and abetted" the drug dealing.  (Reply, Doc. 55 at 6.) The fair gist of Cobey's testimony showed his regular participation in distributing the drugs,

1    Thus, equipped with the transcript of the drug trial, counsel could have affirmatively
2 shown Cobey to have lied about denying being a cocaine dealer.  Any impeachment beyond
3 that statement, however, would have been more problematic.  The questioning at the drug trial
4 about specific activities, like weighing cutting and grinding cocaine, were all specifically
5 limited to activities while Cobey was living at the Swann/Shaw apartment.  The purpose of
6 such limitation was obvious: the drug trial was based upon items found at the Swann/Shaw
7 apartment and attributed to Petitioner.[47]

8    In contrast, the consistent testimony at the instant trial was that Cobey had been
9 involved in cocaine dealing before moving to the Swann/Shaw apartment, and in particular
10 was involved with Petitioner in dealing cocaine from Ellinghausen's apartment. (*See* Exhibit
11 VVV, R.T. 4/3/86 at 9-10, 32-33.)

12    Accordingly, as concluded by the PCR court, the only solid impeachment to be gained
13 by use of the transcript would have been on Cobey's assertion that he had not denied being
14 a cocaine dealer.  As noted above, it is not surprising that Cobey would distance himself from
15 that singular denial since it was largely inconsistent with the balance of his testimony at both
16 trials.

17    Moreover, it seems not illogical for a jury to have seen through Cobey's niggling over
18 terminology.  There is no indication that Cobey was actively involved in selling as a
19 profession, as opposed to a user who would let friends buy into his own purchases, or who
20 would help Petitioner in completing his sales. Doubtless many users in that situation would
21 not consider themselves a "dealer" despite their buying and selling, the same way that the
22 casual buyer and seller of used cars would not consider themselves a "car dealer."

23    Under these circumstances, the undersigned cannot find a reasonable likelihood that

24

_____

25 even to the point of distributing (if not selling) them to his friends.

26    [47] Petitioner makes much ado about the prosecution's insistence in the drug trial that
27 Cobey was not a dealer. (Petition, Doc. 1 at 7A; Reply, Doc. 55 at 5.)  That is irrelevant to
the effect to which counsel could have put the transcript of the drug trial in the instant trial.
28 Only Cobey's actual testimony was usable  to impeach Cobey.

1   the outcome of trial would have been different had trial counsel made use of the drug trial

2   transcript to impeach Cobey's trial testimony.

3       Therefore, Petitioner's Ground III is without merit and must be denied.

4

5   **D.  ACTUAL INNOCENCE**

6       The undersigned has concluded that Petitioner failed to exhaust his federal claims in

7   Ground II (Juror Misconduct), is now procedurally barred from doing so, and has failed to

8   show cause and prejudice to excuse his failure. "[I]n an extraordinary case, where a

9   constitutional violation has probably resulted in the conviction of one who is actually

10  innocent, a federal habeas court may grant the writ even in the absence of showing cause for

11  the procedural default." *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (emphasis added).

12  Petitioner asserts he has established his actual innocence.  (Reply, Doc. 55 at 32, *et seq.*)

13      The Supreme Court has instructed that a federal court faced with allegations of actual

14  innocence whether of the sentence or of the crime charged, must first address all non-

15  defaulted claims for comparable relief and other grounds for cause to excuse the procedural

16  default." *Dretke v. Haley,* 541 U.S. 386, 394 (2004).  Because the undersigned concludes

17  herein above that there are no non-defaulted claims of merit, and has already addressed the

18  other grounds to excuse the default, the claims of actual innocence will be addressed in this

19  section.

20      **Applicable Standard** - "In *Schlup* [*v. Delo*], the Court . . .held that prisoners asserting

21  innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it

22  is more likely than not that no reasonable juror would have found petitioner guilty beyond a

23  reasonable doubt.' " *House v. Bell,* 547 U.S. 518, 536-537 (2006) (quoting *Schlup*, 513 U.S.

24  298, 327 (1995).

25      New Reliable Evidence - An actual innocence claim does not permit the habeas court

26  to simply second guess what the jury has already decided.  Rather, a claim of actual innocence

27  "requires 'new reliable evidence-whether it be exculpatory scientific evidence, trustworthy

28  eyewitness accounts, or critical physical evidence-that was not presented at trial.'" *Id.*  In

evaluating that new evidence, the habeas court is to "consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Id.* at 538 (quoting *Schlup*, 513 U.S. at 331-332).

<u>All the Evidence</u> - However, the habeas court's review is not limited to the new evidence. Rather, "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.' " *Id.* at 538 (quoting *Schlup*, at 327-328).

Nor is this Court limited to evidence actually or properly admitted at trial.

> Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the [actual innocence] standard, we believe that Judge Friendly's description of the inquiry is appropriate: The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."

*Schlup*, 513 U.S. at 327-328 (quoting Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 160 (1970)).

<u>Deference</u> - In evaluating the evidence, the habeas court is bound by the presumptions of correctness normally accorded to review of state court factual findings mandated by 28 U.S.C. § 2254(e), including credibility determinations. *Sharpe v. Bell*, 593 F.3d 372, 378-379 (4th Cir. 2010). *But see House*, 547 U.S. at 539 (discussing inapplicability of AEDPA's stricter standards for second or successive claims). However, those presumptions must be applied in light of the issue at hand. "It does not matter to our [actual innocence] analysis whether the witness is actually telling the truth-the purpose of a credibility determination-but rather we care only whether all reasonable jurors would choose to believe the proffered testimony." *Smith v. Baldwin,* 510 F.3d 1127, 1142, n. 11 (9th Cir. 2007).

<u>Any Reasonable Juror's Reasonable Doubt</u> - "Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would

1  do.' The court's function is not to make an independent factual determination about what

2  likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors."

3  *House*, 547 U.S. at 538 (quoting *Schlup*, at 329.)  "A petitioner's burden at the gateway stage

4  is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror

5  would find him guilty beyond a reasonable doubt-or, to remove the double negative, that more

6  likely than not any reasonable juror would have reasonable doubt."  *Id.*

7       **Evidence Considered** - In evaluating Petitioner's claim of actual innocence, this Court

8  must consider not only the evidence presented at trial, but any new evidence proffered by

9  Petitioner.  Accordingly this Court must also consider the *Brady* evidence considered in

10  deciding Ground I, *i.e.*(1) the Tabola police reports, (2) the Flood story, and (3) the Cobey

11  statement. Moreover, although it was not deemed subject to *Brady*, this Court must consider

12  (a) the Brown/Howk/Cobey reports and the testimony of Dave Brown submitted as a result

13  of those reports; and (2) the Cobey Presentence Report.

14       Further, this Court must consider the other "newly discovered evidence" raised by

15  Petitioner in his state proceedings which was impacted by the Cobey Statement, including

16  most significantly:  (1) the Jimmy Pechac testimony; (2) the Cobey drug trial evidence; (3)

17  the Rocky Wheeler testimony; (4) the Amy Robinson affidavit; and (5) the Ronald Clements

18  testimony.  Further, this Court must consider the other newly discovered evidence before the

19  state courts, even if not affected by the Cobey Statement, including, most significantly: (1)

20  the Larry Roskey testimony; and (2) the Hatch Affidavit.

21       **Analysis of Reasonable Doubt** - Certainly the evidence at trial was itself not

22  uncontroverted; a reasonable juror *could* have found a reasonable doubt of Petitioner's guilt

23  simply by discounting the testimony of Cobey, Hatch and Ellinghausen, and finding the

24  fingerprint evidence explained away by Petitioner's admitted presence in the car on an earlier

25  date.

26       The "new" evidence certainly increases the likelihood that a reasonable juror *could*

27  have found a reasonable doubt.  Petitioner's new evidence presents a plausible story that

28  Cobey and Hatch were themselves involved in drug dealings with the victim, conspired to rob

1    him, did so, the victim was killed by Hatch in the process, and they eventually plotted to make

2    Petitioner their scapegoat.  While comprised primarily of testimony tainted by it's "discovery"

3    in prison many years after the events, the testimony (as opposed to those testifying) is not

4    patently incredible, and there is evidence untainted by a prison birth to at least partially

5    corroborate it, *e.g.* the Brown/Howk/Cobey reports, the Hatch affidavit (worked with Wheeler

6    and tried to sell him a gun)[48], the Roskey testimony (worked with Hatch and Wheeler) and the

7    Pechac testimony and affidavits (Cobey sold him jewelry, it was incriminating, and Brown

8    was looking to collect and was sent to Cobey).  Alternatively, the Tabola police reports and

9    related evidence suggest that Tabola and his roommate were in debt to the victim, stood to be

10   beneficiaries of his drug stash,  and thus had at least some  motive to kill the victim, with

11   Tabola then positioned to implicate Petitioner.  All of this evidence, if believed by a jury,

12   could have created a reasonable doubt about Petitioner's guilt.

13          But the standard for the actual innocence gateway is not satisfied by simply showing

14   a likelihood that a reasonable juror ***could*** have reasonable doubt, nor even a likelihood that

15   ***a*** reasonable juror ***would*** have reasonable doubt.  Rather, Petitioner must show that a

16   likelihood that "***any*** reasonable juror ***would*** have reasonable doubt."  *House*, 547 U.S. at 538.

17   Or, conversely, Petitioner must show a likelihood that "no reasonable juror would find him

18   guilty beyond a reasonable doubt."  *Id.*

19          Here, the reasonable juror with all the evidence would still face a need to evaluate the

20   credibility of the witnesses in order to determine whether proof beyond a reasonable doubt

21   was shown.  Here, a juror could, in the face of all Petitioner's new evidence, still reasonably

22   choose to find the testimony of Tabola, Cobey, Hatch, and Ellinghausen sufficiently credible,

---

48   Petitioner argued to the state courts that this Affidavit served to impeach Hatch
because of his claims of having never been to the "Quail Tree Apartments," that Wheeler was
a prison buddy of Petitioner, and that Petitioner had threatened him.  (*See* Exhibit O, PFR at
21-23. *See* Exhibit NNN, R.T. 3/24/86 at 66-67, 98 (discussion between hatch and Coobey
at apartments at "7th Avenue and Missouri".)  Even if this Court were to presume that the
Affidavit provided such impeachment, given the passage of time and the collateral nature of
the inconsistencies, the undersigned would not find the impeachment persuasive.

1  (especially when coupled with the fingerprint evidence),[49] and Petitioner's new evidence

2  sufficiently incredible, so as to be convinced of Petitioner's guilt beyond a reasonable doubt.

3      Consequently, the undersigned concludes that Petitioner has failed to show that this

4  is "an extraordinary case, where a constitutional violation has probably resulted in the

5  conviction of one who is actually innocent." *Carrier*, 477 U.S. at 496.

6      Therefore, Petitioner may not be relieved of his procedural default of his state remedies

7  on the claims in Ground I.

8

9  **D.  SUMMARY RE CLAIMS**

10      Petitioner procedurally defaulted his state remedies on the claims in Ground II (Juror

11  Misconduct), and has failed to show cause and prejudice or actual innocence to avoid the

12  effect of his default.  Accordingly, that ground must be dismissed with prejudice.

13      Petitioner has failed to show a constitutional violation in his *Brady* claims in Ground

14  I, and his ineffective assistance of counsel claims in Ground III.  Accordingly , the balance

15  of Petitioner's Petition must be denied.

16

17                    **IV.  CERTIFICATE OF APPEALABILITY**

18      **Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in

19  habeas cases the "district court must issue or deny a certificate of appealability when it enters

20  a final order adverse to the applicant."  Such certificates are required in cases concerning

21  detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C.

22  § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

23      Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention

24  pursuant to a State court judgment.  The recommendations if accepted will result in

25  ───────────────

26      [49]  There certainly was other evidence which was consistent with the prosecution's

27  story, such as the weapons evidence, the drug debt log, etc..  However, that evidence was
circumstantial, and not particularly persuasive of itself.  For example, many weapons could
have been the murder weapon and many key players had weapons, the prosecution ultimately

28  had to argue that interpreting the drug debt log was highly speculative, etc.

1  Petitioner's Petition being resolved adversely to Petitioner.  Accordingly, a decision on a
2  certificate of appealability is required.

3    **Applicable Standards** - The standard for issuing a certificate of appealability
4  ("COA") is whether the applicant has "made a substantial showing of the denial of a
5  constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the
6  constitutional claims on the merits, the showing required to satisfy § 2253(c) is
7  straightforward: The petitioner must demonstrate that reasonable jurists would find the district
8  court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529
9  U.S. 473, 484 (2000).  "When the district court denies a habeas petition on procedural grounds
10 without reaching the prisoner's underlying constitutional claim, a COA should issue when the
11 prisoner shows, at least, that jurists of reason would find it debatable whether the petition
12 states a valid claim of the denial of a constitutional right and that jurists of reason would find
13 it debatable whether the district court was correct in its procedural ruling." *Id.*

14    **Standard Not Met** - Assuming the recommendations herein are followed in the
15 district court's judgment, that decision will be in part on procedural grounds, and in part on
16 the merits.

17    To the extent that Petitioner's claims are rejected on procedural grounds, under the
18 reasoning set forth herein,  the undersigned finds that "jurists of reason" would not "find it
19 debatable whether the district court was correct in its procedural ruling."

20    To the extent that Petitioner's claims are rejected on the merits, under the reasoning
21 set forth herein,  the constitutional claims are plainly without merit.

22    Accordingly, to the extent that the Court adopts this Report & Recommendation as to
23 the Petition,  a certificate of appealability should be denied.

24

25                **V.  RECOMMENDATION**

26    **IT IS THEREFORE RECOMMENDED** that Ground II (Juror Misconduct) of the
27 Petitioner's Petition for Writ of Habeas Corpus, filed July 14, 2008 (Doc. 1) be **DISMISSED**
28 **WITH PREJUDICE**.

1    **IT IS THEREFORE RECOMMENDED** that remainder of the Petitioner's Petition
2  for Writ of Habeas Corpus, filed July 14, 2008 (Doc. 1) be **DENIED**.

3    **IT IS FURTHER RECOMMENDED** that to the extent the reasoning of this Report
4  & Recommendation is adopted, that a certificate of appealability **BE DENIED**.

5

6    ## VI. EFFECT OF RECOMMENDATION

7    This recommendation is not an order that is immediately appealable to the Ninth
8  Circuit Court of Appeals.  Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules of*
9  *Appellate Procedure*, should not be filed until entry of the district court's judgment.

10    However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall
11 have fourteen (14) days from the date of service of a copy of this recommendation within
12 which to file specific written objections with the Court.  *See also* Rule 8(b), Rules Governing
13 Section 2254 Proceedings.  Thereafter, the parties have fourteen (14) days within which to file
14 a response to the objections.   Failure to timely file objections to any findings or
15 recommendations of the Magistrate Judge will be considered a waiver of a party's right to *de*
16 *novo* consideration of the issues,  *see United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th
17 Cir. 2003)(*en banc*),  and will constitute a waiver of a party's right to appellate review of the
18 findings of fact in an order or judgment entered pursuant to the recommendation of the
19 Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

20

21 DATED: April 11, 2011                                        _____

22                                                                                          JAY R. IRWIN
                                                                            United States Magistrate Judge
23

24

25

26

27

28